Randall K. Rathbun #09765
DEPEW GILLEN RATHBUN & MCINTEER LC
8301 E. 21st Street North, Suite 450
Wichita, KS 67206-2936
Telephone: (316) 262-4000
Fax: (316) 265-3819
Email: Randy@depewgillen.com

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| DONETTA RAYMOND, FREDERICK HESTON, JILUN SHA, RANDY WILLIAMS, WILLIAM SCOTT DENNY, DEBRA HATCHER, BRIAN MARKS, RUSSELL BALLARD, GREGORY BUCCHIN, BRUCE ENSOR, FORREST FARIS, CHERYL RENEE GARDNER, CLARK T. HARBAUGH, CRAIG HOOBLER, BRIAN SCOTT JACKSON, WILLIAM KOCH, FRED LONGAN, DAVID B. MILLER, KENNETH L. POOLE, JR., BAHRAM RAHBAR, RUSSELL SPRAGUE, CRAIG TOLSON, ROBERT TROILO and CURTIS J. VINES, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) Case No. |
| SPIRIT AEROSYSTEMS HOLDINGS, INC. and SPIRIT AEROSYSTEMS, INC., | ) ) ) |
| Defendants. | ) ) ) |

# Complaint

COME NOW the Named Plaintiffs Donetta Raymond, Frederick Heston, Jilun Sha, Randy Williams, William Scott Denny, Debra Hatcher, Brian Marks, Russell Ballard, Gregory Bucchin, Bruce Ensor, Forrest Faris, Cheryl Renee Gardner, Clark T. Harbaugh, Craig Hoobler, Brian Scott Jackson, William Koch, Fred Longan, David B. Miller, Kenneth L. Poole, Jr., Bahram Rahbar, Russell Sprague, Craig Tolson, Robert Troilo and Curtis J. Vines, on behalf of themselves and all others similarly situated, through their attorneys, and for their cause of action against the defendants, allege as follows:

## I.    INTRODUCTION

### A.    Summary of the Case

1.    This is a collective action initiated by twenty-four former Wichita-based aerospace engineers and other salaried, non-management employees, for themselves and others similarly situated, under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 ("ADEA"), against their former employer, aerospace manufacturer Spirit AeroSystems, Inc. (and its owner, Spirit AeroSystems Holdings, Inc., hereafter collectively "Spirit" or the "Company"), challenging their termination from employment on or about July 25, 2013 and Spirit's later exclusion of them from new job openings.  The Named Plaintiffs also assert individual ADEA claims, and some bring claims under the Americans with

2

Disabilities Act, 42 U.S.C. §§ 12101, et seq. ("ADA") and/or the Family and Medical Leave Act, 29 U.S.C. §§ 2601, et seq. ("FMLA").

2.     The Named Plaintiffs are age 40 or above, skilled, experienced, union-represented aerospace workers with solid (or better) work records. They and/or their family members had significant, costly and/or potentially costly medical conditions (and/or a record thereof), while covered by Spirit's employee health insurance. Spirit's senior management believed, based on knowledge of such conditions, that older employees, including the Named Plaintiffs (themselves, their family members or both) posed a high risk of incurring large medical costs that Spirit would be solely responsible for paying, due to the company becoming "self-insured" on July 1, 2013.

3.     The Named Plaintiffs seek relief – for themselves and approximately one hundred and sixty similarly situated older, union-represented, formerly Wichita-based Spirit employees – from Spirit's misconduct arising from its centrally planned and administered group layoffs that targeted and/or disproportionally affected older employees, including them, and also from Spirit's failures and refusals to rehire them. The Named Plaintiffs contend that Spirit acted with the purpose and effect of discriminating against them and others like them based on age and disability to avoid large healthcare claims that the Company believed they would incur.

4.     The Named Plaintiffs contend that they and similarly situated,

union-represented, former Spirit employees age 40 and over (hereafter "Plaintiffs") were harmed by decisions, policies, practices, and plans developed and orchestrated at upper levels of Spirit's management beginning in 2012, culminating on or about July 25, 2013, and continuing to the present in the form of the ongoing failure and refusal to hire Plaintiffs who were terminated in July 2013 and who remain interested in filling open positions at Spirit for which they are qualified.

### B.    Summary of the Facts

5.    By the fall of 2012 or even earlier, Spirit's senior management had for years tracked the age demographics of its workforce together with the cost and incidence of medical conditions experienced by its workers and their family members covered by Spirit's health plan.  During this time Spirit studied how to reduce those costs.  With the aid of health insurance consultants and administrators, senior management carefully examined the cases of covered workers (and family members) whose care expenses qualified them as "high cost claimants," and also categories of claimant medical conditions whose great expense qualified them as "cost drivers."  By this time, Spirit's senior management believed that specific categories of medical conditions, including diabetes, back ailments, heart disease, hypertension and cancers, all of which are disproportionately experienced by persons age 40 and above, were critical health "cost drivers" for the Company.  Spirit was determined to reduce its ranks of older

workers, and what the Company assumed to be their related, unacceptably high health costs.

6.      By the fall of 2012 or even earlier, Spirit was actively planning to fire hundreds of employees at its Wichita plant and other facilities in 2013.  The Company went to great lengths to keep the nature and scope of its plans secret.  Spirit also undertook substantial efforts to punish (and thereby to further discourage) internal dissent regarding these plans.  The Company carried out several waves of terminations (some of them forced resignations or retirements "in lieu of termination" constituting constructive discharges) in early 2013.  These terminations affected older workers with significant, costly and/or potentially costly medical conditions (and/or family members with the same).  They also affected lower-level (mostly "first-level") managers who resisted pressure from senior management to identify subordinates to be given artificially lower performance ratings.  These managers knew that such lower ratings could facilitate their subordinates' termination, and they did not believe their subordinates' performance justified lower ratings or dismissal.

7.      Spirit's plans culminated in a July 25, 2013 "reduction-in-force" ("RIF") in which the Company fired the Named Plaintiffs and more than three hundred other (mostly older) workers.  Spirit gave affected employees – including the Named Plaintiffs and approximately one hundred and sixty other older unionized workers at Spirit's Wichita plant – no warning of the RIF and virtually

5

no information about the reasons for their inclusion in the RIF. The Company has continued to discriminate against Plaintiffs and other similarly situated older workers by failing and refusing to consider those terminated in July 2013 for hundreds of new salaried and other job openings that Spirit has filled since then, and is still filling. Many of these openings involved jobs similar to those held by the Plaintiffs before their termination.

8.    Spirit has claimed that it chose Plaintiffs and others like them for discharge, and has refused to rehire them, on lawful grounds, principally their supposed poor performance.  Yet Plaintiffs had positive, not poor work records, until their most recent performance reviews, which took place in late 2012 and early 2013, after Spirit's planning for its 2013 RIF program was well underway. Spirit assigned many Named Plaintiffs and similarly situated older workers uncharacteristically low performance evaluation (or "PM") scores and "retention ratings"[1] in their most recent reviews before the July 2013 RIF.  Spirit also directed some of them to satisfy a "performance improvement plan" (PIP) based on these atypical ratings.

9.    Spirit has acknowledged that in 2012 and 2013, in the lead-up to the July 2013 RIF, the Company's centrally-administered Human Resources function

---

[1] The collective bargaining agreement for the Society of Professional Engineering Employees in Aerospace ("SPEEA"), of which all Named Plaintiffs are members, defines a "retention rating" as "a comparative rating . . . giving consideration to each employee's competence, diligence and demonstrated usable capabilities based upon the employee's current performance and a review of the employee's previous performance."  2012 SPEEA Collective Bargaining Agreement at 19.

"oversaw" corporate employee evaluation efforts, i.e., both Spirit's "2012 performance management exercise" and its "entire 2013 retention rating process." The result of these efforts was that Spirit downgraded the performance ratings of, and on that basis selected for termination, a much greater proportion of older workers than younger workers from among its union-represented Wichita-based workforce. Spirit has claimed that it simply wanted to end "grade inflation" in employee ratings. Yet this assertion cannot explain the Company's disproportionate pattern of downgrading and terminating older, rather than younger workers.

10.     During the 2012-13 period, Spirit implemented employee performance reviews in a very uneven-handed manner by age. For instance, in early 2013 Spirit assigned lower 2012 PM ratings to older (age 40 or over) Wichita-based, union-represented workers at a disproportionally higher rate. Over half of all such older workers with a high previous PM rating – more than 400 older Spirit employees – received a lower, midrange PM rating in 2013. By contrast, Spirit similarly reduced PM ratings for less than a third of comparable workers under age 40. In addition, Spirit downgraded twice as large a share of older workers with a prior high or midrange rating to one of the lowest PM rating levels. In both cases, these age-related differences are statistically significant and highly unlikely to have occurred by chance.

11.     Then in mid-2013, just before the July 2013 RIF, Spirit once again downgraded a disproportionate share of Wichita-based, union-represented older (age 40 and above) workers by assigning them the lowest possible ("C") retention rating after giving them a higher grade in the Company's prior retention rating exercise, eighteen months before.  While Spirit downgraded more than 160 older workers to a "C" in 2013, it did the same to fewer than 20 employees under age 40.  Spirit achieved this numerical imbalance by downgrading approximately twice the proportion of older workers than comparable younger employees.  The age-related disparities between these results also are statistically significant and unlikely to have occurred by chance.

12.     The July 2013 RIF was unique in that Spirit, for the first and only time, "designated" hundreds of SPEEA-represented employees who received "C" retention rating  (on an A to C scale) –  not just a handful, as in the past – and thereby denied most Plaintiffs and other older longtime employees:  (a) a "bump" up to a "B" (for those not designated, with at least 20 years' tenure), that would have protected them from layoff; and (b) "recall rights" that would have required Spirit to return them to work should a comparable position become available.

13.     Further, Spirit terminated a much higher percentage of "designated," C-retention-rated, low-PM-rated *older* workers than *younger* workers in July 2013.  Spirit selected for the RIF more than three-quarters (75%) of those C-rated and age 40 or above, but less than 60% of those C-rated and under age 40.  Spirit

8

terminated more than 100 − over 50% − of all *older* low-PM-rated employees in 2013, but fewer than 10 and less than 25% − i.e., less than half as great a proportion − of low-PM-rated *younger* employees. These differences in Spirit's treatment of its union-represented workers age 40 and above and below age 40 are also statistically significant.

14.     In September 2013, by contrast, Spirit conducted a RIF without designating, and thus without terminating, large numbers of C-rated employees.

15.     Given these and other anomalies, Plaintiffs submit that Spirit fired them and refused to rehire them (and others similarly situated) despite their solid (or better) performance because of their age, as well as their and/or their family members' health status, and the costs (or anticipated costs) Spirit believed to be associated with their health status, which Spirit supposed to be related to Plaintiffs' older age.  Moreover, Plaintiffs contend that Spirit's reliance on unreasonable non-age factors, and in particular Plaintiffs' and/or their family members' health status, had the same adverse effect on Plaintiffs (and others similarly situated) as intentional age bias.  Some individual Plaintiffs also assert that Spirit subjected them to discrimination in terminations and hiring due to their disabilities (and/or their association with a family member with a disability) and/or their use of federally-protected FMLA leave.

16.     On July 1, 2013, just weeks before the July 25, 2013 RIF, Spirit became "self-insured."  In doing so, the Company assumed full liability for paying

employee medical claims covered by Spirit's health insurance plan.  Many employers avoid such risk by paying health insurers a regular fee to cover each employee's claims, the cost of which cannot be predicted in advance. However, Spirit elected to assume such risks itself.  Moreover, the Company did so without purchasing "reinsurance" (or "stop-loss" insurance), a common risk mitigation strategy for "self-insured" employers designed to shift risk back to an insurance carrier in the form of a duty to pay large employee health insurance claims, usually in excess of a fixed amount.

17.    Spirit had, by virtue of its adoption of this risk-taking approach, as of July 1, 2013, a powerful new incentive to fire workers with significant, costly and/or potentially costly health conditions in order to avoid large health insurance claims for which the company had become solely responsible.  To this day, Spirit continues to have this incentive:  it is still fully liable to its unionized, salaried, Wichita employees for reimbursement of their claims, whatever they may be, on the Spirit employee health insurance plan.

18.    Spirit's senior management carried out the July 2013 terminations under the powerful influence of an assumption that the Company's Wichita-based, union-represented, salaried employees with significant, costly and/or potentially costly health conditions were older, and also a further assumption that such employees posed a serious threat of incurring significant medical expenses for which Spirit would be solely responsible under its self-insured employee

10

health insurance plan.  Based on these same influential assumptions, Spirit's senior management also subsequently refused to rehire these individuals for numerous job openings for which they were qualified.  As a result, Spirit made selections for the July 2013 RIF (and prior terminations in March and May 2013), and later made hiring decisions with the purpose and effect of denying employment opportunities to older employees and job applicants with such health conditions.

19.    After firing hundreds of mostly older salaried employees in March, May and July 2013, Spirit embarked on a self-proclaimed "hiring blitz". Beginning with a "Job Fair" in September 2013, and continuing into 2014, Spirit took on hundreds of new employees for open positions in Wichita. The Company continued to advertise and fill open positions in Wichita, including many salaried positions, during 2014 and 2015, and the first half of 2016.  By the middle of 2014, Spirit had filled approximately 140 salaried, SPEEA-represented positions at its Wichita facility since July 2013.  By the middle of 2015, that number had grown to more than 400 salaried positions.  By the middle of 2015 Spirit had filled more than 600 salaried positions in Wichita since the July 2013 layoffs. While nearly 75% of Spirit's SPEEA-represented Wichita workforce was age 40 and over on July 1, 2013, approximately 60% of those Spirit hired for such jobs in each of the next two years were under age 40.

