# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DONETTA RAYMOND, et al.,      )
                                      )
         **Plaintiffs,**     )
                                        )
vs.                                  )    **Case No. 16-1282-JTM-GEB**
                                        )
SPIRIT AEROSYSTEMS HOLDINGS, INC., and )
SPIRIT AEROSYSTEMS, INC.,     )
                                        )
         **Defendants.**    )
                                        )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Protective Order and Sanctions (**ECF No. 172**). On March 22, 2017, the Court convened an in-person hearing to address the pending motion. Plaintiffs appeared through counsel, Randall K. Rathbun and Diane S. King. Defendants appeared through counsel, James M. Armstrong and Boyd A. Byers. After consideration of both the arguments of counsel and the parties' briefing, Defendants' Motion (ECF No. 172) is **GRANTED in part and DENIED in part** for the reasons outlined below.

## I.    Background[1]

### A.    Nature of Suit

In July and August, 2013, defendant Spirit AeroSystems ("Spirit")[2] conducted a "reduction in force" ("RIF") which terminated the employment of the named Plaintiffs[3] and more than two hundred other workers (Compl., ECF No. 1, at 5).  The workers were all members of the Society of Professional Engineering Employees in Aerospace ("SPEEA"), a labor union.  Plaintiffs claim the RIF eliminated a disproportionate number of Defendants' older employees.  Defendants allege Plaintiffs and others like them were discharged, and not considered for rehire, for lawful reasons—primarily their poor performance.

Plaintiffs filed this collective action in July 2016, claiming Defendants wrongfully terminated their employment and/or later failed to consider them for new job openings because of their age and, in some cases, the older employees' (or family members') medical conditions and related medical expenses.  In addition to the collective action claims under the Age Discrimination in Employment Act[4] ("ADEA"), some Plaintiffs also assert individual ADEA claims, while other Plaintiffs claim their termination

---

[1] Unless specifically indicated, the facts recited are drawn from the parties' pleadings (Pls.' Compl., ECF No. 1; Defs.' Answer, ECF No. 27) and the briefing regarding the instant motion (ECF Nos. 173, 181, 189, 196).  Plaintiffs filed their Memorandum of Law in Opposition twice; once as ECF No. 181, and as an identical but redacted version, with page 13 under seal, as ECF No. 189.  References to either document (ECF Nos. 181, 189) necessarily pertain to both filings.

[2] Throughout this Order, the use of "Spirit" will refer to defendant Spirit AeroSystems, as well as its parent company, defendant Spirit AeroSystems Holdings, Inc.

[3] The initial Complaint was filed by 24 named Plaintiffs.  In October 2016, a number of Consents to Opt In were filed (ECF Nos. 31-103, filed Oct. 4-5, 2016; ECF Nos. 104-152, 154, filed Oct. 18, 2016).  Although three opt-in plaintiffs were voluntarily terminated (ECF No. 226, June 27, 2017), the current number of potential Plaintiffs is approximately 70.

[4] 29 U.S.C. § 621 et seq.

violated the Americans with Disabilities Act[5] ("ADA") and/or the Family and Medical Leave Act[6] ("FMLA").

### B.    Procedural Posture

The unique posture of this case was discussed in a recent order (ECF No. 202, Feb. 22, 2017) and will not be repeated to the extent addressed therein. Highly summarized, this case is progressing on a phased discovery plan, and the initial phase—focused on the validity of releases signed by Plaintiffs at termination—is underway. After the first phase issues are resolved through dispositive motions, as anticipated by the parties, the case will progress to a second phase of discovery, to focus on Plaintiffs' wrongful termination claims.

Prior to commencing discovery, the Court held an in-person scheduling conference on October 19, 2016, to address the parties' phased discovery proposal. During that conference, Plaintiffs' counsel revealed to the Court they possessed certain proprietary, confidential, and/or privileged information belonging to Defendants, which had been delivered to counsel from an anonymous source. Plaintiffs asked the Court to review the documents in camera to determine whether the information is, in fact, privileged. Defendants reported their intent to pursue sanctions against Plaintiffs for their failure to notify opposing counsel when they initially received the documents. The Court instructed the parties to fully brief the issues, leading to the instant motion.

---

[5] 42 U.S.C. § 12101 et seq., as amended by the ADA Amendments Act of 2008.
[6] 29 U.S.C. § 2601 et seq.

## II. Defendants' Motion for Protective Order and Sanctions (ECF No. 172)

### A. Factual Background

#### 1. History between the Parties and Counsel

To illustrate the familiarity that most of these parties and counsel have with one another, a brief review of the parties' relationship is prudent. As noted above, Plaintiffs were SPEEA-represented, salaried employees selected for layoff in July and August 2013. Throughout the short history of this litigation, Plaintiffs have been represented by four groups of counsel: 1) Diane King and Kimberly Jones, of King & Greisen, LLP in Denver, Colorado and admitted here pro hac vice; 2) Thomas Buescher and M. Jeanette Fedele, of Buescher, Kelman, Perera & Turner, P.C., in Denver, and previously admitted pro hac vice but recently withdrawn;[7] 3) Daniel Kohrman, Dara Smith, and Laurie McCann of the AARP Foundation Litigation group in Washington, D.C., also admitted pro hac vice; and 4) local counsel, Randy Rathbun, of Depew Gillen Rathbun & McInteer, LC. Defendants are represented by counsel from the local law firm of Foulston Siefkin LLP ("Foulston"), including Boyd Byers, Charles McClellan, James Armstrong, Teresa Shulda, and Trisha Thelen.

Although this is the first case in which Ms. King and Ms. Jones have appeared in this Court, and the first Spirit case in which the AARP lawyers have appeared, SPEEA and Spirit have been engaged in litigation in this District multiple times over the past

---

[7] Notice of Withdrawal of M. Jeanette Fedele (ECF No. 183); Notice of Withdrawal of Thomas B. Buescher (ECF No. 184).

several years.[8]  Mr. Buescher and Ms. Fedele were involved in other cases on behalf of
SPEEA,[9] while members of the Foulston firm have appeared on behalf of Spirit and its
predecessor, Boeing Wichita, in numerous other matters.[10]  Not only are these parties no
strangers to litigation, but many of the counsel are familiar with one another and the
parties they regularly represent, and they are regarded as experienced counsel.

## 2.    Before Receipt of the Documents

In 2012-13, Spirit and SPEEA were involved in litigation[11] regarding Spirit's
performance improvement process—the procedure through which Spirit addresses
employee performance, including coaching, discipline, and termination of employees
who do not meet performance standards.[12]  As a result of the 2012 litigation, and
reportedly in anticipation of future litigation, Spirit decided to revamp its employee
performance evaluation process.  In late 2012, it engaged the Foulston firm, specifically
Mr. Byers, to provide advice to its Human Resources ("HR") department on the
performance improvement initiative.[13]  Spirit continued to work on the initiative from

---

[8] *See, e.g.*, *SPEEA v. Spirit Aerosystems, Inc.*, No. 14-1407-EFM (filed Dec. 5, 2014); *SPEEA v. Spirit Aerosystems, Inc.*, No. 14-1281-JTM (filed Aug. 28, 2014); *SPEEA v. Spirit Aerosystems*, No. 12-1180-JTM (filed May 17, 2012).  This list is by no means exhaustive.

[9] *See* cases listed *supra* note 8.

[10] *See, e.g., supra* note 8.  *See also Woods v. Boeing Company*, 06-2280-JAR (filed July 7, 2006); *SPEEA v. Boeing Company*, 05-1251-JTM (filed Aug. 8, 2005); *Smith et al v. Boeing Company*, No. 05-1073-JTM (filed Mar. 11, 2005); *Pyles, et al v. Boeing Company*, No. 01-2331-JWL (filed July 6, 2001).  As above, this list is incomplete and only offered as a sampling of the many cases in which the Foulston firm has represented Boeing and/or Spirit in litigation in the District of Kansas.

[11] *See SPEEA v. Spirit Aerosystems*, No. 12-1180-JTM, 2012 WL 5995552 (D. Kan. Nov. 30, 2012); *aff'd*, 541 Fed. App'x 817 (10th Cir. 2013).

[12] Byers Decl., ECF No. 173-3, Ex. 2, at ¶¶ 5-6.

[13] *Id*. at ¶ 6.

approximately October 2012 to March 2013.[14]  During that time period, Spirit's HR team created presentations and other documents for review and critique by its legal advisors. The information originating from the group initiative was treated as confidential, with much of it considered attorney-client privileged and attorney work product, and was accessible to only a few high-level HR personnel, in-house Spirit counsel, and Mr. Byers.[15]

Following this initiative, in March 2013 Spirit terminated dozens of employees alleging they failed to meet performance expectations.  Spirit contends the March 2013 terminations were unrelated to the July/August 2013 layoffs that form the basis of this action.[16]  In March 2014, after the July/August 2013 layoffs, SPEEA and the King and Buescher law firms held a press conference to announce they would be filing charges of discrimination with the Equal Employment Opportunity Commission against Spirit.

### 3.    Initial Receipt of Documents

In the spring of 2014, Ms. King and Ms. Jones made multiple trips to Wichita to interview potential plaintiffs and witnesses in their investigation of possible legal claims against Spirit.[17]  During the investigation, Plaintiffs' counsel received reports of what witnesses considered unusual secrecy surrounding Spirit's performance review and layoff process in the months leading up to the July 2013 terminations.[18]  Witnesses told Ms.

---

[14] Caster Decl., ECF No. 173-4, Ex. 3, at ¶ 2.
[15] *Id*. at ¶¶ 5, 8-9, 11.
[16] *Id*. at ¶ 7.
[17] King Aff., ECF No. 181-3, Ex. 2, at ¶ 12.
[18] *Id*. at ¶¶ 19-21.

