IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DONETTA RAYMOND, *et al.,*

Plaintiffs,

v.                                              Case No. 16-1282-JWB

SPIRIT AEROSYSTEMS HOLDINGS, INC.,
*et al.,*

Defendants.

## MEMORANDUM AND ORDER

This matter is before the court on the parties' cross-motions for partial summary judgment. (Docs. 338, 342.)  The motions are fully briefed and are ripe for decision. (Docs. 341, 343, 356, 358, 366, 368.)  For the reasons stated herein, Plaintiffs' Motion for Partial Summary Judgment (Doc. 338) is DENIED and Defendants'[1] Motion for Partial Summary Judgment (Doc. 342) is GRANTED IN PART and DENIED IN PART.

### I. Background

Plaintiffs are former employees of Spirit.  They filed this collective action on behalf of themselves and others under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"),[2] alleging that Spirit unlawfully discriminated against them when it terminated their employment in a reduction-in-force (RIF), and later when it did not hire them for new job openings. The Plaintiffs also bring individual ADEA claims, and some assert claims under the Americans

---

[1] The named Defendants are Spirit Aerosystems, Inc., and its owner, Spirit Aerosystems Holdings, Inc. For purposes of this opinion, they are hereinafter referred to collectively as "Spirit."
[2] Class actions under the ADEA are authorized by 29 U.S.C. § 626(b), which incorporates the opt-in class mechanism of the Fair Labor Standards Act of 1938, 29 U.S.C. § 216(b). *Thiessen v. Gen. Elec. Cap. Corp.*, 276 F.3d 1095, 1102 (10th Cir. 2001). These provisions allow for a class action where the complaining employees are similarly situated. *Id.*

with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and/or the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"). (Doc. 1 at 2-3.)

During 2013, Spirit engaged in a number of Human Resource (HR) actions to reduce its overhead, including offering employees early retirement incentives and laying off workers. Such actions were taken at Spirit's manufacturing facilities in Tulsa and McAlester, Oklahoma; in Kinston, North Carolina; and in Wichita, Kansas.

In July 2013, Spirit implemented layoffs at its Wichita facility. There were 271 employees selected for layoff, including 221 represented by the Society of Professional Engineering Employees in Aerospace (SPEEA). Spirit offered each laid-off employee a severance package which included a lump-sum payment in exchange for a waiver of claims against Spirit. All but 11 of the employees impacted by the Wichita layoffs executed a release agreement containing a waiver.

In 2016, 24 of the SPEEA-represented employees filed this lawsuit. They were later joined by 47 opt-in Plaintiffs. Of the 71 total Plaintiffs, 66 signed a release agreement. The Plaintiffs who signed the releases argue their waivers of ADEA claims were not knowing and voluntary under the standards of the Older Workers Benefit Protection Act (OWBPA), 29 U.S.C. § 626. The parties agreed to conduct the litigation in two phases, with the first phase to address the validity of the ADEA waivers. The parties have now filed cross-motions for summary judgment addressing that issue.

## II. Uncontroverted facts

Plaintiffs' 53-page statement of facts (Doc. 341) contains a multitude of assertions that are not supported by the materials cited in support, or that constitute argument. Spirit disputes almost all of Plaintiff's allegations (and then some) in a 203-page responsive statement. (Doc. 358-1.)

Plaintiffs' responsive statement to Spirit's own statement of facts, meanwhile, runs 100 pages. (Doc. 356.) The briefs, responses, and replies supporting the motions total about 400 pages, with over 150 footnotes, and the materials cited in support exceed 5,000 pages. The parties' factual presentations are, in the court's view, highly argumentative and excessively contentious, making it difficult to compile a statement of facts – *many* of which should have been undisputed.

The parties' difficulties likely stem in part from the governing law, which employs vague standards making virtually every aspect of an employer's business operations a consideration in deciding ADEA waiver issues. *See e.g.,* 29 C.F.R. § 1625.22(f)(3) (employer's OWBPA disclosure obligation is based on "its organizational structure and decision-making process" and must be determined "on a case-by-case basis.") With that background in mind, the court has attempted to compile a comprehensible statement of facts. The following statement excludes any of the parties' assertions that are immaterial or unsupported by the record cited.[3]

The Named Plaintiffs are 24 former Wichita-based salaried, non-management employees of Spirit. They were laid off by Spirit effective August 8, 2013. Each of them was represented by SPEEA. The Named Plaintiffs seek to represent 47 SPEEA-represented opt-in Plaintiffs who have filed consent forms to participate in this action. (Doc. 343 at 14.)

Spirit is an aerospace manufacturer. In 2013, it had domestic manufacturing facilities in Wichita, Kansas; Chanute, Kansas; Tulsa, Oklahoma; McAlester, Oklahoma; and Kinston, North Carolina. It also operates facilities in other countries. Spirit's world headquarters is in Wichita. Its Wichita facility manufactures and assembles fuselage and propulsion (underwing) sections, primarily for Boeing aircraft. Wichita also houses some salaried overhead functions, such as HR,

[3] The instant motions were briefed in part prior to assignment of this case to the undersigned judge. From this point forward, any motions by the parties must comply with the undersigned's standing order regarding page limitations. The length of the current briefs plainly demonstrates the wisdom of that order.

information technology, accounting, public relations, supply chain management, and engineering. (*Id.*) The majority of Spirit's employees in 2012 worked at its Wichita site.

SPEEA represents two separate bargaining units of non-management employees in Wichita: the Wichita Engineering Unit (WEU) and the Wichita Technical and Professional Unit (WTPU). Each of these units has its own collective bargaining agreement (CBA) with Spirit. SPEEA does not represent employees at other Spirit facilities. (*Id.*)

Spirit's Tulsa facility produces leading wing edges for Boeing aircraft and (back in 2013) fully-assembled wings for Gulfstream aircraft. (*Id.*) The hourly workforce in Tulsa is represented by the United Auto Workers (UAW). The McAlester facility fabricates small parts of wing components, primarily for assembly at the Tulsa facility. Its hourly workers are represented by a separate bargaining unit of the UAW. The Kinston, North Carolina, facility produces Airbus fuselages and (in 2013) some Gulfstream parts. Its management and salaried employees are not represented. (*Id.* at 15.) Each of these facilities maintains some of its own overhead support staff.

Some of Spirit's programs span multiple locations. For example, Spirit's 787 and 737 programs have employees and operations in multiple locations across the company. But the employees performing work at one location on a program do not perform the same work as employees performing work on that program at other locations.

In late 2012, Spirit was facing significant challenges. In October 2012, it announced a $590 million pre-tax charge for extraordinary expenses in the third quarter. It reported a net income loss of $134 million for the third quarter, and ended the year with net income down 82 percent. Spirit's leadership decided the company needed to be more competitive by reducing overhead costs.

In October of 2012, an HR report indicated the company needed to aggressively manage overhead and salaried workers by increasing "performance separations" – i.e. firing more workers for poor performance. (Doc. 351-6 at 3.)  It also noted there were 670 employees across the company over the age of 62 and suggested the company could replace "long service/high cost" employees with new hires by offering a voluntary separation package. (*Id*. at 4.)  The report observed the company's total headcount was 16,301, which was 636 "heads over budget" for the year 2012 (based on an operating budget of 15,665 positions), with 622 open requisitions. (*Id.* at 5.)  Revenue-per-employee was one of the metrics Spirit used to track its performance. Spirit wanted a more favorable ratio in that metric and in overall profitability, in part by reducing the employee "headcount" of the company.[4]

As part of an effort to reduce overhead, Spirit executives concluded the company needed to reduce the size of management and salaried staff.  Subsequently, over the course of 2013, Spirit devised and implemented eleven HR actions that were designed to reduce overhead.  The actions included redesigning fringe benefits, eliminating non-essential costs, restructuring work schedules, restricting overtime, improving worker productivity through performance management, offering early retirement incentives, and conducting layoffs.  The June 2013 Wichita layoffs that are the focus of this suit were the result of one of the HR actions aimed at reducing overhead. (Doc. 343 at 16-17.)  The same core members of Spirit's senior leadership team were involved in and approved the decisions to go forward with each of the 2013 HR actions discussed herein.  These

---

[4] Plaintiffs assert that Spirit's leadership made a commitment to the Board of Directors "in late 2012" to reduce total company head count to 15,600 employees. (Doc. 341 at 18.) That assertion pervades Plaintiffs' statement of facts.  As Spirit points out, that representation occurred at a board meeting in late July 2013, *after* Plaintiffs had been selected for layoffs. *See* Doc. 358-1 at 9-10; Doc. 351-2 at 2 (August 1, 2013 report indicating that original 2013 head count budget was for 16,113 employees).  Nevertheless, Plaintiffs have cited evidence that in the fall of 2012 and thereafter, Spirit was intent on reducing overall company headcount as part of its efforts to improve profitability. *See e.g.*, Welner deposition, Doc. 341-1 at 20 ("Q. And the planning for headcount reduction in 2013 actually began the fall of 2012, correct? A. Yes. We knew we had to reduce overhead costs on the heels of the Q3 earnings, so we started looking at how we could get our costs in line.")

members included Vice President Justin Welner, Senior Vice President and Chief Administrative Officer Samantha Marnick, Director of Human Resources Jason Hohl, and Senior Vice President over Spirit's fuselage-segment, David Coleal. (Doc. 341 at 21-22; Doc. 358-1 at 39.)