20.     Many of the Plaintiffs fired in July 2013 applied for open positions advertised during and after the "hiring blitz."  Some Plaintiffs applied to jobs similar (in some cases they appeared to be virtually identical) to those they held at the time of the RIF.  Others sought positions they had filled at the Company before July 2013; still others applied for jobs involving skills matching theirs that they believed they could perform well.

21.     Yet at the September 2013 Job Fair and thereafter, Spirit hired none of the Named Plaintiffs (nor, on information and belief, any others similarly situated) for jobs for which they were qualified.  Rather, on information and belief, Spirit declined to consider and/or caused to be ignored, rejected or screened out, the job applications and/or resumes submitted by the Named Plaintiffs and others similarly situated, even though others competing for the same jobs were younger, less qualified and/or less experienced.  In addition, on information and belief, others competing for the same jobs were not known to have significant, costly and /or potentially costly medical conditions, and/or a record of the same, and/or family members with such conditions.

22.     Some older workers terminated in July 2013 did not later apply for open positions at Spirit, including jobs for which they were well-qualified, because they justifiably believed that doing so would be futile.  These "deterred applicants" relied on reports, including from former Spirit co-workers, of Spirit's discouragement and/or rejection of the applications of older workers terminated

in July 2013.  Examples of such discouragement include Spirit's different, adverse treatment of the applications of July 2013 terminees at the September 2013 Job Fair, and Spirit's consistent rejection of qualified applicants from that group since then.

23.    Still other older workers terminated in July 2013 applied for one or more Spirit jobs for which they were qualified, but later were deterred from applying for other Spirit jobs because their own experiences, and/or those of others similarly situated of which they learned, convinced them of Spirit's determination not to hire them and thus, the futility of applying again.

### C.    Summary of the Claims

24.    This ADEA collective action consists of three related challenges to Spirit's misconduct connected to the July 2013 RIF.  In each, the Named Plaintiffs assert that Spirit's centralized decision-making produced policies, practices, actions and inactions causing injuries to them and similarly situated union-represented workers age 40 and above who may opt-in to this collective action.

25.    <u>First</u>, the Named Plaintiffs assert a <u>termination claim</u> for themselves and other former Wichita-based Spirit salaried workers, age 40 and older, who were represented by SPEEA and who were terminated in July 2013.  Available records show that there are approximately 160 persons other than the Named Plaintiffs in this category of potential "Opt-In Plaintiffs."  The Named Plaintiffs contend that Spirit engaged in two forms of illegal age bias:  intentional

discrimination ("disparate treatment") (Count One); and implementation of age-neutral policies and practices with an unjustified (*i.e.*, not "reasonable") adverse effect on older workers ("disparate impact") (Count Two).

26.    Second, this collective action also addresses the fact that in July 2013, Spirit required the Named Plaintiffs and other potential members of the proposed collective to sign a waiver of claims, including ADEA claims, in order to receive severance benefits.  Nineteen of the Named Plaintiffs signed such a waiver.  These nineteen contend for themselves and others similarly situated that their waiver of ADEA claims was invalid under the Older Worker Benefits Protection Act amendments to the ADEA, 29 U.S.C. § 621, 626(f) (OWBPA), as Spirit failed to comply with the OWBPA's strict information disclosure requirements (Count Three).  As a result, these waivers were not "knowing and voluntary" and do not bar the signers' claims.

27.    Third, this collective action concerns Spirit's failure and refusal to rehire the Named Plaintiffs and others similarly situated who were terminated in the July 2013 RIF.  Since July 25, 2013, 19 of the 24 Named Plaintiffs and at least fifteen other potential Opt-In Plaintiffs have applied for rehire by Spirit, without success, to jobs for which they were qualified.

28.    Moreover, four Named Plaintiffs and, on information and belief, many other potential members of the proposed collective, have been discouraged and deterred from applying for open positions at Spirit for which they were

qualified.  Spirit's discriminatory policies have discouraged and deterred them from applying for any open positions at Spirit, either from July 2013 on, or after they applied unsuccessfully for one or more specific positions since July 2013. They have reached the justifiable conclusion that Spirit has a policy and/or a practice of refusing to rehire employees terminated in July 2013, and that accordingly, applying for rehire would be futile, regardless of their qualifications. The purpose (Count Four) and effect (Count Five) of Spirit's hiring policies and practices is alleged to be because of age violating the ADEA rights of the affected Named Plaintiffs and others similarly situated.

29.    The Named Plaintiffs also state individual claims against Spirit based on its misconduct related to the July 2013 RIF.  Each asserts individual ADEA claims founded on the same grounds asserted in support of their collective action claims in Counts One through Five.  Further, the five Named Plaintiffs who did not sign a waiver of claims (Raymond, Heston, Hatcher, Bucchin and Jackson) challenge their terminations as violating the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq.* (ADA) (Count Six).  Of these five, three (Hatcher, Heston and Jackson) also challenge their terminations as discrimination related to their use of protected leave, in violation of the Family and Medical Leave Act of 1993, as amended, 29 U.S.C. §§ 2601, *et seq.* (FMLA) (Count Seven).

30.    Twenty-three Named Plaintiffs assert individual claims of hiring discrimination by Spirit in violation of the ADA (Count Eight).  Six of the twenty-three also assert individual claims of hiring discrimination related to their use of FMLA leave before their July 2013 discharge (Count Nine).

31.    Plaintiffs seek the following relief:  an order declaring that the waiver of claims in Spirit's severance agreement related to the July 2013 RIF is invalid with regard to ADEA claims because it violates the OWBPA; an order permitting the Named Plaintiffs to proceed with a collective action and to allow others similarly situated to opt-in thereto; an order tolling time limits on the right of others similarly situated to the Named Plaintiffs to file ADEA and ADA like those they have stated herein; a permanent injunction against Spirit's discriminatory policies and practices in carrying out the RIF and in failing and refusing to rehire older workers terminated in the RIF; lost wages and liquidated damages, pursuant to the ADEA, due to (a) the unlawful termination of the Named Plaintiffs and others who may opt-in to this case, as well as (b) Spirit's failure and refusal to rehire the Named Plaintiffs and others terminated in the RIF; lost wages and liquidated damages, attributable to Spirit's retaliatory failure and refusal to rehire Named Plaintiffs with individual FMLA claims; compensatory and punitive damages, pursuant to the ADA, attributable to Spirit's unlawful terminations and failures and refusals to rehire Plaintiffs with individual ADA

claims; and reasonable costs and attorney's fees incurred in this case by the

Named Plaintiffs and others who opt-in to this action.

## II.  JURISDICTION AND VENUE

32.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331

and 1343.  This action is authorized and instituted pursuant to:  the ADEA, 29

U.S.C. §§ 626(c) and 626(b), the latter of which incorporates 29 U.S.C. § 216(b);

Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates Sections

706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §

2000e-5(f)(1) and (3), as well as Section 102 of the Civil Rights Act of 1991, 42

U.S.C. § 1981a; and 29 U.S.C. § 2617(a) of the FMLA.

33.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because

all of the unlawful employment practices alleged herein were committed, and also

had their principal impact, within the jurisdiction of the United States District

Court for the District of Kansas.

## III.  EXHAUSTION OF CLAIMS

34.    All procedural prerequisites for filing this suit have been met.

### A. ADEA Termination & Waiver Claims (Collective Action and Individual Claims)

35.    Each of the Named Plaintiffs timely filed charges of age

discrimination with the Equal Employment Opportunity Commission (EEOC), on

behalf of themselves and all others similarly situated.  The Named Plaintiffs

alleged, inter alia, that Spirit terminated them, and also subsequently failed and refused to consider them for rehire into open positions for which they were qualified, in violation of the ADEA, based on both disparate treatment and disparate impact theories of discrimination. The Named Plaintiffs filed these charges (the "Initial Charges") between March 26, 2014 and May 21, 2014,within 300 days of the July 23, 2013 terminations, and also within 300 days of Spirit's discrimination against them in hiring, including at the September 2013 Job Fair.

36.     The Initial Charges filed by nineteen Named Plaintiffs also timely invoked the OWBPA amendments to the ADEA as the basis for challenging, on behalf of themselves and others similarly situated, the validity of the waiver Spirit required terminated employees to sign in order to receive severance benefits in connection with the July 2013 RIF.

### B.     ADEA Failure to Hire Claims (Collective Action and Individual Claims)

37.     Subsequent to their terminations by Spirit, nineteen Named Plaintiffs applied for available positions with the Company for which they were qualified, but Spirit did not hire them. Sixteen of these individuals timely filed separate charges of discrimination with the EEOC on behalf of themselves and all others similarly situated challenging Spirit's failure and refusal to hire them. The sixteen filed these charges between July 8, 2014 and February 23, 2015, within 300 days of Spirit's hiring discrimination against the Named Plaintiffs, including at the September 2013 Job Fair and numerous subsequent acts of hiring

18

discrimination.  These charges (the "Failure to Hire Charges") alleged, *inter alia*, that Spirit engaged in age discrimination in hiring in violation of the ADEA under both disparate treatment and disparate impact theories.  For purposes of satisfying exhaustion requirements regarding their ADEA failure to hire claims, three of the nineteen Named Plaintiffs who applied for rehire by Spirit (Denny, Ensor and Sprague) rely on the EEOC charges of the other sixteen.

38.     Four other Named Plaintiffs (Sha, Koch, Poole and Tolson) did not apply for rehire into specific open positions.  However, their Initial Charges – as well as the Initial Charges of all other Named Plaintiffs, and all sixteen Failure to Hire Charges – contain allegations stating age discrimination in hiring claims, on behalf of the filers and others similarly situated, in their capacity as applicants deterred from applying for open positions for which they were qualified.  Specifically, these charges contend:  that Spirit engaged in hiring discrimination, beginning at the September 2013 Job Fair and continuing thereafter, by applying a policy and practice of rejecting applications for reemployment to applicants fired in July 2013; that this policy and practice resulted in no jobs for July 2013 terminees equivalent to those they held before their termination; and finally, that the purpose and effect of Spirit's conduct, including its consideration of the medical conditions of the July 2013 terminees (and of their family members), was age discrimination.

39.    Hence, these charges may be relied on by persons similarly situated to the Named Plaintiffs who have applied and been rejected because of Spirit's age-discriminatory hiring policies and practices and by those similarly situated to the Named Plaintiffs who have been deterred by Spirit from applying (or from applying further) because such efforts would be futile.

40.    This Complaint and Jury Demand is being filed more than 60 days after the timely filing of all ADEA charges described above with the EEOC, as required by 29 U.S.C. § 626(d).

### C.    **ADA and FMLA Individual Termination Claims**

41.    The five Named Plaintiffs who did not sign waivers of claims in connection with their termination in July 2013 (Raymond, Heston, Hatcher, Bucchin and Jackson) also assert individual termination claims based on the ADA.  They timely asserted such claims in EEOC charges also containing their ADEA termination claims. Each Named Plaintiff asserting an ADA termination claim contends that they and/or family members covered by Spirit health insurance had and still have one or more disabilities, and/or were regarded by Spirit as having one or more disabilities, and/or had a record of having one or more disabilities, based on which Spirit terminated each of the Named Plaintiffs in July 2013.  Each of these five Named Plaintiffs' ADA charges were pending in the EEOC for more than 180 days, and each received a Notice of Right to Sue

20

from the EEOC which encompassed their ADA claim(s). This Complaint is being filed within 90 days from the issuance and receipt of such Notices.

42.    Three Named Plaintiffs who did not sign waivers when they were terminated in July 2013 (Hatcher, Heston and Jackson) also assert individual retaliatory termination claims based on the FMLA. No administrative exhaustion requirements apply to these claims.

### D.    ADA Individual Failure to Hire Claims

43.    The twenty-three Named Plaintiffs who assert ADEA failure to hire claims also assert individual ADA failure to hire claims.  Sixteen filed Failure to Hire Charges with the EEOC including such individual ADA claims.  Three others who applied for rehire by Spirit (Denny, Ensor and Sprague) rely – for purposes of satisfying exhaustion requirements regarding their ADA failure to hire claims – on the EEOC failure to hire charges of the other sixteen.  The other four (Sha, Koch, Poole and Tolson) are "deterred applicants" protected by the ADA on grounds similar to those supporting their ADEA failure to hire claims, including the "deterred applicant" allegations contained in their EEOC "termination charges."

44.    All the Named Plaintiffs' EEOC charges contain failure to hire and deterred applicant contentions on behalf of all SPEEA-represented older workers with disabilities terminated in the July 2013 RIF.  Thus, these charges all may be relied on by former Spirit employees who have applied and been rejected for

rehire because of their known disabilities, and/or the known disabilities of their family members, and/or their prior protected activity pursuant to the ADA, and/or because of Spirit's discriminatory disability-based hiring policies and practices. Likewise, such charges may be relied on by all former Spirit employees terminated in the July 2013 RIF who have been deterred from applying for rehire by Spirit because doing so would be futile due to Spirit's systematic hiring discrimination against those with disabilities terminated in July 2013. The named plaintiffs reserve the right to move to supplement the Complaint to specify the opt-in plaintiffs who assert such individual claims.

45.   Each Named Plaintiff asserting an ADA failure to hire claim contends that they and/or family members covered by Spirit health insurance had (and in most cases still have) one or more disabilities, and/or were regarded by Spirit as having one or more disabilities, and/or had a record of having one or more disabilities, based on which Spirit failed and refused to rehire them following their July 2013 termination. Twelve Named Plaintiffs (Heston, Sha, Williams, Denny, Hatcher, Ballard, Ensor, Faris, Jackson, Miller, Rahbar and Sprague) alleged to the EEOC and now claim that Spirit subjected them to discrimination in hiring on grounds of disability because of their association with one or more family members on their Spirit health insurance who had a perceived disability, and/or an actual disability, and/or a record thereof.