King and Ms. Jones that members of HR were shredding documents and instructing managers to destroy documents related to the performance improvement initiative.[19]

During a late March 2014 trip to Wichita, Bob Brewer, SPEEA's Midwest Director at the time, gave Ms. King, in Ms. Jones' presence, a packet of documents which he revealed had been delivered to the SPEEA office anonymously through a mail slot on or near the SPEEA office entrance.[20]  The package of documents included the following note, handwritten on lined pink paper: [21]



The original note was apparently misplaced at some unknown point between Mr. Brewer's transfer of the documents to Ms. King, and their eventual disclosure to Defendants.  The copy of this note, produced by the parties, appears to have a redaction in the lower-right corner.  Defendants suggest a signature was covered.[22]  Despite the appearance of redaction, Ms. King affirms that, although the original note was misplaced,

---

[19] *Id*. at ¶ 22.
[20] *Id*. at ¶¶ 28-29; *see* Brewer Dep. 25:17-26:16, Dec. 8, 2016, ECF No. 173-6, Ex. 5.
[21] ECF No. 173 at 9.
[22] *Id*. at 9-10.

the copy is an exact replica of the original.[23] Mr. Brewer testified he gave the original, unaltered note to Ms. King; the copy is a complete and accurate copy of the original note; and the original did not contain a name or other indication of the identity of its author.[24]

Mr. Brewer also testified he spent approximately 30 minutes reviewing the anonymously-received documents, but recognized they were confidential Spirit HR-related documents.[25] He decided to give the documents to Ms. King, because she would know what to do with them.[26] Mr. Brewer told Ms. King something to the effect that the documents might be helpful to her.[27]

On review of the documents later that day, Ms. King realized some pages were marked with a "privileged" stamp, and she immediately ceased document review.[28] When she returned to her Denver law firm, she gave the packet of documents to her paralegal, Dianne Von Behren, and instructed her to look at the documents only for the purpose of separating any documents marked "privileged," and sealing those in a separate envelope.[29] Ms. King states prior to the privileged-marked documents being separately sealed, neither she nor Ms. Von Behren, nor other Plaintiffs' counsel, read or reviewed the contents of those documents,[30] nor did they contact Spirit's counsel to notify them of the receipt of the documents. Ms. Von Behren contends she did not read the substance of

---

[23] ECF No. 181 at 10.
[24] Brewer Dep. 33:22-34:5.
[25] *Id.* at 27:18-22; 36:21-23, 41:22-24.
[26] *Id.* at 32:14-19, 46:25-47:11.
[27] Email from Diane King to Jim Armstrong (Oct. 27, 2016, 4:49 p.m.) (ECF No. 173, Ex. 2-7, at 36).
[28] King Aff. ¶¶ 31-33.
[29] King Aff. ¶ 35, 37-38; Von Behren Aff., ECF No. 181-6, Ex. 5, at ¶ 7.
[30] King Aff. ¶ 40.

the documents, and is not involved in substantive drafting, legal research, or interviewing of witnesses in this case, but is generally involved with file maintenance.[31]

The same day, Ms. King asked one of her law partners to research the Kansas Rules of Professional Conduct, along with relevant Kansas and Tenth Circuit caselaw, regarding the proper procedure for handling privileged documents intentionally produced by a third party prior to litigation.[32] The partner found no authority governing these specific facts, and Ms. King decided to retain the documents for three reasons: 1) to seek in camera review by the Court once a lawsuit was filed; 2) out of concern that relevant information was being destroyed by Spirit; and 3) because she did not review the privilege-marked documents and kept them sealed, she believed Spirit could suffer no harm.[33] On April 10, 2014, to avoid Spirit's potential destruction of information, Ms. King mailed a letter to Spirit, asking it to place a litigation hold on information related to the termination of employees in July 2013.[34] Ms. King's letter failed to alert Spirit's counsel to the documents she received.

### 4. Second Set of Documents

On approximately May 14, 2014, several weeks after receipt of the initial set of documents, a second set arrived by U.S. mail to Ms. King's law firm, addressed to Ms. King and Ms. Jones from an unknown source.[35] When Ms. King opened the envelope

---

[31] Von Behren Aff. ¶¶ 5, 9.
[32] ECF No. 181 at 12; King Aff. ¶ 41; Schwartz Aff., ECF No. 181-7, Ex. 6, at ¶ 4.
[33] Brewer Dep. 32:14-19, 46:25-47:11.
[34] ECF No. 173 at 5.
[35] ECF No. 181 at 14; King Aff. ¶ 44.

and saw it contained Spirit documents, she discontinued her review, and again gave the envelope to her paralegal, Ms. Von Behren, to separate those documents displaying a "privileged" marking.[36] As with the initial set of documents, Ms. King states neither she nor other counsel reviewed any documents marked privileged, and no copies were made of the privileged-marked documents.[37] Plaintiffs' counsel still failed to convey to counsel for Spirit the receipt of either set of documents.

### 5. Nature of the Documents

All the anonymously-delivered documents can be grouped into two primary categories: 1) those specifically marked by Spirit as "privileged", which were maintained in sealed envelopes by Ms. King following their receipt; and 2) those not privileged-marked by Spirit, a majority of which were marked "SPIRIT CONFIDENTIAL" and/or "Spirit Proprietary." For the purposes of this order, the documents will generally be referred to as either "privilege-marked" or "non-privileged" (or confidential/proprietary), although in this context, these labels describe the *physical markings* on the documents themselves, *not the documents' legal characterization* as either privileged or not.[38]

The non-privileged documents primarily contain copies of presentation slides from what Spirit describes as "a series of internal HR presentations and tracking sheets," developed by or at the direction of counsel, regarding the performance improvement

---

[36] King Aff. ¶ 47.
[37] *Id*. ¶ 48.
[38] The documents received by Ms. King and Ms. Jones were produced to the Court for in camera inspection.

initiative in 2012-13.[39]   The non-privileged documents also include a calendar from December 2012 displaying appointments and tasks, and a task list for an eight-day period in late March 2013.[40]   The documents, as produced by Plaintiffs to Spirit and to the Court for in camera review, lack a coherent order.   Confusingly, it appears some documents marked "privileged" may be part, or even duplicates, of other documents not privilege-marked.

### 6. After Receipt of Documents

Ms. King and Ms. Jones swore they set aside the privilege-marked documents. But they reviewed the non-privileged ones in order to determine whether they appeared protected, and concluded they were neither privileged—from a legal standpoint—nor otherwise protected.[41]   Plaintiffs' counsel admits they "understood, of course, that Defendants considered the documents to be confidential."[42]   Plaintiffs drew attention to one of the anonymously-produced documents, not privilege-marked, which plainly outlined Spirit's strict document retention and non-disclosure policy.[43]   Later, during counsel's email correspondence, Mr. Byers confirmed, "information pertaining to Spirit's business or its employees . . . that is not generally known outside the organization (other than known only through improper means) is considered confidential."[44]   Despite her

---

[39] ECF No. 173 at 21.
[40] ECF No. 181 at 9.
[41] King Aff. ¶ 51.
[42] ECF No. 181 at 15.
[43] ECF No. 181, 189 at 12-13 (sealed; the document itself is protected by the parties' Protective Order).
[44] King Aff. ¶ 55-56; *see also* Email from Boyd Byers to Diane King (Nov. 7, 2016, 3:34 p.m.) (attached as Ex. 2-1, ECF No. 181-3).

general awareness of Spirit's practices regarding confidentiality, Ms. King did not consider such a claim of confidentiality to prohibit review of the non-privileged information.[45]

Ms. King states the documents she reviewed corroborated much of the information she learned from prior witness interviews.[46]   And, she reviewed and considered the documents, believing them to be non-privileged, in both her pre-suit investigation and her preparation of the Complaint in this case.[47]   Ms. King denies use of the information in Plaintiffs' administrative charges, but she acknowledges there are three references to information gained from the anonymously-received documents in the 92-page Complaint.[48]

More than two years later, in July 2016, when preparing to file this lawsuit, Ms. King sought ethics advice regarding the handling of the documents from two initial sources:  1) from Colorado attorney Alexander Rothrock;[49] and 2) from local Kansas counsel, Mr. Rathbun.   In her initial telephone contact with Mr. Rothrock, he forwarded to her a Pennsylvania federal court opinion, *Burt Hill, Inc. v. Hassan*,[50] and an Oregon state ethics opinion[51] he felt "may be useful."[52]   He also provided her with names of Kansas counsel experienced in ethics issues—none of which were available at that time.

---

[45] King Aff. ¶ 54.
[46] *Id*. ¶¶ 58-59.
[47] *Id*. ¶¶ 52-53.
[48] *Id*.
[49] *Id*. ¶¶ 61-62.
[50] No. 09-1285, 2010 WL 419433 (W.D. Pa. Jan. 29, 2010) (unreported).
[51] Oregon Formal Op. 2011-186 (Revised 2015) (addressing the "Receipt of Documents Sent without Authority").
[52] King Aff. ¶¶ 63-64; Rothrock Decl., ECF No. 181-9, Ex. 8, at ¶ 5.

In a later telephone call with Ms. King, Mr. Rothrock distinguished the *Burt Hill* opinion from the facts of this case, and opined the applicable ethics rules do not set out a specific protocol to follow when counsel receives documents from an anonymous third party.[53]

When Ms. King consulted local counsel, Mr. Rathbun, he recommended two local attorneys for ethical opinions, and also suggested she contact the Kansas Office of the Disciplinary Administrator for guidance.[54] Acting on Mr. Rathbun's advice, on July 13 and 15, 2016, Ms. King consulted a Wichita, Kansas attorney with experience in ethics concerns: Terry Mann, of Martin, Pringle, Oliver, Wallace and Bauer, LLP. Ms. Mann researched Kansas authorities, and later opined there was no clear guidance from those authorities on how best to handle unsolicited documents, intentionally provided by an anonymous source, prior to litigation.[55]

On July 15, 2016, Ms. King discussed the situation with Deputy Disciplinary Administrator Kimberly Knoll by telephone. At that time, Ms. Knoll advised Ms. King to raise the issue of the privilege-marked documents with opposing counsel at the parties' Rule 26(f) planning conference, and to bring the issue to the Court's attention at the first Scheduling Conference.[56] Ms. Knoll also indicated the documents marked "confidential" were not a matter for attorney regulation.[57]

Both Ms. Mann and Ms. Knoll recommended Ms. King seek the Court's *in camera* review of the privileged-marked documents to determine whether they are, in

---

[53] King Aff. ¶ 64.
[54] *Id*. at ¶ 69; *see also* ECF No. 181 at 18.
[55] King Aff. ¶¶ 65-66; Mann Decl., ECF No. 181-10, Ex. 9, at ¶¶ 11-12.
[56] King Aff. ¶¶ 69-71.
[57] *Id*. ¶ 72.

fact, privileged, and Ms. King contends none of the ethics advisors she contacted recommended she immediately notify Spirit or counsel of the documents, or immediately return them.[58]

Plaintiffs filed their Complaint in this Court on July 11, 2016—more than two years after Ms. King received the first set of anonymous documents, and days *before* Ms. King contacted either Ms. Mann or Ms. Knoll. Surprisingly, and despite their legal experience, counsel justifies this behavior by advising the Court that none of the ethics opinions sought recommended earlier notification. Following the filing of the case, the privilege-marked documents remained sealed, and Ms. King (and all Plaintiffs' counsel) continued to maintain secrecy from Spirit surrounding the anonymous third-party disclosure.

On September 20, 2016, Plaintiffs served their first set of written discovery on Spirit.[59] Spirit contends much of those requests mysteriously focused on its performance improvement initiative in late 2012 through early 2013, and its termination of employees in March 2013, despite the fact that the earlier terminations—which are not the subject of this lawsuit—focused on different employee groups and utilized different performance criteria.[60]

Spirit outlines four separate telephone conversations and two email exchanges between counsel in August 2016, after Ms. King's conversations with Ms. Mann and Ms. Knoll, during which Ms. King—while having full knowledge—failed to inform opposing

---

[58] *Id.* ¶¶ 74-75.
[59] Pl.'s First Set of Interrog., ECF No. 173-3, Ex. 2-8.
[60] ECF No. 173, at 6.

counsel about her anonymous receipt of Spirit's documents.[61]  Ms. King admits counsel

conferred on multiple occasions in advance of the first Court-led conference, but

contends the first truly substantive telephone call between opposing counsel was held on

October 12, 2016—six days prior to the scheduled in-person status conference with the

Court.[62]  It was during that telephone call when Ms. King disclosed the existence of the

anonymously-received documents, her handling of them, and her intent to seek the

Court's guidance and review at the upcoming conference.