In late 2012, Spirit reorganized its HR department so that HR employees at each of its sites reported to HR managers in Wichita instead of reporting to local facility leaders. In early 2013, Spirit's HR leaders worked with managers and HR personnel at all Spirit facilities to reform the performance management (PM) process and make it more uniform. In its annual PM reviews, Spirit managers rated employees by category - from worst to best - as: Unacceptable; Meets Some [expectations]; Meets; Exceeds; or Exceptional. Spirit VP Welner testified that Spirit's PM ratings had historically been "skewed right," with employees highly rated even though the company was underperforming. (Doc. 341-1 at 23.) Welner implemented a "rigorous calibration process" to make sure managers were rating employees consistently throughout the company. (*Id*. at 24.) Managers were instructed to rate employees in line with a "bell curve" distribution of 15 percent of employees in a top tier, 70 percent in the middle, and 15 percent in a lower tier. As a result, many Spirit employees received lower performance ratings for 2012 than they had in the past. The 2012 PM review process was completed in early 2013. Employees hired after December 1, 2012, were generally excluded from this process, as they had not worked long enough for a complete performance review.

Spirit's executive leadership was of the view, and communicated to its separate facility directors, that healthy companies regularly terminate ten to fifteen percent of their lowest performing employees, which was far more than Spirit had traditionally terminated. Spirit's executive leadership pushed facility managers to reduce overhead by eliminating a significant percentage of the lowest-rated employees at their facilities. As part of that process, Spirit HR

facilitated the "calibration" exercises reforming PM reviews at each facility and the PM ratings for each group had to be approved by senior-level officers.

Wichita performance terminations March 2013. Under the SPEEA CBAs in place in Wichita, Spirit could only terminate SPEEA-represented employees for "just cause." In March 2013, Wichita HR and managers, as a result of Spirit's directives to reform the PM process and to reduce overhead costs, identified and terminated 50 Wichita management and salaried employees with Unacceptable 2012 PM ratings whose performance supported (in management's view) an immediate, just cause termination. Employees hired on or after December 1, 2012, were excluded from consideration, as they did not have a sufficient record of performance. Wichita managers also placed other employees with Unacceptable or Meets Some PM ratings on performance plans. Between May 2 and July 12, 2013, Spirit terminated 17 of these other employees for not sufficiently improving their performance. Spirit offered all 67 Wichita employees who were terminated for performance issues a severance payment in exchange for a release of claims and an agreement that the employee would not be eligible for reemployment with Spirit. None of the Plaintiffs were terminated in the March 2013 Wichita performance terminations.

The release agreements for the 50 employees terminated in March 2013 included an OWBPA Disclosure List ("Disclosure List") identifying the employees selected for termination. The 17 employees later terminated for performance reasons received updated disclosure lists of the employees to whom the severance was offered. The OWBPA Disclosure identified the decisional unit from which Spirit selected the persons for termination and severance benefits as: "All salaried employees (excluding executives) hired before December 1, 2012, who actively performed work in 2012 and who worked at Spirit's Wichita facility (or whose performance ratings are assigned by managers who work at the Wichita facility) as of March 11, 2013." (Doc. 341-53

at 2.)  The Disclosure stated that job performance was the factor Spirit considered to determine who would be selected for termination.  It stated that all employees within the decisional unit who are terminated for performance from March 11, 2013 to date received the offer of severance benefits.  (*Id.*)  Wichita managers and HR personnel who considered and selected employees for performance termination did not consider any employees outside of Wichita, and no jobs at other locations were reduced or saved as a result of these Wichita terminations.

Tulsa layoffs and retirements March 2013.  By the end of 2012, Spirit considered its two Oklahoma facilities to be about 700 employees "over budget" based on projected work load and revenue per employee.  The surplus was primarily in the Tulsa facility.  In January 2013, Tulsa management and HR personnel decided upon a layoff of Tulsa management and salaried employees to occur in March of 2013.  Tulsa site managers and HR assigned Tulsa employees a composite score that combined employees' year-end 2012 PM performance ratings with their managers' assessment of their knowledge, skills, ability, and versatility ("KSA-Versa"). Tulsa managers grouped employees into "comparator groups" based on similarity of job positions and ranked employees within each group.  To the extent Tulsa management identified appropriate areas for reduction in headcount, the lowest ranked Tulsa employees were selected for a March layoff. On March 8, 2013, Spirit laid off 55 employees in Tulsa.  Unlike Wichita, these were not for-cause terminations for poor performance.  Although the impetus to reduce overhead and positions came from Spirit's executive leadership and the plan for doing so was subject to their approval, the process and criteria for the Tulsa layoff was created by Tulsa leadership and Tulsa-based HR employees independent of the reductions in Wichita.  No employees from Wichita were considered in this process, and no Wichita jobs were reduced or saved from reduction because of the Tulsa

layoffs.  Spirit offered each employee selected for layoffs in Tulsa a severance package in exchange for a release of claims.

In March of 2013, Tulsa management also offered a voluntary retirement incentive to certain retirement-eligible UAW-represented hourly employees, instead of calling for a layoff among that portion of the Tulsa employee population.

Kinston performance terminations March 2013. In March 2013, Kinston management and Kinston HR personnel identified and terminated three management and salaried Kinston employees whose performance ratings warranted (in management's view) their termination.  One other Kinston employee who was on a performance plan was also terminated in May 2013.  Spirit presented each of the four terminated Kinston employees an offer of severance in exchange for a release of claims.  No Wichita employees were considered during this process and no jobs in Wichita were reduced or saved from reduction because of these terminations.

The Spirit employees terminated in March of 2013 in Tulsa, Wichita, and Kinston all received severance payments determined under the same severance formula.  Spirit instructed HR managers at the various facilities that the 2012 PM review process should be closed out by mid-April of 2013.  As part of this process, managers met with employees to communicate their 2012 PM ratings.  Employees who were not terminated but whose performance needed improvement were placed on performance plans.  Some were later terminated for failing to improve performance.  A number of Spirit employees (63) voluntarily resigned after being notified of performance issues.  Spirit characterized such terminations and resignations as "performance exits" in its tracking of headcount across the enterprise.

In an email dated May 20, 2013, Welner expressed to Marnick that the number of performance terminations was not up to Board of Directors' expectations and that other HR actions

needed to be taken. He wrote that HR would put together plans to expedite headcount reductions in Tulsa, conduct a retention exercise for SPEEA-represented employees in Wichita (in anticipation of a layoff), and identify managers who were "not up to leading the charge" on performance terminations. (Doc. 351-28.)

<u>Wichita layoffs July 25, 2013</u>. Jeff Turner was Spirit's CEO from the company's founding in 2005 until April 2013, when he retired. Spirit first started reducing headcount in early 2013 at Turner's direction. Turner was openly opposed to layoffs in Wichita. Instead, Spirit began reducing headcount in Wichita through attrition by implementing a hiring freeze for most management and salaried positions, with some exceptions for critical-skill positions. This meant Spirit would not backfill positions in Wichita as they were vacated. Turner also insisted the company should attempt to "manage its underperformers" (*i.e.* remove employees not meeting expectations) before considering layoffs in Wichita. Turner's policy in that regard resulted in the March 2013 performance terminations in Wichita. On April 6, 2013, Larry Lawson became Spirit's CEO and President. Lawson communicated to Welner that Spirit needed to more aggressively reduce headcount in Wichita and directed him to make preparations for Wichita layoffs.