46.     Each of these sixteen Named Plaintiffs' ADA failure to hire charges were pending in the EEOC for more than 180 days, and on May 31, 2016, the EEOC issued to all sixteen individuals a Notice of Right to Sue related to their charges.  This Complaint and Jury Demand is filed within 90 days of the issuance and receipt of these Notices.

### E.    **FMLA Individual Failure to Hire/Retaliation Claims**

47.     Finally, six Named Plaintiffs assert individual FMLA failure to hire claims, contending  that Spirit failed and refused to rehire them, following their termination by Spirit in July 2013, in retaliation for their having used FMLA leave while employed at Spirit prior to their termination.  No administrative exhaustion requirements apply to these claims.  The named plaintiffs reserve the right to move to amend this Complaint to add timely additional failure to rehire claims by one or more of the opt-in plaintiffs.

## IV.PARTIES

### A.    **Plaintiffs**

48.     Plaintiff Donetta Raymond is a Kansas resident and former Spirit Wichita plant employee.  She was 59 years old when Spirit terminated her employment on or about July 25, 2013, despite a record of solid (or better) job performance, after approximately 25 years of service at Spirit and its predecessor, Boeing.  As of July 1, 2013, Ms. Raymond had Spirit self-insured employee health insurance, under which Spirit was fully responsible for reimbursing health

insurance claims by Ms. Raymond.  She had several significant, costly and/or potentially costly medical conditions (including heart disease, blood clots in her lungs, thyroid disease and reflux) in the period leading up to her termination by Spirit, and also later, including when she applied for several open positions with Spirit for which she was qualified, but was not rehired.  One or more of these conditions, which were known to Spirit, constituted an ADA "disability."[2]

49.     Plaintiff Frederick Heston is a Kansas resident and former Spirit Wichita plant employee.  He was 56 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after over 8 years of service at Spirit and its predecessor, Boeing. As of July 1, 2013, Mr. Heston and his wife both had Spirit self-insured employee health insurance.  Both Mr. Heston and his wife had significant, costly and/or potentially costly medical conditions (including an antibiotic-resistant infection (MRSA) – him; and diabetes and breast cancer – her) leading up to Mr. Heston's termination by Spirit, and also later, including when Mr. Heston applied for several available positions with Spirit for which he was qualified, but was not rehired (including at a Spirit job fair in August 2014).  Mr. Heston also took

---

[2]  The medical conditions of each Named Plaintiff and cited family member satisfy the ADA's three-part definition of "disability," 42 U.S.C. § 12102(1), because, at a minimum, they are ADA "impairments," 29 C.F.R. § 1630.2(h).  The Named Plaintiffs allege, inter alia, that they and their family members all are "regarded as having" an ADA disability as they have "been subjected to an action prohibited [by the ADA] because of an actual or perceived . . . impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A).

FMLA leave in 2013 to care for his own serious medical conditions. One or more of Mr. and Mrs. Heston's conditions, which were known to Spirit, satisfied the requirements of ADA "disabilit[ies]" and also "serious medical condition[s]" under the FMLA.

50.    Plaintiff Jilun Sha was a Kansas resident and a 62-year-old Spirit Wichita plant employee when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance. Mr. Sha now resides in Alabama. In July 2013, Mr. Sha had worked for approximately 13 years at Spirit and its predecessor, Boeing. As of July 1, 2013, Mr. Sha and his wife both had Spirit self-insured employee health insurance. In the period leading up to Mr. Sha's termination by Spirit and thereafter, his wife experienced significant, costly and/or potentially costly medical conditions, including a brain tumor and lung cancer. One or more of these conditions, which were known to Spirit, constituted an ADA "disability." Spirit's discriminatory hiring policies in regard to employees terminated in July 2013 discouraged and deterred Mr. Sha from applying for any open positions with Spirit for which he was qualified following his termination.

51.    Plaintiff Randy Williams is a Kansas resident and former Spirit Wichita plant employee. He was one day shy of his 52nd birthday when Spirit terminated his employment on July 25, 2013, despite a record of solid (or better) job performance, after more than 27 years of service at Spirit and its predecessor,

Boeing.  As of July 1, 2013, Mr. Williams and his wife both had Spirit self-insured employee health insurance.  They had several significant, costly and/or potentially costly medical conditions (including diabetes and high blood pressure – him; and multiple sclerosis – her) in the period leading up to Mr. Williams' termination by Spirit, and also later, including when he applied for numerous open positions with Spirit for which he was qualified, but  was not rehired.  For Mr. Williams and for his wife, one of more of their conditions, which were known to Spirit, satisfied the requirements of an ADA "disability."  After Mr. Williams filed a second EEOC charge, Spirit finally offered him re-employment, but at a lower rate of pay and a lower level of responsibility than he had before his termination.  By that time, Mr. Williams had secured another job with a different employer at a higher rate of pay than what Spirit was offering for an entry-level position.

52.    Plaintiff William Scott Denny is a Kansas resident and former Spirit Wichita plant employee.  He was 53 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after approximately 27 years of service with Spirit and its predecessor, Boeing.  As of July 1, 2013, Mr. Denny and his wife both had Spirit self-insured employee health insurance.  Both Mr. and Mrs. Denny had significant, costly and/or potentially costly medical conditions (including diabetes – him; and lupus and Raynaud's disease – her) in the period leading up to Mr.

26

Denny's termination, and also later, including when Mr. Denny applied for one or more open positions with Spirit for which he was qualified, but was not rehired. One of more of Mr. and Mrs. Denny's conditions, which were known to Spirit, satisfied the requirements of ADA "disabilit[ies]."

53.    Plaintiff Debra Hatcher is a Kansas resident and former Spirit Wichita plant employee.  She was 53 years old when Spirit terminated her employment on or about July 25, 2013, despite a record of solid (or better) job performance, after more than five years at the company.  As of July 1, 2013, Ms. Hatcher and her husband had Spirit self-insured employee health insurance.  Mr. Hatcher had significant, costly and/or potentially costly medical conditions (including non-alcoholic cirrhosis of the liver, causing him to be on a liver and kidney transplant list) in the period leading up to his wife's termination by Spirit, and also later, including when Ms. Hatcher applied for several open positions with Spirit for which she was qualified, but was not rehired.   Ms. Hatcher also took FMLA leave in 2012 to care for one or more of her husband's conditions during her employment with Spirit.  One or more of Mr. Hatcher's conditions, which were known to Spirit, satisfied the requirements of an ADA "disability" and also a "serious medical condition" under the FMLA.

54.    Plaintiff Brian Marks is a Kansas resident and former Spirit Wichita plant employee.  He was 53 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after

more than 30 years of service with Spirit and Boeing.  As of July 1, 2013, Mr. Marks had Spirit self-insured employee health insurance.  He had significant, costly and/or potentially costly medical conditions in the period leading up to his termination by Spirit (including a brain aneurysm resulting in a stroke in August 2012), and also later, including when Mr. Marks applied for several open positions with Spirit, for which he was qualified, but was not rehired.  He also took FMLA leave in 2012 to care for one or more of his medical conditions while at Spirit.  One or more of Mr. Marks' conditions, which were known to Spirit, satisfied the requirements of an ADA "disability" and also a "serious medical condition" under the FMLA.

55.    Plaintiff Russell Ballard is a Kansas resident and former Spirit Wichita plant employee.  He was 49 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after approximately 8 years of service at Spirit and Boeing.  As of July 1, 2013, Mr. Ballard and his wife both had Spirit self-insured employee health insurance.  Mr. and Ms. Ballard both had significant, costly and/or potentially costly medical conditions in the period leading up to Mr. Ballard's termination by Spirit and thereafter (including high blood sugar – him; and gastrointestinal problems requiring two major surgeries, as well as depression and anxiety – her).  One or more of Mr. and Ms. Ballard's conditions, which were known to Spirit, constituted ADA "disabilit[ies]."

28

56.      Plaintiff Gregory Bucchin is a Kansas resident and former Spirit Wichita plant employee.  He was 57 years old on or about July 25, 2013 when Spirit terminated his employment, despite a record of solid (or better) job performance, after more than 5 years of service.  As of July 1, 2013, Mr. Bucchin had Spirit self-insured employee health insurance.  He had several significant, costly and/or potentially costly medical conditions in the period leading up to his termination by Spirit (including hearing loss, partial loss of his right hand, and symptoms of a heart attack), and also later, including when he applied for numerous open positions with Spirit, for which he is qualified, but was not rehired.  One or more of Mr. Bucchin's conditions, which were known to Spirit, constituted an ADA "disability."

57.      Plaintiff Bruce Ensor was a Kansas resident through the spring of 2014.  He was 55 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after over 12 years at Spirit and Boeing.  As of July 1, 2013, Mr. Ensor and his wife had Spirit self-insured employee health insurance, and both also had significant, costly and/or potentially costly medical conditions (including diabetes – him; and chronic neuropathy of the legs and feet – her) in the period leading up to his termination by Spirit. Mr. and Mrs. Ensor still had such conditions later, including in January 2015, when Mr. Ensor learned that Spirit was hiring for his former position.  He applied but was not rehired.  One or more of Mr. and Mrs.

Ensor's conditions, which were known to Spirit, satisfied the requirements of ADA "disabilit[ies]."

58.    Plaintiff Forrest Faris is a Kansas resident and former Spirit Wichita plant employee.  He was 61 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after more than 21 years of service at Spirit and Boeing.  As of July 1, 2013, Mr. Faris and his wife had Spirit self-insured employee health insurance.  They both had significant, costly and/or potentially costly medical conditions (including heart disease – him; and colon dysfunction, requiring two major surgeries – her) in the period leading up to Mr. Faris' termination by Spirit, and also later, including when Mr. Faris applied for several open positions with Spirit for which he was qualified, but was not rehired.  One or more of Mr. and Mrs. Faris' conditions, which were known to Spirit, satisfied the requirements of an ADA "disability."

59.    Plaintiff Cheryl Renee Gardner is a Kansas resident and former Spirit Wichita plant employee.  She was 54 years old when Spirit terminated her employment on or about July 25, 2013, despite a record of solid (or better) job performance, after over 32 years of service with Spirit and Boeing.  As of July 1, 2013, Ms. Gardner had Spirit self-insured employee health insurance.  She had significant, costly and/or potentially costly medical conditions (including liver disease, disc surgery and arthritis, requiring a knee replacement) in the period leading up to her termination by Spirit, and also later, including when Ms.

Gardner applied for an open position with Spirit for which she was qualified, but was not rehired.  One or more of Mrs. Gardner's conditions, which were known to Spirit, constituted an ADA "disability."

60.    Plaintiff Clark T. ("Tim") Harbaugh is a Kansas resident and former Spirit Wichita plant employee.  He was 65 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after over 24 years of service at Spirit and Boeing.  As of July 1, 2013, Mr. Harbaugh had Spirit self-insured employee health insurance. Mr. Harbaugh had significant, costly and/or potentially costly medical conditions (including "pre-skin cancer" and "pre-hypertension") in the period leading up to his termination by Spirit, and also later, including when Mr. Harbaugh applied for a number of open positions with Spirit for which he was qualified, but was not rehired.  One or more of Mr. Harbaugh's conditions, which were known to Spirit, constituted an ADA "disability."

61.    Plaintiff Craig Hoobler is a Kansas resident and former Spirit Wichita plant employee. He was 56 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after more than 34 years of service at Spirit and Boeing.  As of July 1, 2013, Mr. Hoobler had Spirit self-insured employee health insurance. Mr. Hoobler had significant, costly and/or potentially costly medical conditions (including a spinal dislocation, carpal tunnel syndrome and hernia surgery), in

the period leading up to his termination by Spirit, and also later, including when Mr. Hoobler applied for multiple open positions with Spirit, but was not rehired. One or more of Mr. Hoobler's conditions, which were known to Spirit, satisfied the requirements of an ADA "disability."

    62.    Plaintiff Brian Scott Jackson is a Kansas resident and former Spirit Wichita plant employee. He was 50 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after approximately 10 years of service with Spirit and Boeing. As of July 1, 2013, Mr. Jackson and his family had Spirit self-insured employee health insurance. Mr. Jackson and his family, including his daughter, had significant, costly and/or potentially costly medical conditions (including asthma as well as a chronic back ailment and a knee injury, both requiring surgery – him; and "brittle bone disease" and an inability to produce growth hormone – his daughter), in the period leading up to Mr. Jackson's termination by Spirit, and also later, including when Mr. Jackson applied for many open positions with Spirit for which he was qualified, but was not rehired. Mr. Jackson also took FMLA leave in 2012 and annually for several years prior, to care for his own and his daughter's serious medical conditions. One or more of Mr. Jackson's and his daughter's conditions, which were known to Spirit, constituted "disabilit[ies]" under the ADA and "serious medical conditions" under the FMLA. Mr. Jackson

also requested reasonable accommodations under the ADA in the period prior to his termination by Spirit on or about July 25, 2013.

63.     Plaintiff William Koch is a Kansas resident and former Spirit Wichita plant employee. He was 68 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after more than 33 years of service with Spirit and Boeing. As of July 1, 2013, Mr. Koch and his wife had Spirit self-insured employee health insurance.  They both also had significant, costly and/or potentially costly medical conditions (prostate and chronic back issues – him, and scoliosis and related complications, requiring major surgery – her) including in the period leading up to Mr. Koch's termination by Spirit.  Mr. Koch also took FMLA leave during his employment with Spirit to care for one or more of these conditions. One or more of Mr. and Mrs. Koch's conditions, which were known to Spirit, satisfied the requirements of ADA "disabilit[ies]" and "serious medical condition[s]" under the FMLA.  Spirit's discriminatory hiring policies in regard to employees terminated in July 2013 discouraged and deterred Mr. Koch from applying for open positions with Spirit for which he was qualified following his termination.