Ms. King's office then provided defense counsel with copies of the documents

without privilege markings, and, through a third-party copy service, provided sealed

envelopes to Spirit counsel containing duplicates of the privilege-marked documents.[63]

The parties exchanged emails regarding specifics of the documents' disclosure and the

extent of their dissemination and review.  Ms. King also spoke with Mr. Brewer to

confirm he neither knew the source of the documents nor made modifications to the pink

note.  Ms. King also searched Mr. Brewer's office to verify SPEEA did not maintain any

copy of the documents, [64] and she verified none of the named Plaintiffs in this case were

involved in disclosure of the documents.[65]

Following the in–person status conference on October 19, 2016, and discussion

with the Court, Defendant filed its motion for protective order and sanctions. Plaintiffs

produced all anonymously-received documents to the Court for in camera inspection.

---

[61] *Id*. at 18.
[62] ECF No. 181 at 21; King Aff. ¶ 77.
[63] ECF No. 181 at 21.
[64] ECF No. 181 at 22.
[65] King Aff. ¶ 26.

After thorough consideration of the parties' briefs and oral arguments, the Court is now prepared to rule.

## B. Duty to Confer

As a threshold matter, the Court first considers whether the parties have sufficiently conferred regarding this motion, as generally required by D. Kan. Rule 37.2 and Fed. R. Civ. P. 37(a)(1). Throughout the briefing, and during the in-person hearing, the parties demonstrated their multiple attempts to resolve their differences on these issues. Despite their unsuccessful efforts at resolution, the Court is satisfied they have adequately conferred as required.

## C. Arguments of the Parties

Defendants contend Plaintiffs' counsel violated their obligation to notify them, or Defendants' counsel, when they received the clearly confidential and privileged documents. Defendants ask that, as a sanction for Plaintiffs' failure to notify and the surreptitious retention and use of the documents, the Court should require the return of the documents and exclude them from use in this litigation. Defendants also seek payment of their attorneys' fees for litigating the issue. Defendants rely both on ethical duty and on protections under Fed. R. Civ. P. 26 for privileged and work product-protected information to seek return and exclusion of the documents.

Plaintiffs insist they acted under the guide of ethics advice, and they maintain a "cease review and notify" standard for intentionally-produced documents does not exist in the applicable law. And, because no such standard exists in this jurisdiction, they

argue there is no basis for sanctions. Plaintiffs further contend they presented the issue to the Court at the earliest opportunity, kept the privilege-marked information under seal without review in order to protect the information, and therefore Defendants cannot be prejudiced by their retention of the documents. They claim Defendants blur the necessary line between "confidential" and "privileged" documents in an effort to inappropriately protect information which is merely confidential, but discoverable, and wrongly characterize many of the documents as privileged, when in fact, they are not.

### D.     Analysis

Defendants' Motion for Protective Order and Sanctions presents three primary issues for the Court's consideration:   1) whether Plaintiffs' lawyers were obligated, by ethical rule, caselaw, or otherwise, to notify Spirit they had anonymously received confidential or privileged documents, and/or refrain from using them;  2) if Plaintiffs' lawyers were obligated to notify and/or cease use of any of the documents, what would be an appropriate remedy or sanctions for their failure to do so; and 3) if use of any of the documents is allowed, whether the documents Plaintiffs' counsel received are protected under Fed. R. Civ. P. 26 by attorney-client privilege and/or the work product doctrine. Each of these issues is addressed in turn.

### 1.     Obligations of Counsel upon Unsolicited Receipt of Confidential or Privileged Documents from an Anonymous Source

The central issue before the Court is whether Plaintiffs' attorneys were obligated to notify Defendants that they had anonymously received the documents, and/or to refrain

from using them. Both parties cite authorities which analyze both ethical rules and various courts' opinions in manners they believe to be persuasive to their arguments. This is a novel issue in this district (and for the time being, in this Circuit[66]), and the Court has carefully reviewed each authority. No one authority is entirely persuasive; but given the novelty of the issue, some of the relevant authorities are analogous and are briefly addressed.

### a.  Rules of Professional Conduct

While professionalism should be inherent in all aspects of litigation, the parties seem to believe—and unfortunately the Court agrees—the black-letter ethical rules fail to control this factual situation. But a review of the applicable Rules of Professional Conduct is an appropriate starting point. Although violation of an ethics rule does not necessarily require legal action—and conversely, sanctionable litigation conduct does not mandate an ethical finding—"most courts look to the ethics rules as evidence of standards of conduct"[67] when considering motions for sanctions and in other nondisciplinary contexts.[68] In doing so, courts recognize the importance of ethical standards to maintain the integrity of, and public confidence in, the legal profession.[69]

---

[66] *But see Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273 (D. Utah 2016) (dismissing case, in part, as sanction for plaintiff's improper acquisition of documents, and prohibiting use of those documents. Appeal filed Nov. 4, 2016, before the Tenth Circuit Court of Appeals.)

[67] Ann. Model Rules of Prof'l Conduct, Preamble and Scope ("Ethics Rules as Evidence of Standards of Conduct and Care") (8th ed. 2015).

[68] *Id.*

[69] *See, generally*, *Koch v. Koch Indus.*, 798 F. Supp. 1525, 1532 (D. Kan. 1992) (discussing the purposes behind prior Kansas Model Rule 1.9(a)); *see also* Kan. S. Ct. R. 226 (preamble to KRPC).

# i.    Kansas Ethical Rules

Pursuant to D. Kan. Rule 83.6.1(a), the Kansas Rules of Professional Conduct ("KRPC") as adopted by the Supreme Court of Kansas are "the applicable standards of professional conduct" for proceedings in federal courts in the District of Kansas.[70] The Kansas Supreme Court has also adopted the comments accompanying the rules.[71] The primary rule which appears somewhat applicable to this situation is KRPC 4.4, addressing "Transaction[s] with Persons Other Than Clients; Respect for Rights of Third Persons."  The rule provides:

> (a) In representing a client, a lawyer shall not use . . . methods of obtaining evidence that violate the legal rights of such a person.
>
> (b) A lawyer who receives a document or electronically stored information relating to the representation of the lawyer's client and knows or reasonably should know that the document or electronically stored information was inadvertently sent shall promptly notify the sender.

Comment [2] to KRPC 4.4 defines the phrase "inadvertently sent" as an accidental transmission, "such as when an email or letter is misaddressed or a document or electronically stored information is accidentally included with information that was intentionally transmitted."  The Comment goes on to instruct,

> If a lawyer knows or reasonably should know that such a document or electronically stored information was sent inadvertently, then this Rule requires the lawyer to promptly notify the sender in order to permit that person to take protective measures.  Whether the lawyer is required to take additional steps, such as returning the document or electronically stored information, is a matter of law beyond the scope of these Rules, as is the question of whether the privileged status of a document or electronically

---

[70] *Digital Ally, Inc. v. Z3 Tech., LLC*, No. 09-2292-KGS, 2010 WL 11489136, at *1 (D. Kan. Feb. 3, 2010) (unreported).
[71] Kan. S. Ct. R. 226 (prefatory rule).

> stored information has been waived. Similarly, this Rule does not address the legal duties of a lawyer who receives a document or electronically stored information that the lawyer knows or reasonably should know may have been inappropriately obtained by the sending person.

KRPC 4.4, and its accompanying comments, focus specifically on information received as a result of an unintentional transmission—not, as in this case, the result of a very intentional, yet anonymous, delivery. The Kansas ethical rules do not address a lawyer's duty to notify in an intentional disclosure situation.

Interestingly, a recent edition of an "Ethics Refresher" email guidance issued by the Kansas Office of the Disciplinary Administrator posed a hypothetical question related to KRPC 4.4 to the members of its listserv.[72] The factual scenario involved a husband and wife embroiled in a divorce case scheduled for trial. Prior to trial, Wife accessed Husband's email account without his permission, and obtained information about trial strategy contained in an email from Husband's counsel. Wife gave the email to her own counsel and told him how she obtained it. Wife's counsel used the information to prepare for trial, and did not disclose his receipt of the email until the middle of trial. The Kansas Disciplinary office posed to its listserv members the question of whether Wife's counsel violated the Kansas Rules of Professional Conduct. In this guidance, the Disciplinary Office said "yes," Wife's counsel *did* violate KRPC 4.4 by failing to promptly notify opposing counsel of his receipt of the email. As authority for its conclusion, the

---

[72] "Kansas Ethics Refresher No. 49" Email from the Kansas Office of the Disciplinary Administrator to the KSEthics listserv, provided as a service of the Washburn University School of Law (May 10, 2017, at 10:43 a.m.) (citing *In re Eisenstein*, 485 S.W.3d 759, 762 (Mo. 2016) (en banc) (maintained in chambers file).

disciplinary office cited a 2016 Missouri Supreme Court opinion[73] addressing very similar facts, and a May 2017 Ethics CLE presentation by a Kansas Court of Appeals Judge.[74] Although this guidance is by no means a formal or definitive opinion by either the Disciplinary Administrator or any Kansas court, and it dealt only with attorney-client privileged material, it does suggest Kansas might lean toward extension of KRPC 4.4 to, at a minimum, require notification of opposing counsel in an intentional disclosure situation, even if the rules themselves do not address the return or use of the information.

### ii.    ABA Model Rules and Opinions

Finding minimal guidance from the Kansas ethics rules, the Court examines the model rules. The American Bar Association's Model Rule of Professional Conduct 4.4 is identical to KRPC 4.4, and has been examined in ABA ethics opinions. One such opinion was issued in 1994, prior to the 2002 amendments to the Model Rules addressing inadvertent delivery. In ABA Formal Opinion 94-382, the ABA Ethics Committee required a lawyer who receives an adverse party's confidential-looking materials from an unauthorized source to refrain from reviewing materials "which are probably privileged or confidential;" notify the opposing party, and either follow the opposing party's instruction or cease review until a ruling is obtained by the court.[75] However, after the adoption of Model Rule 4.4(b) in 2002, specifically addressing inadvertent disclosure,

---

[73] *In re Eisenstein*, 485 S.W.3d at 762 (*see* discussion *infra* pp. 33-34).

[74] *See supra* note 72. The "Ethics Refresher" acknowledges an Ethics CLE presented May 5, 2017, by Honorable Steve Leben, Kansas Court of Appeals.

[75] ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 94-382 (1994) (discussing the unsolicited receipt of privileged or confidential materials).

ABA Formal Opinion 94-382 was withdrawn and replaced by ABA Formal Opinion 06-440.