During May and June 2013, Wichita executives and HR staff discussed a Wichita layoff. The CBAs for SPEEA-represented employees included layoff provisions that required Spirit to retain employees with the best performance or as warranted by business need in each job classification. (Doc. 343-2 at 8.) The CBAs thus typically required Spirit to choose the lowest-rated employees in each classification when selecting employees for a layoff.

The CBAs allowed Spirit to conduct a retention exercise in advance of a layoff. (Doc. 343 at 19.) Under that process, Spirit assigned retention ratings within each retention group. The

CBAs mandated that Spirit assign each represented employee a retention-rating Category of A, B, or C, with A representing employees in the top 70% of each classification, B representing the next 20%, and C representing employees rated in the lowest 10% of each classification. WEU employees were grouped by job classification and skill code; WTPU employees were grouped according to job classification and exempt/non-exempt status. (*Id.* at 18.) Within each retention rating group, managers rated each employee based on performance, versatility, and criticality.

In preparation for layoffs, Spirit conducted a retention rating exercise in Wichita in June of 2013, led by Gina Boswell from Wichita HR. Under her direction, Wichita managers within each retention group assigned a retention rating to each SPEEA-represented employee using the CBAs' mandatory 70/20/10 distribution. (*Id.* at 19.) Managers were directed to rate employees using the following criteria: the 2012 PM rating and 2013 performance to date; versatility (including critical thinking skills, transferable skill sets, and flexibility); and criticality (including skills needed for critical functions and future requirements). (Doc. 339-33 at 6.)

Spirit HR cautioned managers they should not fill Category C with newer employees, that newer employees should be evaluated based on their progress to date and potential, and that company service should be used as a "tie breaker" rather than the primary basis for retention. (*Id.* at 7.) HR did not want managers to "take the easy way out" by filling Category C with newer workers; it wanted them to truly identify bottom-level performers. Spirit HR "designated" most of the SPEEA-represented employees who were assigned Category C retention ratings, meaning they were not eligible for a seniority "bump up"[5] and did not have recall rights in the event of a RIF. By operation of the CBAs, SPEEA-represented employees hired on or after May 21, 2013, automatically received a C retention rating. (Doc. 343 at 19.)

---

[5] Pursuant to a CBA provision, an employee with 20 or more years of service who received a C-rating would be automatically bumped up to Category B unless Spirit "designated" the employee.

In July 2013, Spirit's executive leadership made the decision to lay off management and salaried employees in Wichita. Spirit HR did not assign Wichita managers a mandatory reduction target, but indicated they should be looking at a reduction of 10-15 percent of reporting employees. (*Id.* at 20.) The uncontroverted facts show that throughout 2013, Spirit executives pushed facility site Directors and HR representatives to reduce employee headcount by terminating the lowest rated employees for cause, by offering early retirement incentives, and by enacting layoffs. Early in 2013, Spirit was projecting a need to reduce overall employment to about 16,100 employees. A mid-year assessment resulted in a commitment to further reduce overall employment to 15,600 employees. The HR actions in 2013, including the July layoffs in Wichita, resulted from directives by Spirit executives to facility Directors and HR personnel to reduce headcount. The various HR actions in 2013 resulted in an overall headcount of 16,023 employees at the end of 2013.

The July 2013 Wichita layoffs did not cover all employees at the Wichita facility. The Wichita managers and Wichita HR considered the following portion of the workforce for layoffs: all managerial employees (excluding executives) and all salaried employees, both non-represented and represented (but excluding non-management employees in job or skill management codes 63Y-Stress Engineering; 64B-Systems Engineering; 643-Thermal Analysis; DFKE-Industrial Engineering; DFKK-Manufacturing Engineering; HAAB-Procurement Analyst; HADP-Procurement Agent; JACZ-FAA Designee; UANW_U32-Intern-Student Engineer; and UAMR_U11-Intern-Business.) (*Id.*) Employees considered for layoff included those hired after December 1, 2012.

Managers of SPEEA-represented employees had already identified the bottom ten percent of each retention group through the June 2013 retention exercise. SPEEA-represented workers were selected for layoff based on their retention rankings, which in turn were based on

performance-related factors. Wichita managers and HR ultimately selected 221 C-retention-rated employees for layoff. During June and July 2013, managers of non-represented employees assessed their employees based on several factors, including performance, versatility, and criticality; redundant work statements; consolidation of roles; and flattening of the management structure. (Doc. 343 at 21.) They selected 50 non-represented employees for layoff.

During the process of selecting employees for layoff, Spirit considered whether new hires within the covered group would be laid off. Spirit was concerned that managers would default to selecting new employees for layoff without regard to other selection factors, and that laying off newly-hired employees would damage relations with recruiting sources and waste resources already spent on new hires. Spirit HR decided that any employee in the covered group hired on or after May 21, 2013 – within approximately the last 60 days - would not be selected for layoff. (*Id.*) This decision impacted 18 employees in Wichita, 11 of whom were under the age of 40. (Doc. 343-2 at 13.) The same policy was applied to July layoffs at Spirit's Oklahoma facilities.

Ultimately, 271 management and salaried employees in Wichita were selected for layoff, including 221 represented by SPEEA. Wichita managers and Wichita HR personnel decided which employees in Wichita would be laid off and which ones would not be. They did not consider, evaluate, or compare employees at other Spirit sites as part of their decision-making process and no jobs at other locations were reduced or saved from reduction because of the Wichita layoffs. Employee performance was the predominant factor in selecting persons for the layoff. Individual managers' ratings were sent to Spirit HR to verify compliance with the 70/20/10 mandatory distribution, to conduct an EEO analysis, and to consider any necessary adjustments.

Spirit offered a severance package for all employees chosen for layoff, although it was not contractually required to do so. The severance package offered a lump sum payment based on a

fixed formula, plus career counseling services, in exchange for an employee's agreement to release claims against Spirit (the "Release Agreement"). The Release Agreement provided to Wichita employees included (or was supposed to include) a 65-page Disclosure List indicating the job titles and ages of the selected and non-selected employees in the same job classifications or organizational units.

Spirit publicly announced on July 25, 2013, that it was laying off 360 employees at its Kansas and Oklahoma facilities to reduce overhead costs, increase efficiency, and improve performance. It declined to publicly disclose the number of employees laid off at each location.

A Wichita HR representative and Wichita manager met in person with the selected employees in Wichita who were at work on July 25, 2013. The layoff was effective immediately for non-represented workers and effective August 8, 2013, for SPEEA-represented workers, because the CBAs required two weeks' notice.[6] A Spirit representative reviewed the severance offer and Release Agreement with the selected employees. For selected employees who were not at work that day, Spirit sent notice by certified mail, with a copy of the Release Agreement and Disclosure List.

The Release Agreement prepared by Spirit included representations that the signer voluntarily entered the agreement and read and understood its terms. It stated the signer agreed to unconditionally release Spirit from all claims, including under the ADEA, up to the date of the agreement. It recommended employees have an attorney review the agreement with them and stated that employees had 45 days to consider the agreement and seven days after signing the agreement to revoke it. (Doc. 343 at 25-26.)

---

[6] When the court refers hereinafter to the "July 2013" Wichita layoffs, it refers to all of the Wichita employees notified of the layoff in July 2013, including those whose layoff did not become effective until August 2013.

The Release Agreement included an OWBPA Disclosure Statement ("Disclosure Statement") describing "[t]he decisional unit from which Spirit selected the individuals to whom it would or would not offer to participate in the severance benefit program" as "all managerial employees (excluding executives) and all salaried employees, both non-union-represented and union-represented (excluding non-management employees in job or skill management codes 63-Y Stress Engineering; 64B-Systems Engineering; 643-Thermal Analysis; DFKE-Industrial Engineering; DFKK-Manufacturing Engineering, HAAB-Procurement Analyst; HADP-Procurement Agent; JACZ-FAA Designee; UANW_U32-Intern Student Engineer; and UAMR_U11-Intern-Business), at Spirit's Wichita facility." (Doc. 349-2 at 6.)