64.     Plaintiff Fredrick Longan is a Kansas resident and former Spirit Wichita plant employee.   He was 65 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after more than 32 years of service with Spirit and Boeing.  As of

July 1, 2013, Mr. Longan had Spirit self-insured employee health insurance. He had several significant, costly and/or potentially costly medical conditions (including prostate cancer, diabetes and pancreatitis as well as five surgeries) in the period leading up to his termination by Spirit, and also later, including when Mr. Longan applied for multiple open positions with Spirit for which he was qualified, but was not rehired. Mr. Longan also took FMLA leave to care for his conditions while employed by Spirit. One or more of Mr. Longan's conditions, which were known to Spirit, satisfied the requirements of an ADA "disability" and also that of a "serious medical condition" under the FMLA.

65.    Plaintiff David B. Miller is a Kansas resident and former Spirit Wichita plant employee. He was 59 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after more than 25 years with Spirit and Boeing. As of July 1, 2013, Mr. Miller and his wife had Spirit self-insured employee health insurance. Both had significant, costly and/or potentially costly medical conditions (including diabetes and cardiovascular disease – him; and thyroid cancer – her) in the period leading up to Mr. Miller's termination, and also later, including when Mr. Miller applied for multiple open positions with Spirit, for which he was qualified but was not rehired. One or more of Mr. Miller's and his wife's conditions, known to Spirit, constituted ADA "disabilit[ies]."

66.    Plaintiff Kenneth L. Poole, Jr. is a Kansas resident and former Spirit Wichita plant employee.  He was 58 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after more than 15 years of service with Spirit and Boeing.  As of July 1, 2013, Mr. Poole and his family had Spirit self-insured employee health insurance.  Mr. Poole, his wife and his son each had significant, costly and/or potentially costly medical conditions (including thyroid cancer – him; diabetes and a heart murmur – his wife; and asthma requiring hospitalization – his son), including in the period leading up to his termination by Spirit. One or more of the conditions experienced by Mr. Poole, Mrs. Poole and their son, which were known to Spirit, each satisfied the requirements of an ADA "disability."  Spirit's discriminatory hiring policies in regard to employees terminated in July 2013 discouraged and deterred Mr. Poole from applying for open positions with Spirit for which he was qualified following his termination.

67.    Plaintiff Bahram Rahbar is a current Kansas resident and a former Spirit Wichita plant employee.  He resided in Kansas in 2013 at the time of this termination by Spirit.  He was 65 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after more than 33 years of service with Spirit and Boeing.  As of July 1, 2013, Mr. Rahbar and his family had Spirit self-insured employee health insurance.  He and his son had significant, costly and/or potentially costly

medical conditions (including hypertension and a broken back – him; and a torn retina requiring surgery – his son), during the period leading up to Mr. Rahbar's termination by Spirit, and also later, including when Mr. Rahbar applied for open positions with Spirit, but was not rehired. Mr. Rahbar also took FMLA leave to care for one or more of his and/or his son's medical conditions during his employment with Spirit. One or more of Mr. Rahbar's and his son's conditions, which were known to Spirit, constituted ADA "disabilit[ies]" and "serious medical condition[s]" under the FMLA.

68.    Plaintiff Russell Sprague is a Kansas resident and former Spirit Wichita plant employee. He was 54 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after more than 6 years of service with Spirit. As of July 1, 2013, Mr. Sprague and his wife had Spirit self-insured employee health insurance. Both had significant, costly and/or potentially costly medical conditions (including thyroid cancer and hypertension – him; and diabetes – her), in the period leading up to Mr. Sprague's termination by Spirit, and also later, including when Mr. Sprague applied for an open position with Spirit virtually identical to the position he had successfully performed for years. But despite his qualifications, he was not rehired. One or more of Mr. Sprague's and his wife's conditions, which were known to Spirit, satisfied the requirements of ADA "disabilit[ies]."

69.     Plaintiff Craig Tolson is a Kansas resident and former Spirit Wichita plant employee. He was 57 years old when Spirit terminated him on or about July 25, 2013, despite a record of solid (or better) job performance, after more than 35 years at Spirit and Boeing.  As of July 1, 2013, Mr. Tolson had Spirit self-insured employee health insurance.  He had significant, costly and/or potentially costly medical conditions (including diagnosed sleep apnea and suspected heart disease) including in the period leading up to his termination and thereafter.  One or more of Mr. Tolson's conditions, which were known to Spirit, constituted an ADA "disability."  Spirit's discriminatory hiring policies in regard to employees terminated in July 2013 discouraged and deterred Mr. Tolson from applying for open positions with Spirit for which he was qualified following his termination.

70.     Plaintiff Robert Troilo is a Kansas resident and former Spirit Wichita plant employee. He was 58 years old when Spirit terminated his employment on or about July 25, 2013, despite a record of solid (or better) job performance, after approximately 38 years of service at Spirit and its predecessor, Boeing.  As of July 1, 2013, Mr. Troilo had Spirit self-insured employee health insurance.  He had several significant, costly and/or potentially costly medical conditions (including degenerative arthritis, depression, low testosterone requiring hormone replacement therapy, and damaged discs in his neck) in the period leading up to his termination by Spirit, and also later, including when he applied for one or more open positions with Spirit for which he was qualified, but was not rehired.

37

One or more of Mr. Troilo's conditions, which were known to Spirit, satisfied the requirements of an ADA "disability."

71.    Plaintiff Curtis J. Vines is a Kansas resident and former Spirit Wichita plant employee.  He was 56 years old when Spirit terminated him on or about July 25, 2013, despite a record of solid (or better) job performance, after more than 33 years of service with Spirit and Boeing.  As of July 1, 2013, Mr. Vines had Spirit self-insured employee health insurance.  He had significant, costly and/or potentially costly medical conditions (including an obstructed bowel, as well as gout and hypertension) in the period leading up to his termination by Spirit, as well as later, including when Mr. Vines learned of a job opening at Spirit for which he was qualified. However, Spirit did not announce the opening and thus, Mr. Vines was unable to apply.  Mr. Vines understands and believes that Spirit filled the position with another, significantly younger, less experienced, less qualified former Spirit employee, who neither had significant medical conditions, nor had anyone in their family covered by Spirit health insurance with such conditions, nor had a disability, nor was associated with someone with a disability.  One or more of Mr. Vines' conditions, which were known to Spirit, constituted an ADA "disability."

72.    The named Plaintiffs consent to serve as Representative Plaintiffs, on behalf of themselves and others similarly situated, with respect to their ADEA collective action claims challenging their termination by Spirit, Spirit's failure and

38

refusal to rehire them, and if applicable to them, the validity of their waiver of ADEA claims.  29 U.S.C. §§ 216 (b), 626(b).

**B.   Defendants**

73.    Defendant Spirit AeroSystems Holdings, Inc. ("SAHI") is a Delaware corporation licensed to and doing business in the State of Kansas.  At all relevant times, SAHI has employed more than 10,000 employees.  SAHI is an "employer" within the meaning of the ADEA, the ADA, and the FMLA. SAHI can be served with process upon its registered agent, Corporation Service Company, 2900 SW Wanamaker Drive, Suite 204, Topeka, KS 66614.

74.    Defendant Spirit AeroSystems, Inc. ("SAI") is a Delaware corporation licensed to and doing business in the State of Kansas, and is the subsidiary of Defendant SAHI. SAHI holds more than 50% ownership of SAI.  At all relevant times, SAI has employed more than 10,000 employees.  SAI is an "employer" within the meaning of the ADEA, the ADA, and the FMLA. SAI can be served with process upon its registered agent, Corporation Service Company, 2900 SW Wanamaker Drive, Suite 204, Topeka, KS 66614.

**V.   FACTUAL ALLEGATIONS**

**A.   Collective Action Allegations**

75.    The Named Plaintiffs assert three collective action claims via 29 U.S.C. § 626(b):

a.    a <u>Termination Claim</u> on behalf of themselves and other former Wichita-based salaried Spirit employees who were age 40 or older and SPEEA-represented employees on July 25, 2013, the day on or about which Spirit notified them that it was terminating their employment in a group reduction-in-force (RIF), and on or about which Spirit thereby terminated its responsibility to pay their claims under its self-insured employee health insurance plan (i.e., the "Plaintiffs").  Spirit violated the ADEA by:

   i. considering the older age of the Plaintiffs as a factor that made a difference in selecting them for inclusion in the July 2013 RIF, including by assuming a correlation between their age and their significant medical conditions and/or those of one or more family members, which Spirit believed would likely incur high costs that the Company would be solely responsible for paying, due to the company becoming self-insured on July 1, 2013; and/or by

   ii.    considering the significant, costly and/or potentially costly medical conditions of the Plaintiffs and/or of their family members, as well as uncharacteristically low evaluation ratings of the Plaintiffs, based on arbitrary changes in Company evaluation procedures, as non-age

40

factors that made a difference in their inclusion in the RIF, thereby causing the RIF to have a significant adverse disparate impact on Spirit employees age 40 or older within the pool of employees considered for the RIF, without a reasonable basis therefor;

b.    an <u>OWBPA Claim</u> on behalf of those Plaintiffs, including 19 Named Plaintiffs, from whom Spirit secured releases of ADEA (and other) claims, in return for monetary inducement received by such employees and referenced in a severance document signed by such employees on or about July 25, 2013, which releases were not knowing and voluntary, but rather, were accompanied by incomplete, inaccurate, misleading and otherwise defective OWBPA-mandated disclosures;

c.    a <u>Failure and Refusal to Hire Claim</u> on behalf of those Plaintiffs, including 23 Named Plaintiffs, who after their termination by Spirit on or about July 25, 2013, applied to be rehired by Spirit to open positions with the Company for which they were qualified, but whom Spirit failed and refused to rehire, and/or whom Spirit deterred from applying for such positions, due to its policies, practices, actions and inactions violating the ADEA, including:

i. considering the older age of Plaintiffs as a factor that made a difference in Spirit refusing to rehire older workers terminated in July 2013, by assuming a correlation between their age and their significant, costly and/or potentially costly medical conditions and/or those of one or more family members, which Spirit believed would likely incur high costs that the Company would be solely responsible for paying due to the company becoming self-insured on July 1, 2013; and/or

ii. considering the significant, costly and/or potentially costly medical conditions of Plaintiffs and/or their family members, as well as uncharacteristically low evaluation ratings of such Plaintiffs, based on arbitrary changes in Company evaluation procedures, as non-age factors that made a difference in the Company refusing to rehire former employees terminated in July 2013, thereby causing a significant adverse disparate impact on Spirit employees age 40 or above within the pool of employees considered for rehire, without a reasonable basis therefor.

76.    Based on information they have gathered thus far, the Named Plaintiffs submit that numerous individuals were affected by Spirit's misconduct

and thus, are or should be eligible to participate in asserting the collective action claims stated above:  Termination Claim, approximately 180 individuals; OWBPA/Waiver Claim, approximately 160 individuals; Failure and Refusal to Hire Claim, approximately 150 individuals.

77.    A collective action is superior to other available methods for the fair and efficient adjudication of the group claims set forth herein by the Named Plaintiffs.  The collective action mechanism provides for comprehensive and consistent supervision and adjudication of numerous similar claims by a single court. Its use will result in fewer delays and less expense to all parties and to this Court. A collective action also would permit the pooling of resources to afford the Plaintiffs an economically feasible alternative to individual litigation.

78.    Individual prosecution of this litigation – by joinder of all those adversely affected by Spirit's alleged misconduct violating the ADEA – would be impractical, unduly expensive, burdensome, and duplicative.  It would unnecessarily tax the resources of the court, and would deny the Plaintiffs any realistic chance of vindicating their ADEA rights.  The ADEA issues presented in this case are most likely to be efficiently resolved in a single collective action.

**B.    General Factual Allegations**

**Overview: The July 2013 Terminations**

79.    On July 25, 2013, a Spirit press release announced that the Company had notified "approximately 360 employees" in Kansas and Oklahoma that their

employment was terminated, allegedly as part of "workforce reductions." At the same time, Spirit also terminated employees in North Carolina. Most of these cuts affected salaried personnel at Spirit's Wichita facility. There, nearly 300 salaried engineers and other non-management employees with union representation (by SPEEA) lost their jobs. Many of those terminated, especially those age 40 or over, themselves had, and/or had family members who had, significant, costly and/or potentially costly medical conditions.

80.    One by one, Spirit officials called these employees into closed door sessions, abruptly told them they were fired, and in short order escorted them off the premises. Most of those terminated had dedicated many years, even decades, to Spirit and its predecessor, Boeing. Most, including the Named Plaintiffs, had records of solid or better performance, and were shocked by their terminations.

81.    The reasons for their surprise included that since 2006, when Spirit secured ownership of Boeing manufacturing operations in Wichita (and elsewhere), the company had not conducted any major layoffs. Moreover, Spirit's stated need for "workforce reductions" rang hollow in light of a "hiring blitz" that Spirit initiated shortly after July 2013, including openings for jobs for which the descriptions indicated to the Named Plaintiffs and others similarly situated that they were well-qualified. Yet in filling these jobs, Spirit only rehired younger individuals – i.e., those under age 40 – from among those terminated in July 2013.

## Prelude to July 2013:  Related Terminations
## in March and May 2013.

82.    The July 2013 reduction-in-force was not the first time that year that Spirit's Wichita, Kansas workforce saw long-tenured, older employees walked out the door.