In ABA Formal Opinion 06-440, the Committee noted the 1994 opinion "was influenced by principles involving the protection of confidentiality, the inviolability of the attorney-client privilege, the law governing bailments and missent property, and general considerations of common sense, reciprocity, and professional courtesy."[76] However, the Opinion conceded that "application of other law is beyond the scope of the Rules" and although those principles are "part of the broader perspective that may guide a lawyer's conduct," they are "not an appropriate basis for a formal opinion . . . for which [the Committee] must look to the Rules themselves."[77]  The Opinion goes on to clarify, "if the providing of the materials is not the result of the sender's inadvertence, Rule 4.4(b) does not apply" and "[w]hether a lawyer may be required to take any action in such an event is a matter of law *beyond the scope* of Rule 4.4(b)."[78]

In the Annotations to Model Rule 4.4, the Committee acknowledges the lack of consistency among various jurisdictions in Rule 4.4's adoption and application.[79]  The Annotations contain a reasoned discussion of the opposing views of the treatment of inadvertent disclosure as either similar, or distinct from, the unauthorized receipt of documents.  Despite the various approaches, the Committee acknowledges the rule

---

[76]  ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 06-440 (May 13, 2006) (specifically withdrawing Formal Op. 94-382).
[77] *Id*.
[78] *Id*. (emphasis added).
[79] Ann. Model Rules of Prof'l Conduct R. 4.4, annotation ("Scope of Rule 4.4") (8th ed. 2015).

"tempers the zeal with which a lawyer is permitted to represent a client"[80] but articulates that the scope of the rules, as written, do not reach unauthorized receipt.

Formal Opinion 06-440 and the comments to Model Rule 4.4 specifically note, "Rule 4.4(b) addresses receipt of documents sent *inadvertently*; it does not address the receipt of documents sent *intentionally but from an unauthorized source*."[81] Both ABA sources acknowledge that a lawyer's receipt of materials sent intentionally but from an unauthorized source is a "matter of law beyond the scope of Rule 4.4(b)." A later ABA ethics opinion continues this train of thought. In ABA Formal Opinion 11-460, the Committee found the ethics rules do not independently impose an ethical duty to notify opposing counsel of the receipt of private, potentially privileged communications between an opposing party and its counsel.[82] However, the opinion acknowledges even if the rules do not impose an obligation on counsel, additional obligations may stem from a court's supervisory authority, or civil procedure rules governing discovery.[83]

Despite the lack of clarity and direction from both the Kansas ethics rules and ABA Model Rules and opinions, the Court draws one important conclusion: although the

---

[80] *Id.*

[81] *Id.* ("Unauthorized, as opposed to inadvertent") (emphasis added) (citing ABA Formal Ethics Op. 06-440). *See also* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 11-460 (Aug. 4, 2011) ("Duty When Lawyer Receives Copies of a Third Party's E-Mail Communications With Counsel").

[82] ABA Formal Ethics Op. 11-460 (2011).

[83] *Id.*

black-letter rules do not specifically govern the situation currently before this Court, these rules do not end the Court's inquiry.[84]

### iii. Pillars of Professionalism

The District of Kansas also looks to another source for guidance on the types of behavior expected of counsel. Most Scheduling Orders issued in this District (including the Phase I Scheduling Order in this case, ECF No. 153) include the following directive:

> This court, like the Kansas Supreme Court, has formally adopted the Kansas Bar Association's *Pillars of Professionalism* (2012) as aspirational goals to guide lawyers in their pursuit of civility, professionalism, and service to the public. Counsel are expected to familiarize themselves with the *Pillars of Professionalism* and conduct themselves accordingly when litigating cases in this court.[85]

Formally adopted in 2012,[86] the *Pillars of Professionalism* outline counsel's obligations to other lawyers, the Court, and the public. These guidelines note:

> Professionalism focuses on actions and attitudes. A professional lawyer behaves with civility, respect, fairness, learning and integrity toward clients, as an officer of the legal system, and as a public citizen with special responsibilities for the quality of justice.
>
> Admission to practice law in Kansas carries with it not only the ethical requirements found in the *Kansas Rules of Professional Conduct,* but also a duty of professionalism. . . . Kansas lawyers have a duty to perform their work professionally by behaving in a manner that reflects the best legal traditions, with civility, courtesy, and consideration. Acting in

---

[84] *See* Ann. Model Rules of Prof'l Conduct, Preamble and Scope, at [16] (stating, "The Rules do not, however, exhaust the moral and ethical considerations that should inform a lawyer"); *see also* ABA Formal Op. 06-440 (citing the same).

[85] *See Rowan v. Sunflower Elec. Power Corp.*, No. 15-9227-JWL-TJJ, 2017 WL 680070, at *3 (D. Kan. Feb. 21, 2017).

[86] *See* Memorandum and Order, adopting the *Pillars of Professionalism* (Oct. 19, 2012) (available at http://www.ksd.uscourts.gov/pillars-of-professionalism-joint-order); *see also United States v. Shelton*, No. 14-10198-EFM, 2015 WL 7078931, at *3 n. 16 (D. Kan. Nov. 13, 2015) (adopting the *Pillars* previously embraced by the members of the Kansas Bar).

such a manner helps lawyers preserve the public trust that lawyers guard and protect the role of justice in our society. . . .[87]

Although the *Pillars* are not law, the Court expects counsel to reflect these tenets in all aspects of litigation.

## b. Illustrative Caselaw

Even if Plaintiff's counsel did not technically violate a written ethical rule, the Court must examine other law to determine whether other ethical standards apply. Neither the parties nor the Court's research unearthed binding opinions from the Tenth Circuit or this district; likewise, a review of caselaw from the Kansas state courts reveal nothing. The parties cited a number of opinions, though, from other jurisdictions which offer some guidance.

When Ms. King reached out for ethics opinions in July 2016, Mr. Rothrock provided her a 2010 unreported opinion from the Western District of Pennsylvania—*Burt Hill, Inc. v. Hassan*.[88] In *Burt Hill*, the defendants obtained plaintiff's privileged and confidential documents on two occasions prior to litigation: first, from an anonymous source in an envelope left outside defendants' office; and later, in an envelope left anonymously at one defendant's residence. The court found the defendants' professed lack of knowledge surrounding the source suspicious, and

---

[87] The *Pillars of Professionalism* are available on this Court's website at: http://www.ksd.uscourts.gov/pillars-of-professionalism/ (last updated Feb. 15, 2013).
[88] *Burt Hill, Inc. v. Hassan*, No. CIV.A. 09-1285, 2010 WL 419433 (W.D. Pa. Jan. 29, 2010) (unpublished).

criticized "defense counsel's failure to provide more specific information."[89] The court reviewed both Pennsylvania Rule of Conduct 4.4(b) and ABA Model Rule 4.4(b), and concluded neither rule addressed a situation where documents were sent intentionally but from an unauthorized source, and the law is not static where this issue is concerned.[90] However, the court noted "cases addressing unauthorized disclosures are decidedly unfavorable to defendants" and the receipt of "'anonymous source' documents would raise 'red flags' for any reasonable attorney" under those circumstances.[91] Although Mr. Rothrock, when advising Ms. King, distinguished the *Burt Hill* opinion because it relied, in part, on withdrawn ABA opinions and outdated or distinguishable caselaw, this Court still finds its analysis illuminating. As the *Burt Hill* court aptly noted, "if something appears too good to be true, it probably is,"[92] and if counsel is concerned to the point of hiring an ethics expert—let alone contacting multiple advisors—chances are, counsel may be best served to err on the side of caution. The *Burt Hill* court concluded sanctions were warranted, under its inherent sanctioning power, but declined to disqualify defendants' attorneys because counsel acted in reliance on ethical opinions, and disqualification would cause significant prejudice to defendants.[93] But the court determined that "firm sanctions [were] necessary to discourage similar conduct in the future."[94] The court ordered defendants to return or destroy all documents received

---

[89] *Id*. at *2.
[90] *Id*. at *3-4.
[91] *Id*. at *5.
[92] *Id*. at *5.
[93] *Id*. at *6.
[94] *Id*. at *7, *9.

through the two anonymous sources, and prohibited the documents' use for the remainder of the litigation.[95]

Also in 2010, the Northern District of Illinois addressed a similar situation. *Chamberlain Grp., Inc. v. Lear Corp.*,[96] was a patent case where the plaintiff patent holders brought a lawsuit against their competitor. After one plaintiff, JCI, received confidential and privileged documents by email from defendant Lear's former employee, the court found JCI did not have any part in soliciting the documents, but it did breach its duty to timely disclose its receipt of the documents. Although the disclosure occurred during discovery, and the court noted JCI's duty to timely produce the documents under an outstanding document request, the court also addressed the issue in the terms of ethical duty. Discussing ABA Formal Opinion 06-440 and Model Rule 4.4(b), the court "failed to see why [the duty to disclose an inadvertent receipt under ethics rule 4.4] should cease where confidential documents are sent intentionally and without permission. If anything, the duty to disclose should be stricter when a party obtains the documents outside legitimate discovery procedures."[97] The court went on to find "even in the absence of privilege, this duty to disclose extends to receipt of proprietary or confidential documents."[98] Finding sanctions appropriate, Lear's former employee was barred from testifying, and JCI was barred from further contact with him. JCI was also prohibited

---

[95] *Id.* at *9.
[96] *Chamberlain Grp., Inc. v. Lear Corp.*, 270 F.R.D. 392 (N.D. Ill. 2010).
[97] *Id.* at 398.
[98] *Id.* (citing *Burt Hill*, 2010 WL 419433, at *5 n. 6 (collecting cases where "courts have extended the "unauthorized disclosure" rules to materials that are "proprietary" or "confidential.")

from using the documents at issue, aside from those produced through legitimate discovery methods, and ordered to pay Lear's attorneys' fees expended in pursuing its motion for sanctions.[99]

Although *Burt Hill* and *Chamberlain* extended the duty to notify to an intentional disclosure situation, in 2011, the Western District of Wisconsin disagreed when addressing a similar issue. In the context of determining appropriate class representatives when deciding a motion for class certification, the court in *Chesemore v. Alliance Holdings, Inc.* was faced with plaintiffs' possession of defendants' confidential documents.[100] Before plaintiffs filed the class action lawsuit, at least one plaintiff encouraged other employees of defendants to disclose confidential documents to plaintiffs' counsel. Even if plaintiffs' counsel was unaware of how the documents were being gathered, defendants argued, at minimum, they knew the documents were confidential and failed to notify defendants of their receipt.[101] The *Chesemore* court reviewed the *Burt Hill* case, but found it relied on withdrawn ABA Opinions, rather than the newest ABA Formal Opinion 06-440.[102] Additionally, the court found *Burt Hill* relied on cases involving privileged documents, not confidential or proprietary information. Although the court noted "[t]here may be policy reasons for sanctioning a lawyer who fails to notify a third party of improperly-obtained documents given to counsel without permission," it did not analyze those policy reasons because the

---

[99] *Id.* at 399-400.
[100] *Chesemore v. Alliance Holdings, Inc.,* 276 F.R.D. 506 (W.D. Wis. 2011).
[101] *Id.* at 515.
[102] *Id.*

defendants did not argue them, and the court determined "the ABA's revision of its position on this matter weighs against" looking outside the rules.[103] The court found the receipt of non-privileged, confidential documents without authorization to be unethical or sanctionable "only . . . if counsel directed others to obtain those documents and release them without authorization."[104]

But this Court finds *Chesemore* distinguishable on multiple bases. First, unlike counsel in *Chesemore*, here the parties do articulate policy arguments. Also, this Court respectfully disagrees with *Chesemore*'s interpretation of ABA Formal Op. 06-440, because the Opinion clearly—along with the comment to the Model Rules—warns lawyers that the black-letter rules must not end their inquiry into ethical standards of attorney conduct. Rather, the Committee simply acknowledged it was unable to do more than analyze the Model Rules in its formal opinions, which does not limit the court's ability to address other law or policy. None of the documents in *Chesemore* appeared to be either attorney-client or work-product privileged, and it is unclear how long plaintiffs' counsel retained the documents before producing them in discovery.