The Release Agreement described the eligibility factors for the severance offer as: "All employees within the decisional unit who were selected to be laid off on or about July 25 or on or about August 8, 2013, are receiving an offer to participate in the severance benefit program." (*Id.*) The Disclosure List includes employees hired in Wichita after May 20, 2013, because these newly-hired employees had been considered to receive the severance offer, although Spirit ultimately decided not to select them for the layoff, and because they were part of the same job classifications and organizational units as those who were selected to receive the offer. (Doc. 343 at 27.) The Disclosure Statement information was limited to information about the July 2013 Wichita layoffs. It did not include information pertaining to HR actions at other Spirit facilities or at other times in Wichita.

By signing the Release Agreement, the signer acknowledged that they "have received the Older Workers Benefit Protection Act Disclosure Statement attached to the Agreement as Exhibit B." (*Id.* at 28.)

SPEEA communicated to its members that they should not sign a settlement agreement before consulting with SPEEA or an adviser of the member's choice. At SPEEA's request, Spirit twice extended the 45-day period to allow SPEEA members more time to consider the Release Agreements. SPEEA also urged members to take their time to review their options, and that members should decide whether to sign based on what was best for them and their families.

Of the 271 laid-off Wichita employees from July and August 2013, 260 executed the Release Agreement, including 210 of 221 SPEEA-represented employees. Spirit paid out about $6 million in severance benefits to employees impacted by the Wichita layoffs. (Doc. 343 at 29.)

Tulsa layoffs July 25, 2013. By June of 2013, Spirit's Tulsa leadership was planning for a second round of layoffs at the Tulsa facility. Martha Webb-Jones, who became Director of Human Resources for Spirit's Oklahoma operations in April 2013, worked with site leader Chris Collins and others to supervise the process. Tulsa Directors performed a review to identify areas where reductions could be made. As before, Tulsa managers and Tulsa HR assigned composite scores based on PM ratings and an assessment of "KSA," although this assessment was based on 2013 performance ratings to-date rather than 2012 ratings. Tulsa Directors, with input from other managers, determined who would be laid off.

Spirit announced the layoff of 70 Tulsa employees on July 25, 2013, the same day as Wichita and McAlester layoffs. The Tulsa managers and HR representatives who made the selections did not consider employees outside of Tulsa during the selection process, and no jobs at other locations were reduced or saved from reduction because of the Tulsa layoffs. Spirit offered each employee a severance package in exchange for a release of claims. Spirit did not conduct any other layoffs or group reductions at Tulsa in 2013.

McAlester July 25, 2013 layoffs.  Spirit had not engaged in any performance terminations, retirement incentives, or layoffs at its McAlester facility in March of 2013.  In July 2013, McAlester site leadership identified a need to reduce four positions.  McAlester managers, in consultation with McAlester and Tulsa HR personnel, identified and selected for layoff three employees who had recently been on performance plans and a fourth who volunteered for layoff. (Doc. 343 at 37.)  The layoffs were announced on July 25, 2013.  The selected employees were offered a severance package in exchange for a release of claims against Spirit.  The McAlester employees were not considered during the Wichita layoffs or in any other Spirit HR actions in 2013.  Spirit did not conduct any other layoffs or group actions at McAlester in 2013. (*Id.*)

Spirit headcount reduction commitment July 29, 2013.  Spirit's Chief Administrative Officer (CAO) presented a plan to Spirit's Board of Directors on July 29-30, 2013, with a commitment to reduce Spirit's overall employee headcount to 15,600 employees by the end of 2013. (*Id.* at 38.)  This was a mid-year revision to a previously budgeted headcount projection of 16,113 employees by year-end 2013.  For the rest of 2013, Spirit's executive leadership monitored the company's progress toward the 15,600 number.

Mid-year review August 2013.  A mid-year review presented by HR head Welner to Spirit's Business Council (a regular meeting with Spirit vice presidents) identified a top priority of terminating an additional 300 employees to reach a total headcount of 15,600 across the enterprise.  The review laid out plans for a "Phase II" in Wichita including voluntary retirements, voluntary layoffs, and an involuntary layoff impacting 200 employees in September 2013. (Doc. 351-11 at 4.)  It also suggested a "Phase III" of further reductions in October 2013, including through consolidation and a RIF in the United Kingdom. (*Id.*)  The plans projected total "exits" of 421 employees by the end of October.

Additional Wichita reductions. As a result of the CAO's commitment to reduce overall employment to 15,600 employees, Wichita HR implemented three additional HR actions in the Fall of 2013. A second involuntary layoff among some parts of the workforce in Wichita was announced on September 12, 2013, with an effective date in November 2013. Shortly thereafter, Spirit announced a voluntary retirement incentive and a voluntary layoff incentive for Wichita employees. Spirit excepted certain groups from these programs. Spirit offered a different severance package to each of these groups of employees in exchange for a release of claims. (*Id.* at 39.)

Distribution of OWBPA Disclosure Lists

Spirit cites evidence that its representatives met with those Wichita employees who were selected for layoff and who were at work on July 25, 2013. Prior to those meetings, according to Spirit, its HR personnel generated a set of paperwork for each employee that included a personalized Release Agreement and OWBPA Disclosure Statement, with a 65-page OWBPA disclosure list setting forth the job titles and ages of employees in Wichita selected and not selected for layoff. Spirit cites evidence that its HR representatives received the packets and delivered them to the selected employees during face-to-face individual meetings. It also cites evidence that selected employees who were not at work that day or who refused to meet with HR representatives were mailed the prepared packets, both by certified and regular mail, to their home address. (*See* Doc. 349-1.)

The Release Agreements included a provision stating: "You acknowledge that you have received the Older Workers Benefit Protecion Act Disclosure Statement attached to the Agreement as Exhibit B. This Disclosure Statement identifies the decisional unit from which Spirit selected the individuals to whom it would or would not offer to participate in the severance benefit program;

the eligibility factors and time limits for the severance benefit program; the job titles (including levels) and ages of all individuals selected for the severance benefit program; and the job titles (including levels) and ages of all individual units who are not selected for the severance benefit program." (*See* Doc. 349-1 through 349-12.)

Plaintiff Emilio Caire has submitted an affidavit stating he was given the Severance Agreement in late July 2013 and signed it on August 1, 2013. The affidavit states that at no time did Spirit provide Caire with a document listing the job titles and ages of the individuals Spirit did or did not select for layoff. It states that Caire recently reviewed the 65-page Disclosure List cited by Spirit and that "I did not see and was not provided with a Disclosure List" or any similar document during his July 25, 2013 layoff meeting or at any other time in 2013. It states that the paperwork Caire was provided during the layoff meeting "consisted of no more than a dozen pages" and did not include any document similar to the Disclosure List. (Doc. 341-12.) Affidavits essentially identical to Caire's have been submitted by Plaintiffs William Denny (Doc. 341-13), Bruce Ensor (Doc. 341-14), Fred Longan (Doc. 341-15), Dennis Richardson (Doc. 341-16), Jilhun Sha (Doc. 341-17), and Shane Schmidt (Doc. 341-18). Plaintiffs Fred Heston and Brian Marks testified in depositions that they did not receive the OWBPA Disclosure List. (Doc. 341-3 at 33; Doc. 341-5 at 8.)

For its part, Spirit cites sworn testimony from Spirit managers that they delivered or mailed a packet, including the 65-page OWBPA Disclosure List, to the above-named Plaintiffs.

Plaintiffs' counsel sent an August 23, 2017, letter supplementing an interrogatory answer, which stated that one Plaintiff (Brian Marks) "did not receive the disclosure list." The letter said counsel would supplement the answer within a reasonable time of learning of any other Plaintiffs in the same category. On September 15, 2017, Plaintiffs' counsel supplemented the answer by

identifying nine more Plaintiffs (Denny, Ensor, Heston, Longan, Sha, Caire, Daniels, Richardson, and Schmidt) who "do not recall receiving the OWBPA disclosure with their severance agreement…."[7]  On January 5, 2018, Plaintiffs' counsel disclosed that Daniels had located a copy of the list and no longer claimed not to have received it.