83.    In March 2013, Spirit abruptly discharged dozens of Wichita-based workers, including many long-time Spirit and Boeing employees, in a cluster of so-called "for cause" terminations.

84.    Among those Spirit fired were lower level managers who balked at directives from senior-level managers to fabricate performance "issues" for subordinates who they (the lower level managers) believed did not deserve negative evaluations.

85.    In March 2013, Spirit also fired employees at least 40 years old (some much older) who had accumulated lengthy service at Spirit and Boeing, and who also had one or more significant, costly and/or potentially costly medical conditions, and/or spouses or children who had the same.

86.    On information and belief, the alleged bases of the "for cause" terminations of many, if not all of these individuals, were contrived and pretextual.

87.    A few months later, in May 2013, Spirit constructively terminated at least 20 (and possibly many more) employees – also Wichita-based SPEEA

members – through coercive "offers" of resignation or retirement "in lieu of termination."

88.     Like the employees Spirit terminated in March 2013 and later in July 2013, those constructively terminated in May 2013 were overwhelmingly age 40 or older, and many had serious medical conditions themselves, and/or had spouses or children with such conditions.

89.     Spirit centrally planned and administered the March, May and July 2013 terminations, as well as its later decisions not to rehire employees terminated in July 2013. Spirit's senior management established uniform processes, to be implemented in the same way across the organization, for evaluating and rating employees, with ratings to be distributed so as to mirror a predetermined distribution: i.e., so-called "forced ranking." In particular, Spirit executive leadership sought to achieve performance management ratings according to a natural bell curve, so that at least 15% in any work group received the lowest scores. Spirit's executive leadership aimed to have retention ratings with a 70%/20%/10% distribution, with at least 10% in any workgroup receiving the lowest scores.

90.     Spirit's use of "forced ranking" in evaluating employees prior to the July 2013 RIF required lowering the rating of many employees. Moreover, it often required assigning ratings contrary to the views and experience of first-level managers who worked directly with Spirit employees and knew their abilities

best.  It often involved second-level or higher-level supervisors directing or otherwise requiring lower-level managers to impose lower employee ratings than the lower-level managers believed the performance and potential performance of their employees warranted.  On information and belief, Spirit management used such uniform processes to select employees for the 2013 terminations.

91.    On information and belief, Spirit's senior management arranged to conduct the 2013 terminations in waves, rather than all at once, so as to give the appearance of separate termination events, rather than a single reduction-in-force, so that the OWBPA-mandated disclosures did not demonstrate age discrimination as strongly, and instead, obscured both the fact that older workers were targeted and the size o the layoffs' adverse impact on employees age 40 and above. Although Spirit's three 2013 RIFs were part of a single program of reductions, Spirit provided no  OWBPA disclosures to the employees included March and May waves of terminations, nor disclosures regarding the March and May terminations to the July 2013 terminees.

### Spirit Decides to "Self-insure" Its Employee Health Plan

92.    Another explanation for Spirit's 2013 terminations emerged just before the third set of related headcount reductions in late July.  On July 1, 2013, Spirit implemented dramatic alterations to its employee health insurance plan. Unbeknownst to most Spirit employees, including the Named Plaintiffs, for many months prior to July 2013, the Company had been transitioning its employee

47

health insurance from a third party health insurance provider system to a fully

"self-funded" or "self-insured" plan.

93.    A self-insured employee health insurance plan requires an employer

itself to pay employee health insurance claims – including for prescriptions,

medical appointments, hospital charges, surgical bills, etc. – made by its covered

employees and also any family members covered on the employee's plan (to the

extent of each individual's coverage, whether "primary" or "secondary").  By

contrast, employers with "third-party" insurance plans usually pay a fixed

monthly fee for each individual employee's potential health insurance claims –

however high or low they may actually be.

94.    Thus, a self-insured employer has a strong incentive to limit its

exposure to large employee health insurance care claims.  An employer with

third-party health insurance, by comparison, has a much lesser incentive to do so.

95.    In order to mitigate the financial risks posed by self-funded

employee health insurance plans, many self-insured employers take out so-called

"stop-loss" insurance (or "reinsurance").  Such policies typically require an

insurer, not the employer, to cover health insurance claims that exceed a certain

figure in a given year for a covered employee's family overall, or for each covered

individual.  Thus, with "stop-loss insurance," a self-funded employer's risk is less

in regard to employees (or their family members) with conditions requiring

expensive medical treatments and procedures.   Yet Spirit took no such steps to

48

mitigate the risks of going self-insured.  Thus, as of July 1, 2013, Spirit became

fully liable for all expenses incurred by those on its self-insured employee health

plan.

**Spirit's Efforts to Track Employee
Health Claims and Conditions**

96.    By the fall of 2012, Spirit had been closely tracking and analyzing

employee medical and demographic data – including age – for many years.  The

data Spirit monitored included, *inter alia*, employee age, sex, medical

condition(s), and number and cost of all medical claims, including doctor visits,

hospitalizations (inpatient and outpatient) and prescription drug expenses.  Spirit

obtained this data from various sources, including Mercer, its long-standing

health insurance consultant, and Aetna (formerly Coventry Health Care of

Kansas, Inc., and Preferred Health Systems, Inc.), its health plan administrator in

all relevant time periods.

97.    Spirit's health care consultants and administrators regularly

prepared data and analyses for Spirit on the demographics of its workforce,

including by age, and on trends in employee healthcare costs.  This included

identifying specific categories of employee health conditions causing Spirit the

highest healthcare costs (which the analyses called, e.g., health "cost drivers") and

the largest claim amounts in a given year attributable to single individuals (whom

the reports called, e.g., "high-cost claimants").  Spirit and its consultants shared

some of this data and analysis with representatives of SPEEA at quarterly

meetings held pursuant to the union contract.   At these meetings, the parties discussed trends in healthcare costs and possible steps to control such costs. Spirit representatives repeatedly expressed urgent concern about the volume and rate of increase of the Company's expenditures for employee health insurance. Also discussed was the age profile of Spirit workers and links between the share of older age workers and the incidence of higher cost employee medical conditions. These links included conditions Spirit considered principal "cost drivers," such as diabetes, back ailments, hypertension, heart disease and cancers, all of which disproportionately affect persons age 40 and above.

98.    At these meetings, Spirit provided SPEEA employee healthcare data without identifying employee names.  Yet this data focused on the incidence of certain medical conditions among Spirit employees, like diabetes and hypertension, correlated with high future  health claims (so-called "trigger diagnoses"), and also specified the most expensive conditions (the "Top 25 Cost Drivers"), causing the highest dollar volume employee health claims.  Spirit tracked employee claims for these diagnoses and other conditions *to the penny*. And Spirit representatives repeatedly pressed SPEEA for suggestions how to reduce such costs and claims.

99.    Spirit's healthcare consultants and administrators have had access to extensive employee healthcare claims and cost data not shared with SPEEA representatives, including data on costs attributable to specific individual

employees – costs after July 1, 2013 that were Spirit's exclusive responsibility to

pay.  To the extent Spirit has secured access to individualized employee

healthcare cost and/or other data in the hands of its healthcare consultants and

administrators, it was (and is) able to identify specific employees incurring the

largest self-insured employee health insurance claims.

100.    On information and belief, even if Spirit's healthcare consultants and

administrators have not shared individualized health care claims and cost data

with the Company, Spirit's access to healthcare data – especially in the period

leading up to the switch to self-insurance – included considerable information

allowing the Company to identify and target individuals, with what the Company

considered high healthcare costs, by other means.  These means included, for

example:  supervisors being told and otherwise learning of healthcare challenges

experienced by subordinates; and supervisors reviewing requests for employee

medical leave; as well as, on information and belief, consultants/administrators

sharing individualized health employee data as part of the process of Spirit

switching to self-insurance, and employee participation in the Healthy Spirit

employee "wellness" program.

### Spirit Takes Steps Related to Its Self-Funding to Address Employee Health Costs.

101.    By the fall of 2012, Spirit had developed a detailed, month-by-month

plan for the 2013 reduction-in-force.  Spirit identified numerous specific actions

to be taken by a variety of senior and junior personnel to implement coordinated reductions in its facilities in Wichita, Oklahoma and North Carolina.

102.    On information and belief, Spirit developed plans for the 2013 reductions-in-force plans in conjunction with plans for a transition to a self-funded employee health insurance program, and accordingly, coordinated its planning of these projects.

103.    On information and belief, sometime in 2012 (and possibly earlier), as Spirit decided to switch to a self-insured plan for employee health insurance, senior level management began to design steps they anticipated would significantly alter the demographics of their workforce so that it would be younger, based on assumptions that such a workforce would be healthier, give rise to lower health care expenses and cost the company less.  Spirit projected that it could save *millions* of dollars by terminating older workers.

104.    Further, on information and belief, during the same period, and in connection with its work on these projects, Spirit gained access to *additional* and more detailed employee health information, including information allowing employees and their family members to be more easily identified.

105.    Senior management staff and HR employees spent weeks behind closed doors, in secrecy, leading up to the March, May and July 2013 layoffs.  On information and belief, their activities included identifying employees to be included in these reductions-in-force.

52

106.    At some point (and likely at multiple points) in planning the 2013 layoffs, Spirit prepared projections of who would be affected by the proposed layoffs, including "EEO impact analys[e]s" to examine if there would be statistically significant impacts on protected classes of employees, such as those ages 40 and older.  On information and belief, in the course of these analyses, Spirit management and HR learned that its proposed layoffs would result in significant disproportionate, adverse impact on older employees.

### Spirit Adopts New Evaluation Practices to Realize Its Goals for the July 2013 RIF

107.    In designing and carrying out a reduction-in-force at the Wichita plant, Spirit's senior management was constrained by provisions of its Collective Bargaining Agreement ("CBA") with SPEEA governing a reduction-in-force and employee "retention" rating exercises.  These constraints posed especially serious barriers to Spirit terminating several hundred employees, many of whom, like the Named Plaintiffs, were long-tenured employees and high level performers with no record of significant performance problems.

108.    Pursuant to the CBA, if Spirit decided to make a reduction-in-force, the Company was generally required to retain employees who had the best performance ratings.  Spirit had to provide specific justifications to SPEEA for making exceptions to such requirements.  Lowering ratings of employees Spirit wanted to terminate was one way for the Company to avoid having to provide such explanations to SPEEA for firing employees with good work records.

109.    Under the CBA, the performance of Spirit's SPEEA-represented employees is measured both by annual performance reviews (the "PM" or "performance management" process) as well as by a "retention rating" process that occurs approximately every 18 months.

### Spirit's Discriminatory Revisions to Its PM Process

110.    In late 2012 and early 2013, Spirit implemented an "enhanced and tightly controlled PM execution process" (also referred to by Spirit as its PM "Calibration" exercise).

111.    Most of the Named Plaintiffs received their 2012 performance evaluations in or about April 2013.

112.    Spirit's new PM approach had the purpose and effect of driving down the performance ratings of many high-performing, experienced, older employees with significant, costly and/or potentially costly medical conditions and disabilities, who had no material performance issues.  They received such lower ratings in time for them to be selected for termination in the July 2013 RIF, if not before, in time for them to be included in forced resignations Spirit carried out in March and May of 2013.

113.    Spirit's management, in carrying out the new performance evaluation process, lowered the PM ratings of about 600 SPEEA-represented Wichita-based employees for 2012.  A disproportionate share of these employees were age 40 or over.  And a disproportionate share of those receiving low PM

ratings who Spirit terminated in July 2013 – including most of the Named Plaintiffs – were age 40 or over.

114.    Spirit's PM ratings for 2011 and 2012 (and prior years as well) included two high ratings – "Exceptional" and "Exceeds Expectations," one midrange rating – "Meets Expectations," and two low ratings – "Meets Some Expectations" and "Unacceptable."

115.    In 2013 Spirit informed more than 400 Wichita-based, union-represented Spirit workers age 40 or over with a high 2011 PM rating – either "Exceptional" or "Exceeds" – that they would be receiving a lower, midrange PM rating of "Meets" for 2012.  This downgrading affected more than half of the over 800 older, salaried, unionized Wichita Spirit employees who the Company assigned high PM ratings in 2011.  By contrast, Spirit similarly reduced PM ratings of a much lower share of comparable workers under age 40 – less than a third.  Just before the 2013 RIF, Spirit also downgraded twice as large a share of its older Wichita unionized workers with a prior high or midrange PM rating to one of the two lowest PM rating levels – "Meets Some" or "Unacceptable":  more than 7.5% of the older group versus just above 3.5% of the younger group.  In both instances, the differences in results for employees age 40 and over and for those under age 40 are statistically significant and thus, unlikely to have occurred by chance.  The Company admits that in 2012 "many Spirit employees received lower ratings than they had enjoyed in the past," but argues the outcomes of its

new approach reflect "legitimate, nondiscriminatory business reasons," such as ending "grade inflation" and a desire to "more effectively manage poor performance." But Spirit fails to explain how its supposedly innocent methods caused such grossly unequal results by age and the firing of so many older workers.

116.    In July 2013, Spirit terminated more than 100 older employees with a "Meets Some" or an "Unacceptable" PM rating. This represented more than 50% of all Spirit employees assigned such ratings for 2012. By contrast, Spirit terminated fewer than 10 employees under age 40 with a "Meets Some" or an "Unacceptable" PM rating, which represented only about one-quarter of the total in that category – or approximately one-half the proportion of comparably-rated older employees terminated. This far higher rate of termination of older employees is statistically significant and thus likely did not occur by chance.

117.    On information and belief, Spirit Vice President of Human Resources ("HR") Suzanne Scott, and Director of Training and Organizational Development Cassie Caster were responsible for developing Spirit's "PM execution process" and a plan for its implementation. They presented the process and plan for approval by Spirit's management, including Samantha Marnick, Senior Vice President and Chief Administrative Officer, and Justin Welner, Vice President of Human Resources, Environment, Health & Safety, and Building Maintenance.