This Court finds the actions of counsel particularly compelling in a 2014 opinion from the Northern District of California. In *Brado v. Vocera Commc'ns, Inc.*,[105] a former employee of defendant provided internal Vocera documents to an investigator for plaintiff's counsel, during plaintiff's fact investigation prior to the lawsuit. Upon receipt, the investigator suspected the documents might contain attorney-client privileged

---

[103] *Id.*

[104] *Id.*

[105] *Brado v. Vocera Commc'ns, Inc.*, 14 F. Supp. 3d 1316 (N.D. Cal. 2014).

information.  Plaintiff's counsel sequestered the documents without reviewing them, and immediately hired separate counsel to hold the documents and notify the opposing party. Neither plaintiffs nor their counsel ever reviewed any of the documents, and promptly sent a copy of the documents to the defendant for review.  Defendant sought to bar use of the documents until produced pursuant to formal discovery.[106]  The *Brado* court examined a number of previous cases and applied several factors to determine whether exclusion of the documents would be appropriate.[107]  Finding no inappropriate conduct on behalf of plaintiffs' counsel, in addition to weighing other factors, the court permitted plaintiffs to use the documents, subject to a protective order and claims of privilege.[108]

A 2016 case from the District of Utah, now on appeal to the Tenth Circuit, compared the actions of counsel in *Brado* to the facts before it.  In *Xyngular Corp. v. Schenkel*,[109] the district court addressed the situation where the defendant collected confidential information, and encouraged another employee to collect information, regarding plaintiffs' business activities and employees.  The collection of information occurred for at least a year prior to the parties' litigation.  Although there was some disagreement about when plaintiffs discovered the extent of defendant's document gathering, the issue came to the court during a hearing on plaintiffs' motion for temporary restraining order.  Plaintiffs later filed a motion for sanctions, including

---

[106] *Id*. at 1318.

[107] *Id.* at 1320 (collecting cases to discuss various factors for consideration when deciding whether wrongfully obtained internal documents may be used in litigation).

[108] *Id*. at 1323-24.

[109] *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273 (D. Utah 2016) (currently on appeal to the Tenth Circuit).

dismissal of defendant's counterclaims, claiming defendant improperly encouraged an employee to steal documents, shared them with his counsel, failed to return them, and used them to support his request for a restraining order. Defendant filed his own motion for terminating sanctions on other bases. The court cited its inherent powers to sanction litigation misconduct.[110] After considerable analysis, the court found that defendant engaged in sanctionable conduct and that terminating sanctions were warranted. The court concluded "it may use its inherent powers to sanction a party who circumvents the discovery process and the rules of engagement employed by the federal courts by improperly obtaining evidence before litigation and then attempting to use that evidence in litigation."[111] The court also drew attention to defendant's inaction: both his failure to decline the information offered by the employee, and his lack of "complete or meaningful disclosure" of this document gathering until after the lawsuit began.[112] The court criticized defendant for circumventing the judicial process, noting "[i]t was also inappropriate for the [defendant] and his lawyers to unilaterally decide whether the documents were proprietary, confidential, or privileged, where 'those decisions are best resolved through the formal discovery process.'"[113] The court dismissed defendant's counterclaim; excluded the improperly-obtained documents (except those which plaintiffs

---

[110] *Id*. at 1311-12.
[111] *Id*. at 1315.
[112] *Id*. at 1323.
[113] *Id*. at 1316 (quoting *Glynn v. EDO Corp.*, 2010 WL 3294347, at *5 (D. Md. Aug. 20, 2010) (unreported)).

themselves utilized); and awarded plaintiffs their attorneys' fees and costs expended in filing and defending the sanctions motions.[114]

In addition to the above decisions from federal district courts, two state court opinions also offer direction. In *Merits Incentives, LLC*, the Nevada Supreme Court in 2011 pronounced a new "notification rule" to "apply to situations where an attorney receives documents or evidence from an anonymous source or from a third party unrelated to the litigation."[115] In *Merits*, plaintiffs received an anonymous package containing a disk, after filing its lawsuit. The disk contained over 500 confidential and privileged documents belonging to the defendant. Although plaintiff supplemented its pretrial disclosures by identifying and providing a copy of the disk, defendant sought disqualification of plaintiff's counsel.[116] The district court found, in part, that plaintiff's counsel acted reasonably by promptly notifying opposing counsel, and declined to disqualify counsel under those circumstances.[117] Defendant then petitioned the Nevada Supreme Court for mandamus, asking the court to either compel the district court to reconsider, or instruct the district court to disqualify counsel. Although the high court declined to overturn the district court's decision, it did "take [the] opportunity to adopt a notification requirement" by analogizing to Nevada Rule of Professional Conduct 4.4(b)—the rule requiring notification when receiving documents inadvertently.[118] The

---

[114] *Id*. at 1327.
[115] *Merits Incentives, LLC v. Eighth Judicial Dist. Court of State, ex rel. Cty. of Clark*, 262 P.3d 720, 724 (Nev. 2011).
[116] *Id*. at 722-723.
[117] *Id*. at 723.
[118] *Id*. at 724.

court also adopted a nonexhaustive list of factors to consider when deciding whether to disqualify an attorney who, through no wrongdoing of his or her own, received an opponent's privileged materials.[119]

More recently, in 2016 the Missouri Supreme Court addressed a party's procurement and use of the opposing party's privileged information. *In re Eisenstein*[120] was a disciplinary proceeding before the Missouri Supreme Court arising from a divorce case. In the divorce action, attorney Joel Eisenstein represented the husband. Without the knowledge or permission of his wife, Husband accessed her personal email and obtained not only her pay records but attorney-client communications between Wife and her counsel, including a list of direct examinations questions in preparation for trial. Husband delivered the information to Eisenstein in November 2013, and Eisenstein did not notify opposing counsel of the information until the second day of the divorce trial, three months later. The Disciplinary Hearing Panel found that Eisenstein utilized the payroll information in a settlement proceeding prior to trial, and understood his possession of that information and the attorney-client communications was prohibited.[121] The Missouri Supreme Court found Eisenstein violated Missouri Rule of Professional Responsibility 4–4.4(a), which prohibits a lawyer from using methods of obtaining evidence that violate the legal rights of a third party, as well as Rule 4-8.4(c), prohibiting conduct involving dishonesty. The court found "Mr. Eisenstein's failure to promptly disclose his receipt of the information and return it to [opposing counsel] until after the

---

[119] *Id*. at 726-27 (citing *In re Meador,* 968 S.W.2d 346 (Tex. 1998)).
[120] *In re Eisenstein,* 485 S.W.3d 759, 762 (Mo. 2016) (en banc).
[121] *Id*.

trial had commenced supports a finding that Mr. Eisenstein utilized Husband's improper acquisition of Wife's personal information, including privileged attorney client communications."[122]  The court also found Mr. Eisenstein violated MRPR 4–3.4(a) by concealing his possession of Wife's payroll information and opposing counsel's direct examination questions until the second day of trial.[123]

Discussion of the cases above is by no means intended to be exhaustive of the numbers of jurisdictions addressing intentional and/or unauthorized disclosures of sensitive or privileged information outside the confines of formal discovery.  Although several jurisdictions addressed variations of the topic, there appears to be no binding authority within either this District or the Tenth Circuit.  The parties disagree regarding which of the above cases, and others, are appropriate bases for analysis, but given the lack of binding authority, this Court looks to these other cases as simply illustrative of the broader perspective.

### c.  Expectations for Counsel

To determine the standards of conduct expected from counsel in this District, this Court looks to analogous ethical standards, persuasive caselaw, and its own inherent powers to sanction conduct of parties and counsel appearing before it.  These inherent powers of the Court are not governed by any specific rule or statute,[124] but are

---

[122] *Id.*

[123] *Id.* at 763.

[124] *Xyngular Corp.*, 200 F. Supp. 3d at 1301 (citing *Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1320 (10th Cir. 2011) ("We have said that district courts enjoy 'very broad discretion to use sanctions where necessary to insure that lawyers and parties fulfill their high duty to insure the expeditious

"necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."[125]  And it bears repeating that counsel's violation of an ethical standard does not necessarily require legal action—and conversely, sanctionable litigation conduct does not mandate an ethical finding.  However, it is well within this Court's power to expect a level of professionalism and ultimate fairness from counsel appearing in U.S. District Court for the District of Kansas.

At the outset, it is important to note, and the Court acknowledges, Plaintiffs' counsel did not take part in obtaining the information at issue—both sets of documents were received anonymously.  The circumstances surrounding the note attached to the first packet of documents, which appears redacted, are highly suspicious, but the Court has no information before it to conclude any named Plaintiff was involved in the disclosure of the documents, so the Court will not assume as much.  Therefore, the central issue before the Court is counsel's receipt, retention, and use of an opposing party's confidential and privileged-marked information from an unknown source, without notifying the opposing party or counsel for more than two years.

Again, although the Kansas Rules of Professional Conduct do not specifically address this situation, the Court finds it entirely appropriate to analogize to KRPC 4.4(b).

---

and sound management of the preparation of cases for trial.'" (internal citation omitted)); also citing *Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 765 (10th Cir. 1997) (stating that federal courts have the inherent power "to sanction conduct that abuses the judicial process"); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) ("Courts of justice are universally acknowledged to be vested, by their creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates."); *id.* at 46 (noting that "the inherent power extends to a full range of litigation abuses").

[125]*Chambers*, 501 U.S. at 43 (internal citation and quotation marks omitted).

If a lawyer receives information relating to the representation of his or her client, and knows or even reasonably *should* know the information was unintentionally sent by either the opposing party or its lawyer—the rule requires the lawyer to "promptly notify" the sender. The purpose behind this rule is to permit the accidental sender—assumed to be the proper custodian of the documents—to take protective measures.[126] Regardless of the omission in the rule, the Court frankly finds it nonsensical to apply a separate and lesser standard to intentionally-disclosed documents. In fact, given the documents' dubious origins, protections applied to Defendants' proprietary or privileged-marked information should be at least equal, if not heightened, when the disclosure is clearly unauthorized.[127]

The *Eisenstein* case involved a party's own direct, unauthorized access of privileged information. But when the Missouri court, and later the Kansas Disciplinary Office in its Ethics Refresher, analyzed the issues involved, both specifically focused on the conduct of counsel after receiving the information.[128] The Missouri court noted, "[t]he fact that [the party] obtained the information does not negate the fact that [counsel] received the information, realized it was 'verboten,' and then failed to disclose his receipt of that information" until after he utilized it at trial.[129] Likewise, most troubling to this Court is not the *receipt* of the documents themselves, but the long period of retention and use prior to notification of Defendants.

---

[126] Kan. S. Ct. R. 226 at R. 4.4 cmt. [2] (analyzing 4.4(b)).