One Plaintiff, Fred Heston, testified he never received a severance check.  Heston reported this to SPEEA.  Heston later received a letter from Spirit instructing him to document that he never received the check so that Spirit could issue a replacement check.  Heston chose not to complete the requested paperwork, however, because by that time he was interested in suing Spirit. (*Id.*)

Plaintiffs Donetta Raymond, Debra Hatcher, Gregory Bucchin, and Brian Scott Jackson did not sign a severance agreement or release of claims with Spirit.

### III. OWBPA notice requirements

The OWBPA is designed to protect the rights and benefits of older workers. *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 427 (1998).  Toward that end, the OWBPA "sets up its own regime for assessing the effect of ADEA waivers, separate and apart from contract law." *Id.* An individual may not waive an ADEA claim unless the waiver is knowing and voluntary, and a waiver may not be considered knowing and voluntary unless, at a minimum, it meets the eight specific requirements in 29 U.S.C. § 626(f)(1). *See Oubre*, 522 U.S. at 426-27 ("The statutory command is clear: An employee 'may not waive any right or claim under [the ADEA] unless the waiver or release satisfies the OWBPA's requirements.")

The primary provision of the OWBPA in dispute here provides in relevant part:

(H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the

---

[7] On October 10, 2017, Plaintiffs' counsel disclosed three additional Plaintiffs (Martin, Moehring, and Russell) who "do not recall" receiving the disclosures. (Doc. 358-7.)  These three Plaintiffs apparently do not argue they did not receive the Disclosure List, however, as they are not mentioned in Plaintiffs' statement of facts as not receiving the Disclosure List. (Doc. 341 at 60-61.)

employer … informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to—

(i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and

(ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1)(H). The party asserting the validity of a waiver has the burden of showing that the requirements of the OWBPA are met and that the waiver was knowing and voluntary. *Id.* § 626(f)(3).

Spirit cites uncontroverted evidence that the Release Agreements and waivers signed by Plaintiffs complied with the OWBPA requirements not specifically challenged by Plaintiffs, including: that the waiver was part of an agreement written in a manner calculated to be understood by the average individual; that the waiver specifically referred to ADEA rights; that it did not waive claims arising after the date of execution; that the waiver was in exchange for consideration in addition to that which the individual was already entitled;[8] that it advised employees in writing to consult with an attorney before signing the agreement; that the individual had at least 21 days to consider the agreement; and the individual had at least 7 days to revoke the agreement after signing it. *See* 29 U.S.C. § 626(f)(1)(A)-(G).

### IV. Summary of Arguments

Plaintiffs contend their ADEA waivers were invalid because Spirit did not accurately inform them about the class, unit, or group of individuals considered for the termination program. (Doc. 341 at 67.) They argue Spirit failed to disclose that terminations under the same program included layoffs and terminations at other facilities and at other times in Wichita, and also failed

---

[8] Plaintiffs challenge this element with respect to Plaintiff Fred Heston, who never obtained or cashed a severance payment check from Spirit. That issue is discussed *infra*.

to disclose that Spirit excluded its newest hires from consideration for termination. (*Id.*) Plaintiffs further argue that Spirit failed to disclose "the criteria it used to determine which employees would be terminated….'" (*Id.* at 67-68). Plaintiffs argue that Spirit's obligation to disclose "eligibility factors" included an obligation to identify the factors relied on in selecting employees for termination (such as performance), as opposed to merely disclosing that all employees who were selected for layoff were eligible to receive severance benefits if they signed a waiver. (*Id.* at 79-80) (citing *Pagliolo v. Guidant Corp.*, 483 F.Supp.2d 847, 861 (D. Minn. 2007)).

Plaintiff Fred Heston argues that Spirit cannot enforce his waiver because he never received consideration for it. He argues § 626(f)(3) requires proof of receipt of consideration before a waiver can be valid under the OWBPA. (Doc. 341 at 85.)

Lastly, Plaintiffs argue that Spirit failed to provide OWBPA disclosure lists to eight Plaintiffs (Caire, Denny, Ensor, Longan, Richardson, Sha, Schmidt, and Heston) at the time of the layoffs, making their waivers unenforceable under the OWBPA. (*Id.*)

For its part, Spirit argues the relevant termination program was the severance offer to Wichita employees impacted by the July 2013 layoffs. Spirit contends its overall business plan of reducing headcount was not a "termination program" within the meaning of the OWBPA, and that other HR activities in Wichita or at other Spirit facilities were not part of the same program offered to Wichita employees in the July layoffs. (Doc. 343 at 47-50.) It likewise argues that its company-wide reform of the PM process was not a termination program directed at a class or group of employees under the OWBPA. (*Id.* at 51.) Spirit argues the "decisional unit" was properly limited to the July 2013 Wichita layoffs because Spirit's decision-making process focused on each individual site, with Wichita managers and HR considering and selecting only Wichita employees

for layoff without considering, evaluating, or impacting employees at other sites. It also contends the description of a decisional unit is within an employer's discretion. (*Id.* at 54-55.)

Spirit argues that terminations at other times in Wichita and at other facilities did not involve the same decisional unit as the July Wichita layoffs, and therefore were not part of the same OWBPA program. (*Id.* at 56.) Spirit also contends it properly included newly-hired employees in the decisional unit because Spirit "actually considered whether they should be offered the opportunity to participate in the severance program before deciding not to select them." (*Id.* at 56-57.)

## V. Analysis

1. *Scope of OWBPA Disclosures/Decisional unit.* Plaintiffs contend that Spirit, by limiting the scope of its disclosures to Wichita-based employees in July 2013, misrepresented the group of employees that was considered "as part of Spirit's 2013 headcount reduction plan, which was a single, enterprise-wide plan that was designed and implemented in phases across all of Spirit's locations." (Doc. 341 at 69.) For the reasons discussed below, the court finds that Spirit's disclosures relating to the "decisional unit" were consistent with the OWBPA and do not render Plaintiffs' waivers invalid.

An EEOC regulation implementing the OWBPA explains there are two types of relevant "programs." One is an exit incentive program, which is a voluntary program offered to a group or class of employees where they are offered additional consideration in exchange for a decision to resign voluntarily and sign a waiver. The second type encompasses "other employment termination programs," and refers to a group or class of employees who were involuntarily terminated and offered additional consideration in exchange for their decision to sign a waiver. 29 C.F.R. § 1625.22(f)(1)(iii)(A). The regulation goes on to state that "[t]he class, unit, or group of

individuals considered for termination is determined by examining the 'decisional unit.'" 29 C.F.R. § 1625.22(f)(1)(iii)(C). A decisional unit is "that portion of the employer's organizational structure from which the employer chose the persons who would be offered consideration for the signing of a waiver and those who would not be offered consideration for the signing of a waiver." *Id.* § 1625.22(f)(3)(i)(B). The term is designed to "reflect the process by which an employer chose certain employees for a program and ruled out others from that program." *Id.* When identifying the population of the decisional unit, the employer acts on a case-by-case basis, and the appropriate class, unit, or group, and job classification or organizational unit under § 626(f)(1)(H) must therefore be made on a case-by-case basis. *Id.* § 1625.22(f)(3)(ii)(A).

The explanation that the decisional unit is determined on a "case-by-case" basis provides little help to employers, employees, or courts trying to apply these terms. *See Ribble v. Kimberly-Clark Corp.*, No. 09-C-643, 2012 WL 589252, at *5 (E.D. Wis. Feb. 22, 2012) (the disclosure required under § 626(f)(1)(H) is so imprecise it cannot possibly require strict application.) Examples in the regulation offer some (albeit limited) guidance. The regulation says in some cases a subgroup of a facility's workforce is the decisional unit, while in others it may comprise several facilities. If an employer's goal is the reduction of its workforce at a particular facility, and it undertakes a process by which it decides which employees of that facility will be selected for a program and which ones will not, then that facility will be the decisional unit. *Id.* § 1622.25(f)(3)(ii)(C). But if an employer analyzes its operations at several facilities, "specifically considers and compares ages, seniority rosters, or similar factors at differing facilities," and then determines to focus its workforce reduction at one particular facility, then by the nature of the decision-making process the decisional unit will include all considered facilities, not just the one ultimately selected for reductions. *Id.* § 1622.25(f)(3)(ii)(D).