118.    Throughout implementation, the process and plan were "tightly" managed and coordinated by Spirit senior HR executives, including Scott and Caster.  Spirit went to great lengths to restrict access to data regarding implementation, including prohibiting participating managers from retaining, copying or e-mailing:  notes of meetings in which employees were assigned performance ratings or sorted for termination; employee lists and other documents used in such meetings; and even electronic copies of employee spreadsheets and other PM documents.  Spirit had HR staff gather documents from participants at the end of meetings, and established a "designated location" for all spreadsheets documenting the results of the PM rating process for individual employees.

119.    Spirit's senior management arranged for lower level managers to be trained on how to write up employees for performance issues, using examples of recent behavior. Attendance at these trainings was mandatory for all managers. Spirit held make-up sessions to ensure that all managers received training in the new execution process.

120.    In general, upper level Spirit managers required lower level managers to draft employees' annual performance reviews and ratings for 2012 and submit them to HR for review. In the past, HR had accepted and processed lower level managers' ratings of their employees.  For the first time ever with the 2012 performance evaluations, HR reviewed the evaluations and assigned ratings,

and returned them to lower level managers with instructions on how to revise or re-rate specific employees.

121.    On information and belief, lower level managers also were forced to rely on recommendations of senior managers regarding which employees should be written-up and whose performance evaluations should be downgraded, and why.

122.    Lower level managers who refused to go along with the plan were swiftly dealt with.  In some cases, Spirit re-assigned them to oversee different groups of employees about whom they knew very little.   The Company terminated other such lower level managers in March 2013, allegedly "for cause." In such instances, Spirit brought in new lower level managers to implement the directives of senior management with respect to targeted employees.  Such managers also often knew very little about the employees they were assigned to review.  Limited knowledge of subordinates made lower level mangers especially susceptible to influence from above regarding the ratings they gave.

123.    Still other lower level managers who initially refused to carry out directives to lower performance ratings for targeted employees ultimately decided to go along with such plans when it became clear that if they did not, it would cost them their jobs.

124.    Senior Spirit managers also trained lower level managers how to prepare a performance improvement plan (i.e., a "PIP" or "PCP" for "performance

58

coaching plan") for employees with lowered performance evaluations and/or performance ratings.  On information and belief, Spirit senior management personnel imposed PIPs upon employees they believed would need a PIP in their file to facilitate and justify their later termination.  Senior management personnel fired some older employees who successfully completed the terms of their PIPs, and in other instances, fired older employees before giving them an opportunity to complete their PIP.

125.    Most of the Named Plaintiffs were shocked by the results of the new PM process. Their managers had given them positive feedback during 2012, and historically most had earned overall ratings of "meets" or "exceeds" expectations, but suddenly they received evaluations rating them in lower performance categories, such as "meets some expectations."

126.    Most reasons recorded for the lowered performance evaluations of the Named Plaintiffs and others similarly situated were pretextual.  Some individuals received nonsensical explanations for dramatic downgrades, and others no reasons at all.  Still others learned from a first-level manager that he or she had been forced to assign low ratings, despite disagreeing with them and believing a subordinate was performing well.  Other Named Plaintiffs seem to have been downgraded due to the impact of their medical conditions on their work record.

127.    For instance, Plaintiff Jilun Sha, a Product Engineer in the Chief Scientist's Office for approximately six years, received an overall PM rating of "exceeds expectations" for 2010 and 2011 (as well an "A" retention rating in the two retention exercises prior to July 2013). Without warning or explanation, he learned in April 2013 that he had received a much lower PM rating of "meets some expectations" for 2012.  When Mr. Sha inquired with his first-level supervisor about his lowered rating, the manager ignored his questions and stopped giving him work.  On or about July 1, 2013, Mr. Sha also received a much lower retention rating – a designated "C" – again without warning or explanation.

128.    Another example of a Plaintiff who received dramatically lower performance ratings without warning and without a coherent explanation was Randy Williams, a Production Operation Specialist at the Wichita plant who had an impeccable performance record during his nearly 30 years of service to Spirit and its predecessor, Boeing.  Mr. Williams had overall PM ratings of "exceeds expectations" for 2010 and 2011 and had received an "A" retention rating in the two retention exercises prior to the July 2013 terminations.  On July 1, 2013, during his annual review for 2012, Mr. Williams learned from his first level supervisor that his overall PM rating had been downgraded to "meets expectations."  The "explanation" Mr. Williams received for his lowered PM rating was vague and unsupported by any specifics – that he needed to improve his business "acumen."  That same day Mr. Williams also learned – again without

receiving any coherent explanation – that he had been assigned a designated "C" retention rating, and that Spirit was putting him on a "performance improvement plan." Mr. Williams did not have a chance to complete his PIP before his termination on July 23, 2013.

**The Scope of Low Spirit Retention Ratings and "Designations" Was Unprecedented**

129.    In mid-2013, shortly before the July 2013 RIF, and at the same time as Spirit went "self-insured," Spirit also implemented major changes in its "retention rating" process, to the detriment of the Named Plaintiffs and other similarly situated older, long-tenured, high-performing SPEEA-represented employees.

130.    During a "retention exercise," Spirit rates employees on "performance" and on subjective criteria commonly associated with negative age-based stereotypes – i.e., "versatility" and "criticality." Employees receive retention ratings on a scale from "A" to "C", with "A" being the highest rating. Employees who receive a "C" retention rating are at risk of being laid off if a RIF occurs while that rating is in effect.

131.    However, the CBA provides for an automatic service "bump" for employees – like fifteen of the Named Plaintiffs – with 20 or more years of service. Thus, long-tenured employees who receive a "C" retention rating are automatically "bumped" up to a "B" rating. Likewise, those who receive a "B"

rating are "bumped" up to an "A," unless the employee is "designated" upon receipt of the initial rating.

132.    This feature of the retention exercise process applies to many SPEEA-represented Spirit employees because when Spirit purchased the Wichita facility from Boeing in 2005, Spirit allowed former Boeing employees re-hired as "Day One" Spirit employees to count their years of service with Boeing toward their years of service with Spirit under the CBA.

133.    However, when an employee is "designated" – as indicated by a marking in the "designation" box on Spirit's retention rating form – the automatic "bump" up for employees with 20 or more years of service does not apply.  Further, when an employee is "designated," he or she is ineligible for "recall" if his or her position is re-opened following his or her layoff.

134.    Historically, Spirit had "designated" only a few chronically poor performers.  Between 2005 and 2013, Spirit designated *fewer than five* persons given a "C" retention rating.

135.    For this reason, many of the Named Plaintiffs reasonably expected that they would be entitled to a years-of-service bump up in the event that they were to receive a retention rating lower than an "A" during a retention exercise. The only way Spirit could circumvent such an automatic service adjustment without violating the terms of the CBA was to dramatically alter its consistent

past practice by "designating" more employees with retention ratings below an "A."

136.    That is precisely what Spirit senior management decided to do in the run-up to the July 2013 RIF.  In early 2013, Spirit designated about *three hundred* employees with "C" ratings.

137.    In its 2013 retention exercise, Spirit downgraded many more Wichita-based, SPEEA-represented employees age 40 and above than those under age 40.  And the Company assigned older workers the lowest possible "C" retention rating -- after giving them a higher grade in the prior exercise – at a rate far in excess of the rate applicable to younger workers.  Spirit downgraded more than 160 older Wichita Spirit workers to a "C" in 2013; however, it did the same to fewer than 20 such employees under age 40.  This numerical difference reflected dramatically disparate results by age in terms of the proportion – roughly double – of older "C"-rated employees downgraded in 2013: approximately 8.4% of "C"-rated employees age 40 or above, and approximately 4.2% of those under age 40.  Further, Spirit terminated in the July 2013 RIF more than three-quarters of those "C"-rated and age 40 and above, but less than 60% of those under age 40.  These stark differences in Spirit's 2013 retention ratings by age are both statistically significant and unlikely to have occurred by chance.

138.    Before employees could be designated, however, they needed to have some sort of documented performance problem.  Yet most of those terminated in

July 2013, at least prior to their last evaluations, were high-performing employees (or at least solid or better performers) without a record of performance issues that would justify a "designated C" retention rating, thereby permitting Spirit to terminate them without violating the CBA. Nevertheless, Spirit assigned many such employees, including all of the Named Plaintiffs, a "designated C" rating in the retention exercise the Company conducted on July 1, 2013.

139.    The Spirit employees receiving "designated C" retention ratings in 2013 included many employees, among them numerous Plaintiffs, who were told upon receiving their annual review that they were doing good work.

140.    Spirit employees receiving "designated C" retention ratings in 2013 also included individuals who had successfully completed a PIP. For example, Plaintiff William Scott Denny got a "designated C" even though he successfully completed a four-week PIP in May or June 2013.

141.    Plaintiff Debra Hatcher's annual review dated April 18, 2013, completed by her direct supervisor Clayton Walton, stated that Hatcher's

> performance since joining the Logistics and Stores and Process Materials group has met every expectation set by the Company and Leadership. You consistently provided necessary information . . . . You work the quality issues for the entire group diligently, investigating every single issue and reporting back when team performance is impacted. Due to your diligent efforts, our overall quality performance has improved. This . . . is a direct reflection on your personal performance as has been observed in the reports and daily information provided.

64

Yet Hatcher also received a "designated C" in the July 1, 2013 retention rating exercise.

142.    Multiple lower level managers expressed frustration to their subordinates in connection with the July 1, 2013 retention exercise, explaining that they had no control over the ratings assigned, and had been forced to issue unduly low ratings to particular employees.

143.    Some lower level managers went so far as to advocate for employees under their supervision with their own supervisors when they believed their subordinates were being unfairly targeted and assigned inappropriately low retention ratings.  Some such managers were terminated in or before July 2013.  Others ceased objecting after threats of termination from their own supervisors.

144.    Upon information and belief, Spirit senior management changed none of the PM or retention ratings challenged by lower level managers on behalf of their subordinates.

### Spirit's Fall 2013 RIF Demonstrated
### the Uniqueness of its RIF Earlier that Year

145.    In September 2013, Spirit further demonstrated the uniqueness of the RIF process it implemented over the prior year that culminated in the July 2013 RIF, when it conducted another RIF without key features of the July 2013 RIF.

146.    In particular, in the September 2013 RIF, Spirit did not assign a large number of employees a "designated C" retention rating, and cause them to be

terminated thereby, and thus, Spirit also did not deny large numbers of such employees their "recall rights."  Rather, all SPEEA-represented employees laid off in September 2013 – compared with none of those terminated in July 2013 – retained recall rights. Based on such rights, approximately 50% of the 150 individuals laid off in September 2013 returned to work at Spirit.  In addition, prior to implementing the September 2013 RIF, unlike in July 2013, Spirit offered employees the option of taking a voluntary separation package – thereby reducing the need for involuntary terminations – and also extended to them an opportunity to secure Spirit retiree medical benefits.

147.    Since the years 2012-13 very few – approximately 15 – Spirit employees with "C"- level retention ratings have been "designated" and thereby denied "recall rights".

## Spirit's Waiver of Claims in the
## July 2013 Terminees' Severance Agreement

148.    Spirit attempted to secure waivers of claims from employees fired on or about July 25, 2013 by avoiding its disclosure obligations.

149.    Spirit's disclosures did not include all individuals terminated and retained on July 25, 2013 as part of the same termination program, as Spirit did not report those affected facilities other than Wichita, including, but not necessarily limited to, employees at its Tulsa, Oklahoma and Kinston, North Carolina locations.

150.    Spirit's disclosures did not include individuals terminated in Spirit's Wichita facility as a part of the same termination program in March and May of 2013.

151.    Spirit also did not identify the criteria it used to select individuals for termination.

152.    The list of terminated and retained individuals Spirit *did* include in its July 2013 disclosures was inaccurate and incomplete.

153.    Virtually all of the SPEEA-represented employees terminated in Wichita in July 2013 signed waiver and release documents based on information Spirit provided that was incomplete and inaccurate in various ways including those noted above.

## Spirit Failed and Refused to Rehire
## Qualified Persons It Fired in July 2013

154.    Shortly after the July 2013 layoffs, Spirit began recruiting and hiring, including for positions for which the descriptions indicated to the Named Plaintiffs that they were well-qualified.  At its September 2013 Job Fair, Spirit treated applicants who had been terminated in July 2013 differently from others seeking open positions. Specifically, Spirit personnel told the Named Plaintiffs and others terminated in July 2013 not to wait in line for interviews and consideration by Spirit HR personnel and other Spirit personnel with hiring authority for specific positions, but rather, to wait in a separate line, to drop off their resume and to wait to hear back from the Company.  Plaintiffs who attended

the Job Fair saw descriptions of open positions open for which they were qualified, but they were not allowed to compete for them on equal terms.

155.    The Named Plaintiffs who attended the September 2013 Spirit Job Fair, who submitted job applications including their resumes, and who asked the Company to contact them about open positions for which they were qualified, heard nothing back from the Company. On information and belief, Spirit ignored their applications and resumes and/or caused them to be ignored, rejected and/or screened out.  Others similarly situated had the same experience.  Based on this and other similar experiences, the Named Plaintiffs who attended the September 2013 Job Fair and others similarly situated concluded that Spirit had decided not to rehire older former employees terminated in July 2013.  Many affected individuals shared these experiences with other salaried Spirit employees they knew who also were terminated in July 2013.

156.    In late 2013, Spirit announced a goal to hire hundreds of new employees.  Then, in January 2014, Spirit declared that it had met that goal. Soon thereafter, Spirit broadcast its intention to hire hundreds more employees in the first part of 2014.