[127] *See Chamberlain Grp.*, 270 F.R.D. at 398 ("If anything, the duty to disclose should be stricter when a party obtains the documents outside legitimate discovery procedures") (citing *Burt Hill*, 2010 WL 419433, at *4-5 (collecting cases where courts extend the duty to notify in an inadvertent disclosure situation to an intentional disclosure)).

[128] Ethics Refresher, *supra* note 72 (citing *Eisenstein*, 485 S.W. 3d at 762).

[129] *Eisenstein*, 485 S.W. 3d at 762.

Instead of "lying in wait"[130] with the documents, even if Plaintiffs' counsel was not required by black-letter ethical rule to notify Defendants, obligations of decency, fundamental fairness, and frankly the golden rule,[131] should have prompted counsel to notify Defendants in order to avoid problems later. The ethical rules make clear the rules themselves should not end counsel's inquiry, and simply because the rules may not specifically address the situation before counsel does not mean counsel should "throw up their hands and conclude that nothing can or should be done to protect or ameliorate the document owner's privilege and confidentiality interests."[132] In other words, just because you are not *required* by some written regulation to act in a certain manner does not mean you should not.

Although the Court recognizes counsel's efforts to segregate those documents specifically marked "privileged," doing so does not remove the taint from the situation. Permitting counsel's paralegal to separate the documents is tantamount to counsel doing

---

[130] *See Merits Incentives,* 262 P.3d at 727 (noting "instead of lying in wait with the documents, [counsel] went out of [his] way to point out that [he] had received them and to let Defendants ascertain their provenance, giving every opportunity for Defendants to register an objection and demand return and non-use").

[131] "The Golden Rule and common courtesy will carry a lawyer far on the road to professionalism." J. Nick Badgerow, *The Lawyers' Creed of Professionalism: Some Observations from the Field*, 69 J. Kan. B. Ass'n 24, 30 (Feb. 2000). *See also, e.g., Stack v. Abbott Labs., Inc.*, No. 1:12CV148, 2016 WL 4491410, at *7 (M.D.N.C. Aug. 24, 2016), *report and recommendation adopted,* No. 1:12CV148, 2016 WL 5679028 (M.D.N.C. Sept. 30, 2016) (when discussing the doctrine of equitable estoppel, noting the doctrine is based upon an application of the "golden rule" and "[i]t requires that one should do unto others as, in equity and good conscience, he would have them do unto him, if their positions were reversed") (internal citations omitted).

[132] *Chamberlain Grp.*, 270 F.R.D. at 398 (citing *Burt Hill*, 2010 WL 419433, at *3).

so, herself.[133]   The best practice would have been to notify opposing counsel immediately, and seek outside counsel or an escrow agent, of sorts, to maintain the documents until the Court was able to examine the issue.   Compare counsel's actions in this case to that of plaintiffs' counsel in *Brado* (discussed above).[134]   There, the documents were immediately sequestered and sent to outside retained counsel prior to plaintiffs' counsel reviewing them.   The outside law firm facilitated notice to defendants, permitting them to assert their claims of confidentiality and privilege.[135]   Such a process eliminates any appearance of wrongdoing, and would mostly likely have preserved the documents' use in later discovery and avoided sanctionable conduct.

But the method in which Plaintiffs' counsel, in this case, handled the disclosure sidesteps the orderly discovery process, and inappropriately permitted Plaintiffs' counsel to be the ultimate gatekeeper—for over two years—of Defendants' claims of confidentiality and privilege.[136]   It was not Plaintiffs' prerogative to unilaterally determine whether the information received anonymously was truly proprietary, confidential, privileged, or some combination of those labels, and use the information it deemed appropriate.   "Rather, those decisions are best resolved through the formal discovery process."[137]

---

[133] *See, generally, Zimmerman v. Mahaska Bottling Co*., 270 Kan. 810 (2001) (finding the "provisions of the KRPC apply equally, however, to nonlawyer employees" when considering confidentiality issues under KRPC 1.10 regarding disqualification).

[134] *Brado*, 14 F. Supp. 3d at 1318.

[135] *Id*.

[136] *See Glynn*, 2010 WL 3294347 at *5.

[137] *Xyngular Corp.*, 200 F. Supp. 3d at 1317 (citing *Glynn*, 2010 WL 3294347 at *5; and *Jackson v. Microsoft Corp.*, 211 F.R.D. 423 (W.D.Wash. 2002), *aff'd*, 78 Fed. App'x 588 (9th Cir. 2003) (unpublished)).

Not only is the Court troubled by counsel's failure to immediately notify opposing counsel, but it is also concerned regarding the considerable length of retention—more than two years—and the use of the information for Plaintiff's benefit. Regardless of whether Plaintiffs' ultimate plan was to submit the documents to the Court at a later date, the timing of the ultimate notification gives the Court pause. Counsel did not immediately, upon the filing of the case, alert Defendants or the Court regarding this potential issue. Although they kept the privilege-marked documents sealed, they failed to notify Defendants until after reviewing and utilizing the alleged proprietary information in, at a minimum, Plaintiffs' pleadings and discovery requests. Given the longstanding history between SPEEA and Spirit, even if not through these particular named plaintiffs, Plaintiffs' counsel was well aware of the identities of Spirit's counsel, and disclosure would not have created a burden to Plaintiffs or their counsel. Instead—having been alerted to the documents' existence—Plaintiffs would surely have sought them through appropriate channels of discovery. Although Plaintiffs' counsel had the noblest of intentions to eventually disclose the documents, the disclosure simply came too late.

Plaintiffs' concerns regarding potential evidence destruction are understandable, because witnesses informed counsel Defendants were destroying documents. But the "potential destruction of documents does not entitle a party to circumvent the court rules and engage in self-help."[138] And, even if Defendants' alleged "discovery failures should be considered in connection with [Plaintiffs'] dubious ethical conduct, the Court views

---

[138] *Bell v. Lockheed Martin Corp.*, No. CV 08-6292 (RBK/AMD), 2010 WL 11450407, at *7 (D.N.J. June 30, 2010) (unreported).

the latter as far more problematical and disconcerting than the former."[139] Plaintiffs' counsel should have allowed the discovery process to work, rather than assuming it would be unavailing and taking matters into their own hands.

Plaintiffs' counsel also maintains they acted on the advice of ethics experts. However, although counsel researched ethics rules when receiving the documents, a majority of the caselaw discussed above existed prior to that date, and a review of existing caselaw—even if non-binding—should have given counsel pause. Moreover, counsel did not seek additional, more thorough ethics advice until two years later, when preparing to file their lawsuit. Unlike in *Burt Hill*, where counsel's reliance on outside ethics opinions was a mitigating factor, counsel here did not rely upon ethics experts during the two years they reviewed and utilized the information. And, quite frankly, the Court is seriously baffled that out of all the legal minds which reviewed these facts, not one appeared to put themselves in the shoes of the opposing counsel or Defendants.

On the facts before this Court, there appears to be no reason to distinguish between those documents marked privileged and those which are merely marked confidential or proprietary. KRPC 4.4 does not distinguish between privileged or confidential materials, but relates to information merely "relating to the representation of the lawyer's client" that a receiving lawyer "knows or reasonably should know were inadvertently sent."[140] Likewise, here, receiving counsel knew both that the documents related to representation of their clients, and knew—from the markings on the documents

---

[139] *Burt Hill*, 2010 WL 419433, at *8.
[140] Kan. S. Ct. R. 226 at R. 4.4, and 4.4 cmt. [2].

themselves and from their prior dealings with Spirit—that the documents were not intended for disclosure outside Defendants' business. Therefore, the Court finds Plaintiffs' counsel had a duty to, at minimum, immediately notify Defendants of the disclosure, regardless of its intentional nature.

## 2. Sanctions

Defendants seek a range of sanctions for Plaintiffs' counsel's failure to notify. To be clear: the Court does not specifically rely upon the written rules of the KRPC or ABA, the ethical opinions of the ABA, or any specific caselaw as binding precedent. What the Court examines here are the standards expected of its parties and counsel, to act with "civility, courtesy, and consideration,"[141] in order to maintain fairness and the public's confidence in both the legal profession and the legal process.[142] Both caselaw and ethics opinions discussing an attorney's unauthorized receipt of an adverse party's information focus on two primary interests: the conduct of counsel itself, and the effects of that conduct and whether it is "prejudicial to the administration of justice."[143] As noted by the District of New Jersey:

> It is the general abuse of the discovery process being conducted under the authority of this court and the ability to punish the perpetration of fraud

---

[141] *Pillars of Professionalism*, available at: http://www.ksd.uscourts.gov/pillars-of-professionalism/ (last updated Feb. 15, 2013).

[142] *See Farmer v. Banco Popular of N. Am.*, 791 F.3d 1246, 1258 (10th Cir. 2015) (noting, "the Court in *Chambers* ruled that when express laws . . . do not reach the entirety of a litigant's bad-faith conduct, a court may rely instead on its inherent power to impose punitive sanctions.") (citing *Chambers,* 501 U.S. at 57 ("As long as a party receives an appropriate hearing ... the party may be sanctioned for abuses of process occurring beyond the courtroom...."); *see also id.* at 62–63 (Kennedy, J., dissenting)).

[143] *Maldonado v. New Jersey ex rel. Admin. Office of Courts-Prob. Div.*, 225 F.R.D. 120, 139 (D.N.J. 2004).

upon the court that must be sanctioned. It is not necessary to demonstrate that the purloined [documents are] relevant to this lawsuit. *Rather, it is the conduct that must be recognized as an interference with the judicial process and the orderly and fair administration of justice.*[144]

Determining the appropriate sanctions for counsel's failure to notify Defendants in a timely fashion, then, involves an analysis of whether this failure prejudiced the administration of this case.

### a. Disqualification

When determining an appropriate sanction for a party or counsel's questionable conduct, a court should "impose the least severe sanction that will punish the offending party for his wrongdoing, remedy the prejudice to and harm suffered by the adverse party and the judicial process, deter future litigants from engaging in similar conduct, and inspire confidence in the integrity of the judicial process."[145] Although Defendants concede they do not seek disqualification of Plaintiffs' counsel, they did raise the issue, and the Court possesses the inherent power to consider disqualification.[146]

This District has previously acknowledged that, although an attorney's culpable behavior may be grounds to disqualify counsel, "disqualification is not automatic. Rather, disqualification depends on whether the case is tainted by" the questionable

---

[144] *Id.* at 135 (emphasis added) (citing *Perna v. Electronic Data Corp.,* 916 F. Supp. 388, 400 (D.N.J. 1995)).

[145] *Xyngular Corp.*, 200 F. Supp. 3d at 1327.