The regulation additionally provides that the decisional unit is typically no broader than a single facility, such that the duty to disclose ordinarily need be no broader than that facility. *Id.* § 1622.25(f)(3)(ii)(B). Exceptions may include where a number of facilities have interrelated functions or the company uses personnel for a common function at more than one facility. Also, higher-level review of termination decisions does not change the size of a decisional unit. Thus, review by a human resources department to monitor compliance with discrimination laws does not affect the decisional unit. Similarly, review by a regional manager in charge of more than one facility does not alter the decisional unit, unless the manager determines that persons in other facilities should also be considered for termination. *Id.* § 1622.25(f)(3)(vi)(A)-(B).

The uncontroverted facts show Spirit's decision-making process concerning the July 2013 Wichita layoffs was "neither fish nor fowl." It lay somewhere between the two poles described in the regulation. It included some aspects of a company-wide determination, but the greater part of the decision-making process reflected a single-facility consideration and decision. The objective of reducing overall employment levels at Spirit clearly came from Spirit's corporate leadership. It is also obvious that Spirit leadership coordinated HR reductions at various facilities – for example, layoffs were planned for and were carried out simultaneously on July 25, 2013, at multiple facilities. But the evidence cited on summary judgment shows that implementation of the company's objectives was largely left in the hands of individual facility leaders. Site leaders were not given mandatory reduction quotas or specific directives as to how reductions were to be implemented. They were generally directed to reduce overhead by focusing on performance and targeting the lowest ten percent of performers. The decision-makers at each Spirit facility, including Wichita, proceeded to evaluate their site's needs and to exercise business judgment as to how many and which employees should be terminated or laid off in light of the work needs of

the facility. Wichita managers and Wichita HR personnel determined who among Wichita facility employees would be considered (or excluded) from layoffs and which Wichita employees would be selected for layoffs. Those decisions were subject to approval by Spirit HR but were not made by corporate leadership. When Wichita managers made these decisions, there was no consideration or comparison of employees in Wichita with employees at other sites. *Cf.* 29 C.F.R. § 1625.22(f)(3)(ii)(E) (decisional unit includes all facilities where employer "specifically considers and compares ages, seniority rosters, or similar factors at differing facilities.") Although Spirit was obviously attempting to reduce its overall company headcount, performance terminations, layoffs, or non-terminations by managers at one site did not affect or result in terminations or non-terminations at other sites.

Considerations unique to Wichita appear to have played a significant role in the HR actions affecting Wichita. For example, just-cause provisions in the CBAs covering many Wichita employees resulted in a decision in March 2013 to engage in performance-based terminations in Wichita, whereas Tulsa managers opted for layoffs that did not require just cause. In both instances, individual site managers examined employees at their own facilities and determined the nature and scope of the HR action and who would be selected for it. Similarly, the July 2013 layoffs in Wichita were preceded by retention exercises unique to represented employees in Wichita, who were rated for retention based solely on their standing with other Wichita employees within the same retention groups.

The ambiguity of the OWBPA disclosure requirements has been noted by a number of courts. *See Ribble*, 2012 WL 589252, *5 (citing cases). In light of that ambiguity, it makes sense to apply its provisions to further the statutory goal of preventing unknowing or involuntary waivers of ADEA rights and claims. In this case, the focus of any ADEA claims Plaintiffs might have

would be the decision-making process of Wichita site managers implementing the July 2013 Wichita layoffs. *Cf. Adams v. Moore Business Forms, Inc.,* 224 F .3d 324, 329 (4th Cir. 2000) (the question is whether the employees were "provided with the age and job-title information that would be relevant if the employees were to bring an age discrimination claim arising out of their termination.") The process by which Spirit decided which of the Plaintiffs and their co-workers would be considered, selected, or excluded from a layoff (and consequently offered severance pay in exchange for a waiver), were matters entrusted to Wichita site management, subject to corporate approval. Wichita employees laid off in July 2013 were not considered against, compared to, or impacted by Spirit employees at other facilities or at other times. Although Spirit had programs that spanned multiple facilities, Wichita employees performed work that was not duplicated at other sites, but was unique to the Wichita facility. Under these circumstances, disclosing termination data pertaining to a multitude of employees at other facilities, who were considered and terminated by different managers, and whose work and positions were not compared to the Plaintiffs, would do little except dilute the data relevant to the decision to select the Plaintiffs for layoff. *Cf.* 29 C.F.R. § 1625.22(f)(1)(iv) ("The purpose of the informational requirements is to provide an employee with enough information regarding the program to allow the employee to make an informed choice whether or not to sign a waiver agreement.") The court concludes that Spirit's limitation of the decisional unit to the Wichita facility layoffs – and the corresponding description of the "class, unit, or group of individuals covered by such program"- was consistent with the OWBPA and its guidelines.

Plaintiffs also argue the disclosure was improper because it "omitted any reference to Spirit's decision to exclude newly hired employees from the layoff." (Doc. 341 at 49, 69.) Plaintiffs contend Spirit misrepresented the decisional unit because it failed to disclose that it

exempted employees hired after May 20, 2013, from the layoffs. But Spirit cites uncontroverted evidence that it considered whether employees hired after May 20, 2013, would be subject to the layoffs, before ultimately concluding they should be exempt from being selected. Because they were considered, the regulation indicates they must be included in the decisional unit, even though they were ultimately exempted, and Spirit was thus obligated to disclose the titles and ages of these workers as "individuals in the same job classification or organizational unit who are not eligible or selected for the program." 29 U.S.C. § 626(f)(1)(H). *Cf.* 29 C.F.R. § 1625.22(f)(3)(ii)(E) (where employer specifically considers different facilities before focusing on one facility, "then by the nature of that employer's decision-making process the decisional unit would include all considered facilities and not just the facility selected for the reductions.") Plaintiffs argue that Spirit's failure to disclose the exemption for newer hires was inconsistent with its other disclosures, such as those accompanying the March 2013 terminations, which stated that employees hired after December 2012 were not considered for that layoff.

As an initial matter, the question here is not whether Spirit acted consistently with its prior practice, but whether the disclosure accompanying the July 2013 layoffs complied with the OWBPA. The court finds that it did. Moreover, Spirit cites evidence that it *considered* the group of new employees for the July 2013 termination program before deciding to exempt them. The regulation shows this is sufficient to require their inclusion in the decisional unit. Plaintiffs contend this omission "was particularly deceptive" because the new hires were generally younger than longstanding employees, and knowing that Spirit exempted them from the layoff "would have alerted the Plaintiffs of their potential age discrimination claims more clearly than perhaps any other data." (Doc. 341 at 79.) But as Spirit points out, the non-selection of these workers was reflected in the OWBPA disclosure data, which listed the ages of employees in Plaintiffs' units

who were not selected for layoff.  Spirit thus did not "conceal" the fact that those workers who were younger than Plaintiffs were not selected for layoff.  The court finds Spirit did not misrepresent the decisional unit.

Plaintiffs maintain that Spirit's HR activities throughout 2013 were part of a single program carried out in phases, such that Spirit's OWBPA disclosures should have included all of the Spirit employees terminated, laid off, or who resigned in the wake of Spirit's "2013 headcount reduction program," both in Wichita and at other facilities. (Doc. 341 at 75-76.)  But Plaintiffs' focus on Spirit's corporate plan to reduce headcount, its tracking of overall employment numbers, and its implementation of various HR "phases," fails to account for the specific decision-making process behind the Wichita layoffs in July 2013.  As discussed previously, there was no cross-site, multiple-facility consideration of employees when Wichita managers determined who would be considered for and subjected to layoffs in Wichita in July 2013.  Nor are Wichita performance-based terminations in March 2013 properly considered part of the same OWBPA termination program as the July 2013 layoffs.  As Spirit points out, the decisional units for these two HR actions were not the same, as different categories of employees were considered and/or exempted from termination in each instance.  A single disclosure based upon different decisional units is not only a practical impossibility, it would sew confusion rather than enlighten employees trying to compare themselves to other workers who were kept or let go as part of the same termination program.