157.    Throughout 2014 and 2015, Spirit announced numerous openings for salaried positions.  In all, Spirit filled more than two hundred salaried positions in each of these years.  In some cases the salaried positions announced and filled by Spirit resembled positions the Named Plaintiffs and others similarly

situated held prior to their discharge in July 2013. Some Plaintiffs applied for positions at Spirit for which they were qualified in late 2013, as well as in 2014 and 2015. In no instances of which Named Plaintiffs are aware, however, was any older, former Spirit employee terminated in July 2013 hired to a permanent position equivalent to that which they held before their termination. Rather, the Named Plaintiffs only have learned of younger former Spirit employees, terminated in July 2013, who have been rehired.

158. At some point, many Plaintiffs became discouraged and deterred from applying for open positions at Spirit because of the Company's failure and refusal to hire them, and even to show any interest in considering their applications. They, as well as others similarly situated who had not applied to Spirit for rehire, heard from numerous reliable sources, including both current and former Spirit employees, that Spirit had (and has) no intention of considering their applications. In the well-founded view of the Named Plaintiffs and others similarly situated, their age, their significant, costly, and/or potentially costly medical conditions (or those of their formerly Spirit-insured family members), and also their disabilities, are factors that made a difference in Spirit's failure and refusal to rehire them. Based on such conclusions, many Plaintiffs became discouraged and deterred from ever applying (or from applying further) for rehire for open positions with Spirit for which they are qualified.

159.    The vast majority – approximately 60% -- of the individuals hired by Spirit since July 2013 (and in each of the first two years after July 2013) for salaried, SPEEA-represented positions at the Wichita plant were under age 40, and thus younger than the Named Plaintiffs and others similarly situated; in addition, on information and belief, such new hires did not have (either themselves or their family members) significant, costly and/or potentially costly medical conditions or disabilities like those their terminated predecessors had; nor are they associated with individuals with such conditions.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Age Discrimination (ADEA)—Collective Action – Termination – Disparate Treatment
(on behalf of all Named Plaintiffs and all others similarly situated)

160.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

161.    This claim is brought on behalf of all Named Plaintiffs, for themselves and others similarly situated ("collectively the "Plaintiffs") – former Wichita-based, union-represented Spirit employees who were 40 years old or older on July 25, 2013, the date on or about which Spirit terminated their employment.

162    Plaintiffs were skilled, experienced aerospace workers with a solid (or better) work record when Spirit terminated them on or about July 25, 2013.

163.     Plaintiffs had at least one significant, costly, and/or potentially costly medical condition, and/or a record thereof, and/or one or more family members with the same, while covered by Spirit's self-insured employee health insurance. Spirit's senior management believed that Plaintiffs and/or their family members with such conditions, and/or a record thereof, posed a high risk of incurring large medical costs that the Company would have to pay.

164.     In 2012, once Spirit decided to cut costs, it determined to do so by terminating salaried employees in a series of RIFs culminating in July 2013, and to that end, the Company designed and implemented a plan to terminate older employees such as the Plaintiffs, in the belief that this would allow the Company to avoid paying significant medical costs that senior management believed they would incur in the future and that Spirit would have to pay under its self-insured employee health insurance plan.

165.     Spirit's implementation of group terminations in 2013, and in particular in July 2013, included measures the company portrayed as being designed to identify low-performing employees.  However, as carried out by Spirit, these measures were pretexts for age discrimination.  An example is Spirit's one-time expansion, from a few to hundreds in a single year, of the number of older SPEEA-represented employees with a "C" "retention rating" whom the Company "designated," and thereby denied protection from termination, by virtue of their seniority.  Moreover, in general, many employees

71

terminated in July 2013, including all the Named Plaintiffs, were not low performers, but instead were solid (or better) performers with strong work records.

166.    Spirit's implementation of group terminations in 2013 included measures the company portrayed as efforts to eliminate jobs to achieve needed cost reduction. However, as carried out by Spirit, these measures also were pretexts for age discrimination.  The jobs held by some of the Plaintiffs and other older workers that Spirit claimed to eliminate were not actually eliminated, and the RIF did not actually achieve supposed cost reductions, except by Spirit absolving itself of responsibility for older employees' health insurance claims.

167.    Rather, within weeks of completing the July 2013 terminations, Spirit began hiring younger employees for many jobs previously held by Plaintiffs. Thus, on information and belief, the former jobs of many of the Plaintiffs were not eliminated.  Rather, in many instances Spirit simply replaced the Plaintiffs with younger workers lacking significant, costly, and/or potentially costly medical conditions (and/or family members with such conditions) whose expense Spirit would have to pay under its self-insured employee health plan.

168.    In short, by a variety of means, some of which remain to be identified and specified in the course of this lawsuit, Spirit selected many employees for termination in July 2013, including the Named Plaintiffs, because of their age, and further, because Spirit assumed a correlation between their age

and their (and/or their family members') significant, costly, and/or potentially costly medical conditions.  Due to that association, Spirit believed that Plaintiffs would incur large medical costs that Spirit would have to pay.

169.    Spirit's selection of the Plaintiffs for termination in July 2013, in which their age made a difference in Spirit's decisions, violated the ADEA, 29 U.S.C. §§ 623(a)(1).

170.    Spirit engaged in these actions willfully, and with malice or reckless disregard for the federally-protected rights of the Plaintiffs.

171.    As a result of Spirit's conduct, Plaintiffs have suffered and will continue to suffer significant injuries and losses.  Plaintiffs seek remedies described in the Prayer for Relief below.

### SECOND CLAIM FOR RELIEF
### Age Discrimination (ADEA) – Collective Action – Termination -- Disparate Impact
(on behalf of all Named Plaintiffs and all others similarly situated)

172.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

173.    This claim is brought on behalf of all Named Plaintiffs, for themselves and others similarly situated (collectively the "Plaintiffs"): former Wichita-based, union-represented Spirit employees who were 40 years old or older on July 25, 2013, the date on or about which Spirit terminated their employment.

174.    Spirit selected older employees for inclusion in its July 2013 terminations using unreasonable criteria and related means that caused the terminations to significantly, disparately, and adversely affect older workers, including the Plaintiffs.  Specific discriminatory, age-neutral selection factors considered by Spirit included, but were not limited to, the following:

a.    Spirit selected employees for termination based on their and/or their family members' significant, costly, and/or potentially costly medical conditions, and/or records thereof, and the related belief and assumption that such conditions would result in large medical costs that Spirit would have to pay under its self-insured employee health insurance;

b.    in a change from past policy and practice, Spirit "designated" all workers receiving a "C" on their most recent "retention rating," which had the foreseeable effect of rendering experienced, older employees receiving such a rating ineligible to avoid termination by being "bumped" up to a higher retention rating (e.g., a "B") based on seniority, as had been Spirit's past policy and practice;

c.    Spirit relied on low or lower employee "PM" and/or "retention" ratings on the most recent performance reviews, even for workers with a history of solid (or better) performance, and even for

workers who incurred an unexplained and/or precipitous drop in rated performance; and

d.      in conducting employee performance ratings considered in the RIF, Spirit relied on subjective criteria commonly associated with negative age-based stereotypes (such as "versatility" and "criticality" in conducting the 2013 retention exercise), and provided managers and supervisors inadequate guidance and training about how to apply such criteria so as to avoid age discrimination.

175.   Other specific age-neutral means employed by Spirit to select employees for termination in July 2013, as well as the nature and scope of the disparate, adverse impact these factors had on older workers, remain to be identified by the Plaintiffs in this lawsuit.

176.   The specific age-neutral means employed by Spirit to select employees for termination in July 2013, including those identified in ¶ 174, were not "reasonable factors other than age"

177.   Spirit's selection of Plaintiffs for termination in July 2013, in which non-reasonable factors other than age made a difference in Spirit's decisions, violated the ADEA, 29 U.S.C. § 623 (a)(2).

178.   As a result of Spirit's conduct, Plaintiffs have suffered and will continue to suffer significant injuries, and losses. Plaintiffs seek remedies described in the Prayer for Relief below.

### THIRD CLAIM FOR RELIEF
## OWBPA Amendments to the ADEA – Collective Action -- Waiver of ADEA Claims Invalid
(on behalf of 19 Named Plaintiffs and all others similarly situated)

179.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

180.    This claim is brought on behalf of nineteen Named Plaintiffs (Sha, Williams, Denny, Marks, Ballard, Ensor, Faris, Gardner, Harbaugh, Hoobler, Koch, Longan, Miller, Poole, Rahbar, Sprague, Tolson, Troilo and Vines) for themselves and others similarly situated, all of whom (hereafter the "Signers" or "Signer Plaintiffs") signed a severance document presented to them by Spirit on or about July 25, 2013, in connection with their termination.  The document granted severance pay and other benefits on the condition that the Signer also execute a waiver of all claims, including ADEA claims, related to their termination.

181.    All of the Signer Plaintiffs are protected by the strict notice requirements of the OWBPA amendments to the ADEA, 29 U.S.C. § 626(f), which apply to group terminations by virtue of the Signers' acceptance of or capitulating to a waiver of ADEA claims and their inclusion in Spirit's July 2013 "termination program offered to a group or class of employees," 29 U.S.C. § 626(f)(1)(H).

182.    Because Spirit implemented a "termination program offered to a group or class of employees" culminating in July 2013, the OWBPA required Spirit to provide a severance document and waiver of claims "written in a manner

calculated to be understood by . . . the average individual eligible to participate" in the benefits offered.  29 U.S.C. § 626(f)(1)(A).  The termination program carried out by Spirit does not satisfy this requirement.

183.    Further, all older workers terminated in July 2013, including the Signer Plaintiffs and others similarly situated, were entitled to various disclosures regarding Spirit's termination program.  29 U.S.C. § 626(f).  Such disclosures are required to allow affected older workers to decide whether to pursue ADEA claims and/or to execute a waiver of ADEA claims.  Without these disclosures, such a waiver cannot be "knowing and voluntary".  *Id.*, § 626(f)(1).  OWBPA-mandated disclosures that Spirit failed to provide include, but are not limited to, the following:

> a.    individuals terminated and retained (i.e., those "selected ... and [those] not ... selected," 29 U.S.C. §626(f)(1)(H)(ii)) on July 25, 2013 as part of the same termination program in other affected Spirit facilities, including, but not necessarily limited to, the Tulsa, Oklahoma and Kinston, North Carolina locations;
>
> b.    individuals terminated and retained (i.e., those "selected ... and [those] not ... selected," 29 U.S.C. §626(f)(1)(H)(ii)) prior to July 2013 (e.g., in March 2013 and May 2013) in Spirit's Wichita facility as a part of the same termination "program" initiated in  2012 and completed in July 2013;

c.    the "eligibility factors" for inclusion in Spirit's termination

"program," 29 U.S.C. § 626(f)(1)(H)(i), whether overall and/or

applicable to separate parts of the "program" executed at various

times and at various locations, or both; and

d.    an accurate list of "the job titles and ages of all individuals

eligible or selected for the [termination] program," 29 U.S.C. §

626(f)(1)(H)(ii), as the disclosure did not accurately identify "all

individuals eligible or selected."

184.    As a result of Spirit's actions violating the OWBPA, the waiver of claims is invalid as it unlawfully deprived the Signer Plaintiffs of access to the legal process.  Specifically, Spirit misled, delayed, deterred and impeded the Signer Plaintiffs in exercising their right to file EEOC charges against the company and to pursue ADEA claims against Spirit in this Court.

185.    Due to Spirit's conduct, the Signer Plaintiffs have suffered and will continue to suffer significant injuries.  They seek remedies described in the Prayer for Relief below.

## FOURTH CLAIM FOR RELIEF
## Age Discrimination (ADEA) – Collective Action – Failure to Rehire – Disparate Treatment
(on behalf of 23 Named Plaintiffs and all others similarly situated)

186.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

187.   This claim is brought on behalf of : (a) nineteen "Applicant Plaintiffs" (Raymond, Heston, Williams, Denny, Hatcher, Marks, Bucchin, Ensor, Faris, Gardner, Harbaugh, Hoobler, Jackson, Longan, Miller, Rahbar, Sprague, Troilo and Vines and others similarly situated), who applied for one or more open positions for which they were qualified, in response to Spirit job announcements issued after July 2013, but for which they were not hired, despite their qualifications; and (b) four "Deterred Applicant Plaintiffs" (Sha, Koch, Poole and Tolson and others similarly situated), who were discouraged and deterred from applying (or for applying further) for open positions with Spirit for which they were qualified, after their termination in July 2013, because such applications would have been futile due to Spirit's age-discriminatory hiring policies and practices as applied to persons terminated by Spirit in July 2013.

188.   Spirit knew of the ages and medical records of the Applicant Plaintiffs and the Deterred Applicant Plaintiffs (whether because of their status as former employees, and/or their inclusion in the July 2013 terminations, and/or their job applications, and/or other reasons) and their age made a difference in Spirit's decisions not to hire them and to establish a policy and practice of not hiring former employees terminated in July 2013, regardless of their qualifications. This conduct violated the ADEA, 29 U.S.C. § 623(a)(1).

189.    Spirit engaged in these actions willfully, and with malice or reckless disregard for the Applicant Plaintiffs' federally-protected rights, and those of others similarly situated.

190.    As a result of Spirit's conduct, the Applicant Plaintiffs and the Deterred Applicant Plaintiffs have suffered and will continue to suffer significant injuries and losses. They seek remedies described in the Prayer for Relief below.