[146] *Biocore Med. Techs., Inc. v. Khosrowshahi*, 181 F.R.D. 660, 664 (D. Kan. 1998), *on reconsideration,* No. 98-2031-KHV, 1998 WL 919126 (D. Kan. Nov. 6, 1998), and *aff'd sub nom. Butler v. Biocore Med. Techs., Inc.*, 348 F.3d 1163 (10th Cir. 2003) (internal citations omitted).

conduct.[147]  Although no binding authority exists under these facts, where an attorney has

received an opposing party's confidential or privileged materials, through no affirmative

conduct of her own, both the Western District of Washington[148] and the Nevada Supreme

Court[149] have relied upon a Texas Supreme Court case, *In re Meador,*[150] to consider

disqualification.  *Meador* articulated a non-exhaustive list of factors to aid in determining

whether disqualification is warranted.  Those factors include:

> 1) whether the attorney knew or should have known that the material was privileged;
>
> 2) the promptness with which the attorney notifies the opposing side that he or she has received its privileged information;
>
> 3) the extent to which the attorney reviews and digests the privileged information;
>
> 4) the significance of the privileged information; i.e., the extent to which its disclosure may prejudice the movant's claim or defense, and the extent to which return of the documents will mitigate that prejudice;
>
> 5) the extent to which movant may be at fault for the unauthorized disclosure; and
>
> 6) the extent to which the nonmovant will suffer prejudice from the disqualification of his or her attorney.[151]

---

[147] *Klaassen v. Univ. of Kansas Sch. of Med.*, No. 13-2561-DDC-KGS, 2016 WL 6138169, at *7 (D. Kan. Oct. 21, 2016) (quoting *Archuleta v. Turley*, 904 F. Supp. 2d 1185, 1192 (D. Utah 2012); also citing *Layne Christensen Co. v. Purolite Co.*, No. 09-2381-JWL-GLR, 2011 WL 1113543, at *5 (D. Kan. Mar. 24, 2011) )); *Barragree v. Tri-County Elec. Co-op, Inc.*, 950 P.2d 1351, 1359 (Kan. 1997)).

[148] *Richards v. Jain*, 168 F. Supp. 2d 1195, 1205 (W.D. Wash. 2001) (citing *Meador*, 968 S.W.2d at 351–52).

[149] *Merits Incentives*, 262 P.3d at 726-727 (citing *Meador*, 968 S.W.2d at 351–52).

[150] *In re Meador,* 968 S.W.2d 346 (Tex. 1998).

[151] *Merits Incentives,* 262 P.3d at 726 (quoting *Meador,* 968 S.W.2d at 351-52 (Tex. 1998)); *see also Richards*, 168 F. Supp. 2d at 1205.

Briefly applying these factors, the first three weigh in favor of disqualification. There is no doubt Plaintiffs' counsel knew the information was privileged or considered proprietary, because a majority of the documents were clearly marked. Additionally, the Court considers two years an extraordinary length of time between receipt of the documents and notification to Defendants. Although Plaintiffs' counsel attempted to sequester those documents privileged-marked, as previously discussed, the paralegal's review extends to counsel. Even if counsel did not specifically review the privilege-marked items, the Court reviewed all of the documents, and found instances of overlap between those items marked privileged and those unmarked. Counsel reviewed those documents they unilaterally determined to be merely confidential, and admittedly used the information in both the pleadings and discovery requests.

The next two factors are, at best, neutral. At this point, and without additional context in which to examine the documents, the Court is hard-pressed to discern the true significance of the disclosed information—largely due to the manner in which it was produced to the Court for review[152] (whether the fault for this lies with Plaintiffs or with the anonymous sender is unknown.) Additionally, neither party in this case appears to be at fault for the disclosure of the information.

The final factor—prejudice resulting from disqualification—ultimately decides this issue. Frankly, under these facts, the Court is sincerely inclined to disqualify the King & Greisen firm based upon the two-year delay and use of the documents prior to notifying Defendants and the resulting one-upmanship. The delay and seemingly

---

[152] *See infra* discussion Part II.E, pp. 54-55.

strategic timing of disclosure leaves more than a bad taste in the Court's mouth. However, the Court must look at the overall picture and how disqualification would work an injustice to the litigants, despite how appropriate it may seem in light of counsel's misbehavior.

The Court first looks at injustice to the Plaintiffs, assuming none were involved in misappropriation of documents. If Ms. King and Ms. Jones were disqualified, after distinguishing them from other Plaintiffs' counsel by virtue of their two years of use and knowledge—where must the line be drawn? There is no evidence regarding whether, or when, other Plaintiffs' counsel knew about or reviewed the documents. All Plaintiffs' counsel (including out of state and local counsel) are listed on the discovery requests. Without any evidence of how far the information was disseminated and when, and who ultimately knew about or utilized it, the Court is unable to dissociate the King & Greisen firm from other Plaintiffs' counsel. But disqualification of all counsel, for all 24 named plaintiffs and 50-plus putative plaintiffs, would not only cripple Plaintiffs' case, but would affect all litigants. Leaving Plaintiffs without counsel would effectively slam the brakes on this phased litigation, which has already become increasingly labored with numerous motions, requests for extensions, etc., since its filing nearly a year ago— prejudicing not only Plaintiffs, but the entire process.

Defendants were clear in their briefing they do not seek disqualification of Plaintiffs' counsel. And although the Court is certainly within its inherent power to do

so, when balancing the necessary factors, the Court is unsatisfied the "blunt remedy"[153] of disqualification is appropriate.

### b.     Evidentiary Sanctions

Though disqualification appears too drastic a remedy in this situation, the Court may exercise its same inherent powers to impose an evidentiary sanction.  Such sanctions must not necessarily arise from any specific rule or statute, but the Court may supervise and sanction parties in order to "achieve the orderly and expeditious disposition of cases."[154]  It is within this vein that the Court considers evidentiary sanctions.

In *Brado v. Vocera Communications,*[155] the court surveyed cases from other jurisdictions to determine whether improperly-obtained documents may be used.  Some of the factors considered by the court were:

1) whether there was improper conduct by counsel;[156]
2) whether there was a direct benefit to the appropriator;[157]
3) whether other disincentives to the theft were available;[158]
4) whether there was any prejudice to the opposing party.[159]

---

[153] *Biocore Med. Techs*., 181 F.R.D. at 664 ("Because disqualification affects more than merely the attorney in question, the Court must satisfy itself that this blunt remedy serves the purposes behind the ethical rule in question").

[154] *Xyngular Corp.*, 200 F. Supp. 3d at 1301 (citing *Chambers*, 501 U.S. at 43); *see also Maldonado*, 225 F.R.D. at 132.

[155] *Brado*, 14 F. Supp. 3d at 1320.

[156] *Id*. (citing *Burt Hill*, 2010 WL 419433 at *2, *7; *In re Shell Oil Company,* 143 F.R.D. 105, 107-08 (E.D. La. 1992)).

[157] *Id*. at 1321 (citing *Fayemi v. Hambrecht and Quist, Inc.,* 174 F.R.D. 319 (S.D.N.Y. 1997); *JDS Uniphase Corp. v. Jennings,* 473 F. Supp. 697 (E.D. Va. 2007)).

[158] *Id*. (citing *JDS Uniphase Corp.,* 473 F. Supp. at 702-03).

[159] *Id*. at 1321-22 (citing *Ashman v. Solectron, Corp.,* No. C–08–1430 JF, 2008 WL 5071101 (N.D. Cal. Dec. 1, 2008)).  *Brado* also discussed a fifth factor, the public policy in favor of whistleblowers, but this factor was applied in the context of securities laws and the Sarbanes-Oxley Act of 2002.  Such issues are not at play in this litigation, and the Court declines to apply this factor.  *Brado*, 14 F. Supp. 3d at 1323.

To begin briefly addressing each factor, the Court has already discussed sanctionable conduct by Plaintiffs' counsel, and it needs no further discussion. As for any direct benefit to the appropriator, this factor is difficult to assess. Even if not directly appropriated by a named plaintiff, the improper disclosure of Defendants' proprietary documents worked a benefit to Plaintiffs. It enabled Plaintiffs to see the underlying processes Defendants took to restructure their review process with direct involvement of Defendants' counsel, and Plaintiffs admit to utilizing the information in both their Complaint and discovery. It does appear a direct benefit was conferred on Plaintiffs, even if they are not the appropriators. The Court is loathe to incentivize employees to engage in wrongful conduct to gain an upper hand in litigation. Both of these factors, then, weigh in favor of exclusion.

If other disincentives, aside from exclusion, appear available, courts tend to lean toward ordering only the return of the documents, rather than exclusion. For example, in *Brado*, the employee who misappropriated documents was subject to separate claims for breach of contract or conversion.[160] However, in this case, the identity of the misappropriator is unknown, so other disincentives are unavailable. Consideration of this factor also suggests exclusion is appropriate.

Of particular significance to the discussion is the prejudice to Defendants—generally analyzed as a matter of "timing versus substance." If all of the information wrongfully obtained would have been disclosed through the discovery process later, it

---

[160] *Id.* at 1321.

may appear difficult for Defendants to demonstrate actual prejudice. But, given the contents of the documents and Defendants' contentions regarding the documents' proprietary and privileged nature, it is unlikely Spirit would have voluntarily produced many of the documents provided to Plaintiffs' counsel. Plaintiffs' actions foreclosed Defendants' ability to argue against production of the documents. Had the documents been the topic of the discovery process, the Court imagines similarly spirited motion practice on the issue would have occurred. Although some of the documents are likely to have been produced, and this seems, on its face, a matter of mere timing, the Court must consider the greater picture. Defendants were completely unaware, for more than two years, that Plaintiffs possessed their confidential and (at least partially) privileged documents, and this gave Plaintiffs a two-year strategic head start. Even severe evidentiary sanctions cannot erase what Plaintiffs' counsel learned from their review. Additionally, the timing of the disclosure established a distrustful tone for this litigation, which could result in a barrage of unknown issues. Under these circumstances, it is difficult to define the prejudice as merely that of a timing issue.

Considering the balance of the above factors, an evidentiary sanction is appropriate. Plaintiffs must return to Defendants all documents disclosed anonymously in March and May 2014 (PLAP #001-064; PL # 000001-000052), including all copies made or distributed. Plaintiffs must not use the information contained in those documents, or information specifically derived from those documents, to seek additional information in discovery or in any future court filing or proceeding in this action. Because Mr. Brewer admitted to review of at least the entire initial packet of

anonymously-disclosed documents—including the privilege-marked ones—he contains special knowledge of the information therein, and is therefore excluded from participating as a witness in this action, unless a party seeks leave from this Court and demonstrates how his testimony is unrelated to the issues in this Order.

Although Defendants seek to also restrict Plaintiffs' use of any information "related to" the anonymously-received documents, the Court accepts Plaintiffs' counsel's representation that the documents corroborated witness testimony and other evidence gathered during their fact investigations, and finds Defendants' request unnecessarily broad. Therefore, Plaintiffs will be permitted to use other evidence related to the subject matter of the anonymously-received documents, so long as the related information was *independently gathered* through witness interviews or other discovery not arising from the documents and may be substantiated as such, if necessary. Plaintiffs must certify, for each set of all future documents produced or discovery responses, that the information upon which the group of responses are based has been independently gathered.

### c.    Attorneys' Fees

Defendants also seek reimbursement for the fees and costs they incurred while investigating and litigating this issue. Plaintiffs contend such an award has no basis in either the Federal Rules of discovery or the Court's inherent powers, but the Court disagrees. First, thus far, the Court has refrained from extending the protections of Fed.