An examination of the specific decision-making process surrounding the July 2013 layoffs in Wichita supports a finding that these layoffs and accompanying release agreements constituted a distinct termination program requiring disclosures specific to that action.  Spirit's 65-page disclosure of the ages of persons in the same units as Plaintiffs who were selected and not selected

for this layoff provided Plaintiffs with relevant and sufficient information to allow them to consider and make a knowing waiver of potential ADEA claims. Adding information about workers terminated under different standards or at different times, or by different managers at other facilities, would have obscured rather than clarified evidence of age discrimination related to the decision to include Plaintiffs in the July 2013 Wichita layoff.

2. *Eligibility factors*.  Plaintiffs also contend their waivers are invalid because Spirit did not disclose "the eligibility factors used to select employees for termination." (Doc. 341 at 79.) But after examining the OWBPA and its supporting regulation, the court concludes that disclosure of the factors Spirit used to select employees for termination is not among the items that must be disclosed for a valid waiver.

The OWBPA provides in part that if a waiver is requested in connection with "an exit incentive or other employment termination program offered to a group … of employees," the employer must inform the individual as to, among other things, "any eligibility factors for such program…." 29 U.S.C. § 626(f)(1)(H)(i).  The employer must also disclose the job titles and ages of all individuals "eligible or selected for the program," as well as the ages of individuals in the same unit "who are not eligible or selected for the program." (*Id.* § 626(f)(1)(H)(ii)).

Plaintiffs argue that "eligibility factors for such program" refers to the employer's reasons for terminating the employees who were selected in the layoff.  However, this construction of the term is directly refuted by the Department of Labor's own example in the relevant regulations:

> Example: Y Corporation lost a major construction contract and determined that it must terminate 10% of the employees in the Construction Division. Y decided to offer all terminees $20,000 in severance pay in exchange for a waiver of all rights. The waiver provides the section 7(f)(1)(H) of the ADEA information as follows:
>
> (A) The decisional unit is the Construction Division.

(B) All persons in the Construction Division are eligible for the program. All persons who are being terminated in our November RIF are selected for the program.

(C) All persons who are being offered consideration under a waiver agreement must sign the agreement and return it to the Personnel Office within 45 days after receiving the waiver. Once the signed waiver is returned to the Personnel Office, the employee has 7 days to revoke the waiver agreement.

(D) The following is a listing of the ages and job titles of persons in the Construction Division who were and were not selected for termination and the offer of consideration for signing a waiver: [listing job titles, ages, and the number of employees selected/not selected].

29 C.F.R. § 1625.22(f)(4)(vii). In this example, the eligibility factors appear to be addressed in subparagraph (B). Like the statute upon which it is based, the example is highly ambiguous and susceptible to multiple interpretations insofar as evaluating its compliance with the requirements of 29 U.S.C. § 626(f)(1)(H)(i); however, the court finds that two interpretations are the most plausible. First, the eligibility factors in this example may be simply that an individual is assigned to the Construction Division. That appears to be the import of the statement in (B) that "[a]ll persons in the Construction Division are eligible for the program." However, this would make the eligibility factors synonymous with the decisional unit, and in that sense, redundant. Alternatively, the eligibility factors may be set forth in the second sentence of subparagraph (B), where we are told that everyone terminated in the November RIF is selected for the program. In any event, the one thing that is abundantly clear from this example is that it contains no explanation of the factors considered by the employer in deciding which employees should be selected for termination. In that sense, it clearly refutes Plaintiffs' construction of the term "eligibility factors." Moreover, the court notes that the actual disclosures provided by Defendant in the Release Agreement are remarkably similar to those set forth in the foregoing example from the Department of Labor's regulations. (Doc. 349-2 at 6.)

Plaintiffs nevertheless argue the Tenth Circuit has held that the term "eligibility factors" refers to the employer's determination to retain or terminate employees. (Doc. 341 at 82) (citing *Kruchowski v. Weyerhaeuser Co.*, 423 F.2d 1139, 1143 (10th Cir. 2005)). Plaintiffs acknowledge the Tenth Circuit "later revisited" this opinion and "omitted from its holding" any discussion of eligibility factors, but they argue the court "did not overrule that requirement." (Doc. 341 at 82, n.36.) That argument is specious. The Tenth Circuit's initial opinion in *Kruchowski* was withdrawn and superseded by an opinion omitting all discussion of "eligibility factors." *See Kruchowski v. Weyerhaeuser Co.*, 446 F.3d 1090 (10th Cir. 2006). In short, there is no Tenth Circuit authority supporting Plaintiffs' construction. Plaintiffs also cite *Pagliolo v. Guidant Corp.*, 483 F. Supp. 847 (D. Minn. 2007), but the judge authoring that opinion later noted that the superseding opinion in *Kruchowski* "called into doubt the Court's view" and showed "substantial ground for difference of opinion" so as to warrant an interlocutory appeal. *Pagliolo v. Guidant Corp.*, No. 06-943-DWF, 2007 WL 1567617, *3 (D. Minn. May 29, 2007). A more recent and, in the court's view, more persuasive approach was taken in *Behr v. AADG, Inc.*, No. 2016 WL 4119692, *13-14 (N.D. Iowa July 29, 2016), which relied on the language of the statute, on the example provided in the regulation (29 C.F.R. § 1625.22(f)(4)(vii)(B)), and on other case law to conclude that the OWBPA requires disclosure of the criteria for eligibility for benefits, not the criteria used in deciding which employees would be terminated. (*Id.*) (citing *Recchia v. Kellogg Co.*, 951 F. Supp.2d 676, 693 (D. N. J. 2013)).

In sum, the uncontroverted facts show that Spirit's OWBPA disclosures in connection with the July 2013 Wichita layoffs complied with 29 U.S.C. § 626(f)(1)(H).

3. *Failure to provide some Plaintiffs with OWBPA disclosure lists.* Plaintiffs have cited evidence that eight individuals (Caire, Denny, Ensor, Heston, Longan, Richardson, Sha, and Schmidt) did not receive the 65-page OWBPA disclosure list from Spirit. (Doc. 341 at 50-51.) Affidavits (or testimony) from these individuals state they were not given the disclosure list during their layoff meeting or any other time in 2013, but were only given a packet containing a dozen or so pages. (*See e.g.* Doc. 341-12 at 3.) Plaintiffs argue these individuals are entitled to partial summary judgment declaring their waivers invalid. In response, Spirit cites evidence that it systematically provided disclosures lists to every employee selected for the layoff, that Spirit personnel say they provided the lists to these specific Plaintiffs, and that Plaintiffs signed release agreements acknowledging receipt of the disclosure lists. Spirit also argues that these Plaintiffs are attempting to create an issue of fact based on "sham" affidavits. (Doc. 358 at 42.) Spirit contends it is entitled to summary judgment on the ADEA claims because the ADEA waivers of all of the Plaintiffs are valid. (Doc. 368 at 43.)

The court concludes there are genuine disputes of material fact as to whether these eight Plaintiffs were provided the Disclosure List. The court first notes that, perhaps unlike an ordinary contract case, no legal bar arises merely because Plaintiffs signed an agreement stating that they acknowledged receiving the list. A waiver under the OWBPA is not knowing and voluntary unless the employer *in fact* provided the employee a written disclosure in accordance with the Act, no matter what the acknowledgement stated. *See* 29 U.S.C. § 626(f)(1)(H). Plaintiffs cite sworn evidence that they did not receive the lists. To be sure, a reasonable jury might well find that Spirit's evidence – including the written acknowledgments and testimony that Spirit provided the lists to all Plaintiffs – outweighs Plaintiffs' contrary testimony, but it would not have to do so. A reasonable jury could find in Plaintiffs' favor if it believed their testimony and concluded that,

apparently due to some clerical error or oversight, these Plaintiffs were not given the full list required by the OWBPA.