**FIFTH CLAIM FOR RELIEF**
**Age Discrimination (ADEA) – Collective Action – Failure to Rehire –**
**Disparate Impact**
(on behalf of 23 Named Plaintiffs and all others similarly situated)

191.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

192.    After July 2013, Spirit implemented a policy, procedure, and/or practice of rejecting applications for open positions from individuals terminated in the July 2013 RIF.

193.    Spirit's failure and refusal to rehire former employees terminated in the July 2013 RIF had a significant adverse disparate impact on the work opportunities of former Spirit employees age 40 or above, including the Applicant Plaintiffs and the Deterred Applicant Plaintiffs (*see* ¶187 above).  Such disparate impact was not based on "reasonable factors other than age" and violated the ADEA.  29 U.S.C. §§ 623(a)(2), 623(f)(1); 29 C.F.R. § 1625.7.

194.    As a result of Spirit's conduct, the Applicant Plaintiffs and the

Deterred Applicant Plaintiffs have suffered and will continue to suffer significant

injuries and losses.  They seek remedies described in the Prayer for Relief below.

## SIXTH CLAIM FOR RELIEF
### Violation of the ADA – Individual Claims - Termination Because of Disability
(on behalf of five individual Named Plaintiffs)

195.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set

forth herein.

196.    Named Plaintiffs Raymond, Heston, Hatcher, Bucchin and Jackson

declined to sign a severance agreement with Spirit when they were terminated in

mid-2013.  Thus, they (the "Non-Signers") may assert claims of disability

discrimination related to their terminations.

197.    During relevant time periods, and in particular July 2013, when they

were terminated by Spirit, Non-Signers Raymond, Heston, Bucchin and Jackson

had one or more disabilities within the meaning of the ADA, as modified by the

ADA Amendments Act of 2008.  Raymond, Heston and Bucchin were "regarded

as having" a disability – i.e., they allege that they had one or more "actual . . .

impairment[s]" without regard to whether "the impairment[s] limit[ed] . . . a

major life activity."  Named Plaintiffs Raymond, Heston, Bucchin and Jackson

further allege that they had actual disabilities – i.e., one or more "impairment[s]

that substantially limit[ed] one or more major life activities" or one or more

"major bodily functions," and/or that they had "a record of" having such a disability.  42 U.S.C. § 12102(1), (2), (3).

198.   During relevant time periods, and in particular July 2013, the time of her termination by Spirit, Non-Signer Hatcher's husband had several disabilities within the meaning of the ADA, including impairments of his kidney and liver functions.  On that basis, Named Plaintiff Hatcher asserted a claim of associational discrimination under the ADA in her EEOC charge.  This claim concerns Spirit's mistreatment of Hatcher's due to her husband's substantial limitations in multiple major life activities and/or major bodily functions.  *See* 42 U.S.C. §12112 (b)(4); 29 C.F.R. § 1630.8 ("Relationship or association with an individual with a disability").

199.   During all relevant time periods, and in particular July 2013, Non-Signers Raymond, Heston, Bucchin and Jackson could perform the "essential functions" of their jobs "with or without reasonable accommodation" for their disabilities, and thus, were "qualified" for their positions with Spirit.  42 U.S.C. § 12111(8).

200.   Spirit violated the ADA by terminating Non-Signers Raymond, Heston, Bucchin and Jackson on the basis of their disabilities, 42 U.S.C. § 12112(a), and also by terminating Non-Signer Jackson in retaliation for his requesting reasonable accommodations for his disabilities, 42 U.S.C. § 12203.

201.   Further, Spirit violated the ADA by terminating Non-Signer Hatcher, as well as Named Plaintiffs Heston and Jackson, on the basis of their association with family members with disabilities, whose medical expenses were covered by Spirit's self-insured employee health insurance, and whose medical conditions were known to Spirit.  42 U.S.C. § 12112(b)(4).

202.   By firing the five Non-Signers on the basis of disability, Spirit violated the ADA willfully and with malice or reckless indifference to their federally-protected rights.

203.   As a result of Spirit's conduct, the five Non-Signers suffered and will continue to suffer significant injuries and losses.  They seek remedies set out in the Prayer for Relief below.

### SEVENTH CLAIM FOR RELIEF
### Willful Violation of the FMLA – Individuals Claims – Retaliatory Termination
(on behalf of three individual Named Plaintiffs)

204.   Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

205.   Named Plaintiffs Heston, Hatcher and Jackson (the "FMLA Termination Plaintiffs") declined to sign a severance agreement with Spirit at the time of their termination in July 2013.  Hence, they may assert FMLA claims related to their termination.

206.   The FMLA Termination Plaintiffs, within a time proximate to their termination by Spirit in July 2013, used FMLA leave to which they were entitled

in order to care for their own serious health condition(s) and/or to care for the serious health condition(s) of one or more family members covered by Spirit's self-insured employee health insurance.

207.   Plaintiff Hatcher took intermittent FMLA leave in 2012 to care for her husband's serious liver and kidney conditions.  Plaintiff Heston took FMLA leave in March 2013 to care for his own serious medical conditions.  Plaintiff Jackson took FMLA leave in 2012 and annually for several years prior, to care for his own and his daughter's serious medical conditions.

208.   Spirit decided to terminate each of the FMLA Termination Plaintiffs at least in part because of and in retaliation for their use, request to use and/or notice to Spirit of their   intent to use FMLA leave to which they were entitled. This conduct constituted discriminatory unlawful retaliation for their exercise of their protected rights under the FMLA.  29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c).

209.  Spirit's retaliatory dismissal of the FMLA Termination Plaintiffs constituted willful retaliation in violation of the FMLA.  29 U.S.C. § 2617(c)(2).

210.   Due to Spirit's misconduct, the three Plaintiffs have suffered and will continue to suffer significant injuries and losses.  They seek remedies set out in the Prayer for Relief below.

**EIGHTH CLAIM FOR RELIEF**

**Violation of the ADA – Individual Claims – Refusal to Hire
Because of Disability**
(on behalf of 23 individual Named Plaintiffs and others similarly situated)

211.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

212.    The Applicant Plaintiffs (identified in ¶ 187), each applied without success for at least one open position with Spirit for which they were qualified in response to Spirit job announcements issued after July 25, 2013.  Spirit failed and refused to hire each of them to fill the position(s) for which they applied on grounds of their disabilities (as well as their ages).

213.    The "Deterred Applicant Plaintiffs" (identified in ¶ 187), were discouraged and deterred from applying (or from applying further) for open positions with Spirit for which they were qualified, after their termination in July 2013, because such applications would have been futile due to Spirit's hiring policies and practices discriminating on grounds of disability in regard to persons terminated by Spirit in July 2013.

214.    Plaintiffs each had one or more disabilities, and/or were associated with one or more family members with one or more disabilities within the meaning of the ADA. Each of them and/or one or more family members had at least one "impairment that substantially limit[ed] one or more major life activities" or "major bodily functions"; moreover, each of them and/or one or

85

more family members had an actual disability, and/or were "regarded as having" a disability; and/or had "a record of" having a disability – during relevant time periods, and in particular July 2013, the time of their termination by Spirit, and further, at the time of their subsequent application(s) with Spirit.  42 U.S.C. §§ 12102(1), (2).

215.    Spirit's knowledge of Plaintiffs' disabilities, and/or their association with family members with disabilities, made a difference in Spirit's failure and refusal to hire the Applicant Plaintiffs, in Spirit's conduct discouraging the Deterred Applicants Plaintiffs from applying for open positions, and in Spirit's establishment of policies and practices screening out applicants and potential applicants with disabilities who were terminated in the July 2013 RIF.  Such misconduct also affected others similarly situated to Plaintiffs who may hereafter join this case.

216.    Spirit decided not to hire the Applicant Plaintiffs, to discourage applications by the Deterred Applicant Plaintiffs, and to establish disability-discriminatory policies affecting both groups willfully, and with malice or reckless indifference to their federally-protected rights.

217.    Due to Spirit's misconduct, the Plaintiffs have suffered and will continue to suffer significant injuries and losses.  They seek remedies set out in the Prayer for Relief below.

**NINTH CLAIM FOR RELIEF**
**Willful Violation of the FMLA – Individuals Claims – Retaliatory**
**Refusal to Rehire**
(on behalf of six individual Named Plaintiffs)

218.   Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

219.   Named Plaintiffs Heston, Hatcher, Marks, Jackson, Longan and Rahbar (the "FMLA Rehire Plaintiffs"), within a time proximate to their termination by Spirit in July 2013, used FMLA leave to which they were entitled in order to care for their own serious health condition(s) and/or to care for the serious health condition(s) of one or more family members covered by Spirit's self-insured employee health insurance.

220.   Spirit decided to terminate each of the FMLA Rehire Plaintiffs in July 2013 at least in part because of and in retaliation for their use, request to use and/or notice to Spirit of their intent to use FMLA leave to which they were entitled.

221.   The FMLA Rehire Plaintiffs each applied for at least one open position with Spirit for which they were qualified (and in the case of some of these individuals, many such positions) in response to Spirit job announcements issued after July 25, 2013, but Spirit failed and refused to hire each of them to fill the position(s) for which they applied.

222.   Spirit decided not to hire the FMLA Rehire Plaintiffs, at least in part, because of and in retaliation for their prior use, request to use and/or notice to

87

Spirit of their intent to use FMLA leave to which they were entitled prior to July 25, 2013.

223.   Spirit decided not to hire the FMLA Rehire Plaintiffs willfully and with malice or reckless indifference to the Applicant Plaintiffs' federally-protected rights.

224.   Due to Spirit's conduct, the FMLA Rehire Plaintiffs suffered and will continue to suffer significant injuries and losses.  They seek remedies set out in the Prayer for Relief below.

## PRAYER FOR RELIEF

**WHEREFORE**, the Named Plaintiffs, on behalf of themselves and others similarly situated (collectively the "Plaintiffs"), respectfully request that the Court enter judgment in their favor and award the following relief, to the fullest extent allowed by law:

1)      a Declaration that the waiver of claims made by the Signers violates the OWBPA, 29 U.S.C. § 626(f), and therefore is null and void and in all respects unenforceable in regard to claims under the ADEA, and that accordingly, all Plaintiffs, and others similarly situated, including the Signers, may proceed with their ADEA termination claims;

2)      a Declaration that the Named Plaintiffs, as set forth above, are similarly situated to other Wichita-based, union-represented, salaried workers

who Spirit terminated on or about July 25, 2013, when they were age 40 or above, and who Spirit then failed and refused to rehire based on a coordinated set of practices whose discriminatory purpose and effect was to limit Plaintiffs' employment opportunities based on their age, based on factors Defendants supposed to be related to Plaintiffs' age, and based on unreasonable non-age factors, whose application had an adverse disparate impact on Plaintiffs and other similarly situated older workers;

3)      an Order directing Spirit to assist the Court and Plaintiffs to facilitate notice of the collective action claims Plaintiffs propose to maintain, and the right to opt-in to such a collective action for all former Spirit employees similarly situated to the Named Plaintiffs;

4)      a Declaration that the time for former Spirit employees similarly situated to the Named Plaintiffs to file ADEA claims and to opt-in to this collective action shall be tolled by the Named Plaintiffs' filing of collective action charges of age discrimination with the EEOC, which placed Spirit on notice of the collective action nature of this challenge to its July 2013 terminations and their aftermath, including Spirit's inclusion of a challenged waiver of claims in the July 2013 severance agreement, and its failure and refusal to rehire former older employees wrongfully terminated in July 2013;

5)      a Declaration that the time for former Spirit employees similarly situated to the Named Plaintiffs, who seek to opt-in to this ADEA collective

89

action, to file ADA claims related to their termination by Spirit and Spirit's failure and refusal to rehire them based on their disabilities, shall be tolled by the Named Plaintiffs' filing of disability discrimination charges with the EEOC, subject to any valid severance agreement they may have signed at the time of their termination (barring otherwise valid ADA termination claims), as such ADA-based charges put Spirit on notice of numerous others, i.e., other older former employees, similarly situated to the Named Plaintiffs, who were terminated in July 2013, with such ADA claims; and

6)    an Order awarding the Named Plaintiffs and others similarly situated:

a.    Back pay, in amounts to be determined at trial;

b.    Front pay, in lieu of reinstatement;

c.    Liquidated damages as allowed under the ADEA and the FMLA;

d.    Compensatory and consequential damages under the ADA;

e.    Punitive damages as allowed under the ADA;

f.    Injunctive and/or declaratory relief, including an unqualified right to apply and receive fair consideration for future employment with Defendants;

g.    Pre-judgment and post-judgment interest at the highest lawful rate;

h.    Attorneys' fees and costs, including expert witness fees, as allowed; and

i.    Any such further relief as the Court may deem just or

equitable.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER LC

/s/Randall K. Rathbun
Randall K. Rathbun #09765
8301 East 21st Street North, Suite 450
Wichita, Kansas 67206
(316) 262-4000 (p); (316) 265-3819 (f)
randy@depewgillen.com
Attorneys for Plaintiffs

DESIGNATION OF PLACE OF TRIAL

COME NOW the plaintiffs and designate Wichita, Kansas as the place of the trial of this action.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER LC

/s/Randall K. Rathbun
Randall K. Rathbun #09765
8301 East 21st Street North, Suite 450
Wichita, Kansas 67206
(316) 262-4000 (p); (316) 265-3819 (f)
randy@depewgillen.com
*Attorneys for Plaintiffs*

## DEMAND FOR JURY TRIAL

COME NOW the plaintiffs and respectfully request a trial by jury with regard to the above-captioned action.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER LC

/s/Randall K. Rathbun
Randall K. Rathbun #09765
8301 East 21st Street North, Suite 450
Wichita, Kansas 67206
(316) 262-4000 (p); (316) 265-3819 (f)
randy@depewgillen.com
*Attorneys for Plaintiffs*