R. Civ. P. 26(b)(5)(B)[161] or Rule 37[162] to the circumstances at hand, because the bulk of Plaintiffs' actions (or inactions) occurred prior to litigation. However, that is not to say the Court could not, or *would* not, extend the rationale provided by those rules to a pre-litigation context—in fact, in 2015, many counsel involved in this case presented arguments contradictory to the very positions they advance now, and were informed as much. In *SPEEA v. Spirit Aerosystems, Inc.*, the court determined because Spirit was attempting to use a privileged document "in the course of litigation" which SPEEA inadvertently disclosed before the case was filed, the "issue is clearly governed by the broad scope of Fed. R. Civ. P. 26."[163] Likewise, this Court could find similarly, but given its inherent powers, the Court finds it unnecessary to do so.

But Plaintiffs also oppose the award of fees under the Court's inherent power, arguing none of the "narrowly defined circumstances"[164] in which fees may be awarded are present. In 1991, the United States Supreme Court in *Chambers v. NASCO, Inc.* approved the imposition of sanctions, in the form of attorneys' fees, when finding "a

---

[161] Rule 26(b)(5)(B) provides: "If information produced in discovery is subject to a claim of privilege . . . the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The producing party must preserve the information until the claim is resolved."

[162] Rule 37(a)(5) deals with payment of expenses related to a discovery motions, and Rule 37(b) involves sanctions for failure to comply with a court order.

[163] *Soc'y of Prof'l Eng'g Employees in Aerospace, Int'l Fed'n of Prof'l & Tech. Employees, Local 2001 v. Spirit Aerosystems, Inc.*, No. 14-1281-MLB, 2015 WL 3466091, at *2 (D. Kan. June 1, 2015) (unreported). *See also Moreno v. Taos Cty. Bd. of Comm'rs*, 587 Fed. App'x 442, 444 (10th Cir. 2014) (unpublished) (where the Tenth Circuit Court of Appeals affirmed sanctions based on spoliation—the prelitigation conduct which eventually affected an ongoing lawsuit).

[164] Pls.' Mem., ECF No. 181, at 55 (citing *Chambers*, 501 U.S. at 45-46).

party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."[165]   The Court specifically focused on a party's bad faith conduct, but noted "the inherent power extends to a full range of litigation abuses."[166]

Plaintiffs argue the unpublished 2010 Tenth Circuit decision in *Kornfeld v. Kornfeld*[167] clarified the court's inherent powers, and only supports the shifting of attorneys' fees when there is "clear evidence that the challenged claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons."[168]   But *Kornfeld* dealt with the shifting of attorneys' fees at the conclusion of litigation, specifically those "circumstances in which a court may award attorneys' fees to a prevailing party"[169] and noted certain statutes and procedural rules[170] that may be other bases for sanctions for actions during litigation.

The challenge to this Court is not the shifting of the "American Rule"-type fees at the conclusion of litigation, but addressing behavior which largely occurred *prior* to litigation, but which also affects litigation—and the rules of application are not so clear. The Supreme Court in *Chambers* noted the gaps left between application of written rules and statutes and the inherent powers of the courts, and noted, "[a]t the very least, the

---

[165] *Chambers*, 501 U.S. at 45-46.
[166] *Id*. at 46.
[167] 393 F. App'x 575 (10th Cir. 2010) (unpublished).
[168] *Id*. at 579.
[169] *Id*. at 578.
[170] *Id*. at 578 n. 2 (discussing 28 U.S.C. ¶ 1927 (sanctions against attorney who unreasonably multiplies proceedings); Fed. R. Civ. P. 11(c) (sanctions against attorney, law firm, or party presenting a filing for improper purpose); and Fed. R. Civ. P. 37(a)(5) (providing for payment of attorneys' fees for failure to comply with discovery order)).

inherent power must continue to exist to fill in the interstices."[171]  And even if some of

Plaintiffs' described misbehavior occurred during the first few months of the lawsuit,

*Chambers* observed where some unsavory conduct could be addressed by the Federal

Rules, and other conduct may only be reached by inherent powers, the court is not

required to separate the conduct and apply distinct standards to each.[172]

The Supreme Court clearly recognizes the district court's authority to "fashion an

appropriate sanction for conduct which abuses the judicial process."[173]  In fact, the high

court recently reiterated that attorneys' fees may be shifted to the extent the fees

compensate a wronged party for "losses sustained"—specifically, those "attorney's fees

incurred because of the misconduct at issue."[174]  So long as the sanction imposed by the

court is compensatory, rather than punitive, in nature, an award of attorneys' fees is

appropriate.[175]

Due to the retention, use, and failure to notify Defendants for years of their receipt

of proprietary and privilege-marked information, Plaintiffs frustrated the progression of

this case by causing a significant amount of litigation and effort on behalf of the parties

and the Court which may have been avoided with immediate notice.  Defendants are

prejudiced, as discussed above, because even the return and nonuse of the documents

does not make them whole.  Plaintiffs cannot simply "un-see" what they have read and

---

[171] *Chambers*, 501 U.S. at 46.

[172] *Id.* at 51.

[173] *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (citing *Chambers,* 501 U.S. at 44–45).

[174] *Id.* at 1186.

[175] *Id.*

utilized for years. Although the extreme sanctions of dismissal and disqualification are not warranted in this situation, to remedy the expenditure of resources by Defendants as a result of Plaintiffs' actions, the Court finds an award of attorneys' fees and related costs justified.

Therefore, the Court orders Defendants should recover only the portion of legal fees and costs that they would not have incurred, but for Plaintiffs' retention of the documents. Such an award requires the Court to determine whether Plaintiffs' undesirable conduct is truly the "but-for" cause of any fees sought by Defendants.[176] Therefore, Defendants must submit an itemized fee request by **July 31, 2017**. Plaintiffs will have an opportunity to respond to the fee request, and Defendants will be permitted a reply, pursuant to time periods established in D. Kan. Rule 6.1(d)(1).

### E.  Defendants' Motion for Protective Order

If the Court had permitted the documents to be utilized in the case, despite their origins, Defendants asked to protect them under Fed. R. Civ. P. 26 as either attorney-client or work product privileged. Defendants claim the information delivered to Plaintiffs' attorneys should be returned or destroyed and not used during the litigation. Much like the arguments regarding the application of ethical rules, Plaintiffs claim Rule 26(b)(5)(B) only concerns inadvertent disclosures, rather than intentional (though unauthorized) disclosures; therefore Rule 26(b)(5)(B) does not apply.

---

[176] *Id.* at 1187.

Rule 26 confines the scope of discovery to nonprivileged information,[177] and "ordinarily" protects from discovery "documents and tangible things that are prepared in anticipation of litigation . . . by or for another party or its representative (including the other party's attorney . . . )."[178] In the event protected information is produced during discovery, the Rule provides for a process of notification, return, and non-use of the information until the court determines whether it must be protected.[179]

As previously discussed, the parties submitted the disputed documents to the Court for in camera inspection during briefing of this issue, and the Court has had an opportunity to review the information. However, because the Court has already addressed the return or destruction and future use of the documents in the context of sanctions above, the Court need not address whether the documents are actually protected by privilege or whether they are merely confidential and subject to use under the current Protective Order. In this respect, Defendants' Motion for Protective Order (ECF No. 172) seeking protection of the documents as privileged, is **DENIED** as moot.

Although the Court need not reach this issue, it feels compelled to note that the nature of the documents produced to the Court highlight yet another concern with Plaintiffs' uninformed review and use of Defendants' proprietary documents after their disclosure. The documents were either produced in an incoherent manner by the anonymous third party, or may have simply been placed into out-of-sequence categories when separated by Plaintiffs' counsel into "privileged" and "non-privileged" documents.

---

[177] Fed. R. Civ. P. 26(b)(1).
[178] Fed. R. Civ. P. 26(b)(3)(A).
[179] Fed. R. Civ. P. 26(b)(5).

Whatever the cause of the disorganization, the resulting stack of documents is extremely difficult to examine without additional context. This accentuates the need for documents to be produced through the organized discovery process. As discussed by the court in *Xyngular*, "Without the benefit of discovery motion practice, the court cannot determine which documents are relevant to the issues in this case or would have been produced in litigation. Nor can the court determine which documents should be subject to a protective order."[180]

## F.    Conclusion

This Court takes very seriously the situation before it. The black-letter ethical rules currently leave a gap in defining the expectations of counsel under the facts of this case. But documents intentionally and anonymously produced should create a heightened awareness in both parties and counsel, and the mysterious nature of the production must also generate an amplified duty of notification. Counsel must view their actions not in a vacuum, but in the larger context of how their actions—whether proscribed by some precise rule or not—affect not only the opposing party and its counsel but the orderly administration of justice. It bears repeating that a "professional lawyer behaves with civility, respect, fairness, learning and integrity toward clients, as an officer of the legal system, and as a public citizen with special responsibilities for the quality of justice."[181] It is within this larger context that the Court establishes this notification rule.

---

[180] *Xyngular Corp.*, 200 F. Supp. 3d at 1312.
[181]     *Pillars of Professionalism*, available at: http://www.ksd.uscourts.gov/pillars-of-professionalism/ (last updated Feb. 15, 2013).

**IT IS THEREFORE ORDERED** that Defendants' Motion for Protective Order and Sanctions (**ECF No. 172**) is **GRANTED in part** and **DENIED in part** as set forth above.

**IT IS FURTHER ORDERED** that Plaintiffs return to Defendants all documents disclosed anonymously in March and May 2014 (PLAP #001-064; PL # 000001-000052), including all copies made or distributed.  Plaintiffs must not use the information contained in those documents, or information specifically derived from those documents, to seek additional information in discovery or in any future court filing or proceeding in this action.  Mr. Brewer is excluded from participating as a witness in this action, unless a party seeks leave from this Court and demonstrates how his testimony is unrelated to the issues in this Order.

Plaintiffs may use other evidence related to the subject matter of the anonymously-received documents, so long as the related information was *independently gathered* through witness interviews or other discovery not arising from the documents and may be substantiated as such, if necessary.  In this vein, Plaintiffs must certify, for each set of all future documents produced or discovery responses, that the information upon which the group of responses are based has been independently gathered.

**IT IS FURTHER ORDERED** that Defendants recover from Plaintiffs those legal fees and costs directly incurred as a result of Plaintiffs' retention of the documents.  Defendants must submit an itemized fee request by **July 31, 2017**.  Plaintiffs must

respond to the fee request, and Defendants will be permitted a reply, pursuant to time periods established in D. Kan. Rule 6.1(d)(1).

The parties are strongly cautioned that, through this Order, the Court does not intend to encourage additional litigation surrounding this issue. If the parties disagree on any procedure or action ordered herein—such as return of the documents, or whether other evidence was independently gathered—they must first confer with one another, with the utmost dedication to resolving the issue. If the parties are unable to agree, they should request a conference with the Court prior to engaging in additional motion practice regarding the documents discussed in this Order. As previously noted, this case is beginning to show signs of age, and this issue has required considerable resources of both the parties and the Court. Therefore, counsel should be on notice the Court intends to minimize further delays of this nature in these proceedings.

**IT IS SO ORDERED**.

Dated this 30th day of June, 2017 at Wichita, Kansas.

s/ Gwynne E. Birzer
GWYNNE E. BIRZER
United States Magistrate Judge