The court has considered but rejects Spirit's claims that Plaintiffs' evidence should be disregarded under the sham affidavit doctrine. The Tenth Circuit adopted this doctrine in *Franks v. Nimmo*, 719 F.2d 1230, 1237 (10th Cir. 1986). It is based on the premise that courts may disregard an affidavit that conflicts with an affiant's prior sworn statements if circumstances show the affiant is merely seeking to create a sham dispute by contradicting his own testimony. *Franks*, 796 F.2d at 1237. Some courts have applied the rule to interrogatory responses that contradict sworn deposition testimony. *See Wilson v. Frito-Lay North Am., Inc.*, 260 F.Supp.3d 1202, 1212 (N.D. Cal. 2017) (citing cases.) "Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* (citations omitted.) Courts generally apply the sham affidavit doctrine only in "clear and extreme" circumstances, such as where an affidavit is "flatly contrary" to the affiant's prior testimony. It is generally not applied when testimony is merely ambiguous. *Heinrich v. Davis*, No. 16-CV-482, 2017 WL 9398663, *9 (M.D. Pa. Nov. 9, 2017) (citations omitted). *See also Waggel v. George Washington Univ.*, 2018 WL 5893346, *7 (D.D.C. Nov. 9, 2018) (for doctrine to apply, affidavit must clearly contradict prior sworn testimony, rather than clarify confusing or ambiguous testimony, and the contradiction must lack credible explanation, such as new evidence) (citations omitted.)

Spirit cites an alleged contradiction between interrogatory responses stating that these Plaintiffs "do not recall" receiving the OWBPA disclosure, and subsequent affidavits by Plaintiffs

that they did not receive the Disclosure List. A consideration of the relevant factors shows this is not a sufficient basis to invoke the sham rule. The affidavits indicate possible confusion on Plaintiffs' part at the time of the interrogatory response. The affidavits state that having "recently reviewed the 65-page document" disclosed in the litigation, Plaintiffs "did not see and [were] not provided with" a similar document at the time of the layoff, and that the paperwork they were given during the layoff was no more than a dozen pages. *Cf. Genberg v. Porter*, 882 F.3d 1249, 1263 (10th Cir. 2018) (affidavit must explain why fact was not mentioned earlier if one would have expected it to be mentioned). Finally, the initial statement that the witnesses "do not recall" receiving the disclosure is ambiguous. It is not "flatly contrary" to a belief or conclusion by Plaintiffs that they did not receive a 65-page Disclosure List at the time of the layoff. This cryptic interrogatory response did not delve into the specific states of mind of these witnesses or state what the witnesses in fact recalled about what they received. Spirit fails to show that the court should disregard the subsequent affidavits as an attempt to create a sham dispute of fact. *Cf. Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) ("[T]he inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit."). Accordingly, both parties' motions for summary judgment are denied with respect to the validity of ADEA waivers of Plaintiffs Caire, Denny, Ensor, Heston, Longan, Richardson, Sha, and Schmidt.

4. *Consideration for Heston's ADEA waiver.* According to Plaintiff Fred Heston, he did not receive an initial severance check from Spirit after he signed an ADEA waiver. When Spirit sent him instructions for obtaining a replacement check, he declined to seek one and did not accept Spirit's offer of payment, because at that point he was interested in pursuing an ADEA claim. Heston argues Spirit cannot show that he waived his rights in exchange for consideration as

required by the OWBPA. (Doc. 341 at 85) (citing 29 U.S.C. § 626(f)(3)). Plaintiffs argue Heston "made no such 'exchange' because he did not actually receive consideration." (Doc. 356 at 131.)

Spirit argues it satisfied the consideration requirement by promising to pay Heston and to provide career transition services, and by tendering a replacement check when it learned Heston claimed not to have received an initial check. (Doc. 368 at 43.) The court agrees. Section 626(f)(1)(D) provides that a waiver is not knowing and voluntary unless the individual waives rights "only in exchange for consideration in addition to anything of value to which the individual already is entitled." The uncontroverted facts show that Heston agreed to waive ADEA claims in exchange for Spirit's promise to provide him a severance payment and career services. Agreeing to accept these promises in exchange for execution of the waiver was "an exchange for consideration." Long-established contract principles make clear that Spirit's promise to pay constituted consideration for the waiver, and because Heston was not already entitled to such consideration prior to executing the agreement, the exchange satisfied the requirements of § 626(f)(1)(D).

Plaintiffs point out that the text of the OWBPA controls ADEA waiver questions, regardless of how general contract principles might apply to such claims. (Doc. 356 at 131) (citing *Oubre*, 522 U.S. at 427.) But in this instance the text of the OWBPA incorporates terms with well-established common law meanings under contract law – including "exchange" and "consideration" - and it is reasonable to infer Congress meant to incorporate the established meaning of those terms. *See Microsoft Corp. v. 141 Ltd. Partnership*, 564 U.S. 91, 11 (2011) ("[W]here Congress uses a common-law term in a statute, we assume the 'term … comes with a common law meaning, absent anything pointing another way.'") (citations omitted).

Under common law contract principles, a contract "is a promise or a set of promises for the breach of which the law gives a remedy…." Restatement (Second) of Contracts § 1 (Am. Law Inst. 1981). A bargain "is an agreement to exchange promises or to exchange a promise for a performance or to exchange performances." *Id.* § 3. "[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Id.* § 17. "To constitute consideration, a performance or a return promise must be bargained for" – meaning it "is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." *Id.* § 71. With certain exceptions not applicable here, "a promise which is bargained for is consideration if … the promised performance would be consideration." *Id.* § 75.

When the terms "exchange" and "consideration" are given their established meanings in § 626(f)(3) and applied to the uncontroverted facts, it is clear that Heston's waiver was provided in exchange for consideration – Spirit's promise to pay him and to provide career services – to which he was not already entitled. Spirit has thus satisfied § 626(f)(3). The court notes that Plaintiffs do not claim that Spirit's actions (i.e. its alleged failure to initially send Heston a severance check) constituted a breach of the release agreement that relieved Heston from any duty to perform. Accordingly, Plaintiff Heston is not entitled to summary judgment on his claim that his waiver was invalid.

5. *Plaintiffs who did not sign a waiver.* Plaintiffs Donetta Raymond, Debra Hatcher, Gregory Bucchin, and Brian Scott did not sign a severance agreement and release of claims with

Spirit. (Doc. 341 at 62.)  Any Plaintiff who did not sign a release agreement is obviously not barred by a waiver of ADEA claims in that agreement.[9]

6. *Count 3 of the complaint – OWBPA*.  Spirit argues that Count 3 fails as a matter of law because it asserts a claim for relief under the OWBPA, but the OWBPA does not provide a private right of action. (Doc. 343 at 65) (citing *Whitehead v. Okla. Gas & Elec. Co.*, 187 F.3d 1184 (10th Cir. 1991)).

The Tenth Circuit has stated in an unpublished opinion that the OWBPA "provides a plaintiff a cause of action for declaratory or injunctive relief to negate the validity of a waiver as it applies to an ADEA claim." *Palmer v. Salazar*, 324 F. App'x 729, 733 (10th Cir. 2009) (citing *Whitehead*, 187 F.3d at 1191.)  Count 3 of Plaintiffs' complaint asserts that the waivers at issue violated the OWBPA and are unenforceable with respect to ADEA claims, and it seeks a declaration to that effect. (Doc. 1 at 78, 88.) Spirit's motion to dismiss Count 3 is accordingly denied.

**IT IS THEREFORE ORDERED** this 14th day of December, 2018, that Plaintiffs' Motion for Partial Summary Judgment (Doc. 388) is **DENIED**;

**IT IS FURTHER ORDERED** that Spirit's Motion for Partial Summary Judgment (Doc. 342) is **GRANTED IN PART AND DENIED IN PART** as stated in this order. As to those Plaintiffs who signed ADEA waivers and who concede they received the 65-page OWBPA Disclosure List from Spirit at the time of layoff, the court finds the waivers of these Plaintiffs were knowing and voluntary within the meaning of the OWBPA, and that the waivers entitle Spirit to summary judgment as to any ADEA claims by these Plaintiffs within the scope of their waivers.

---

[9] Spirit concedes these four Plaintiffs did not sign a release, (Doc. 358-1 at 199), although Plaintiff Scott is not included in Spirit's own list of non-signers. (Doc. 343-2 at 14.) Moreover, Spirit asserts that two other Plaintiffs - Raymond and Doyon - did not sign releases. (Doc. 343 at 29.)

As to the eight Plaintiffs specified in this order who cited evidence that they did not receive the OWBPA Disclosure List at the time of layoff, the court finds that a genuine issue of fact exists concerning the validity of their ADEA waivers, and that Spirit is not entitled to summary judgment as to their ADEA claims.

**IT IS SO ORDERED**.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE